**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | |
|---|---|
| **DENISE L. SMITH,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION NO.  03-CV-05-1018-MHT** |
| | ) |
| **SEARS, ROEBUCK & CO.,** | ) |
| | ) |
| **Defendant.** | ) |

## SEARS, ROEBUCK & CO.'S BRIEF IN
## SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Sears, Roebuck & Co., ("Sears" or "defendant") submits the following as its Brief in Support of its Motion for Summary Judgment:

### I.    STATEMENT OF THE CASE

Denise Smith, an African-American female, was employed at Sears as a sales associate in its appliance department in Auburn, Alabama.  In early November 2004, Sears' management discovered that another sales associate in the appliance department was misusing Sears' service coupon by giving customers unauthorized discounts.  This is strictly prohibited by Sears' policy.  Sears subsequently investigated the entire appliance department to determine if anyone else was misusing the service coupon.  Based on its investigation, Sears discovered that Smith was violating the service coupon policy.  Sears terminated Smith's employment on November 14, 2004.

On April 28, 2005, Smith filed an EEOC charge alleging solely that Sears discriminated against her based on her race when it terminated her employment.  The EEOC found no cause to believe that discrimination had occurred and dismissed the

charge. On October 24, 2005, Smith filed this lawsuit. She alleges a <u>single</u> <u>claim</u> of race discrimination under Title VII of the Civil Rights Act of 1964 based <u>exclusively</u> on her termination and seeks backpay, reinstatement, and "other relief as deemed appropriate." (Compl. ¶¶ 6, 12). Sears filed its Answer to Smith's Complaint on December 5, 2005, denying that it discriminated against Smith and setting forth several affirmative defenses. For the reasons set forth below, the plaintiff's claim is due to be dismissed.

## II.    UNDISPUTED STATEMENT OF FACTS

### A.    Sears and Its Unauthorized Discount Policy

Sears operates a retail establishment located in Auburn, Alabama where it sells fashion merchandise, hardware, paint, automotive supplies, home appliances, home fashions, home electronics and office equipment. (Gandy Decl. ¶ 3; Mason Decl. ¶ 3). Sears employs sales associates to work in these various departments. (Gandy Decl. ¶ 4; Mason Decl. ¶ 4).

Sears' policies strictly prohibit employees from giving customers unauthorized discounts. (Pltf. depo. p. 87, Ex. 1; Gandy Decl.¶ 5; Mason Decl. ¶ 6; Reese Decl. ¶ 4; Darby Decl. ¶ 5; Till Decl. ¶ 8; Dodson Decl. ¶ 5; Landers Decl. ¶ 4). This includes applying a coupon to a transaction when the customer is not eligible to receive the discount stated on the coupon. (Pltf. depo. pp. 86:13-88:12; Reese Decl. ¶ 4; Gandy Decl. ¶ 5; Mason Decl. ¶ 6; Darby Decl. ¶ 5; Till Decl. ¶ 8; Dodson Decl. ¶ 5; Landers Decl. ¶ 4). Sears' Associate Handbook specifically states that giving an unauthorized discount to a customer is unacceptable and constitutes unethical behavior and that associates who violate this policy may be terminated. (Pltf. depo. pp. 87:9-88:4, Ex. 1; Gandy Decl. ¶ 5; Mason Decl. ¶ 6; Reese Decl. ¶ 4; Darby Decl. ¶ 5; Till Decl. ¶8;

Landers Decl. ¶ 4; Dodson Decl. ¶ 5). All sales associates receive and are trained on the policies in this handbook. (Pltf. depo. pp. 18:11-19:9 Ex. 1; Gandy Decl. ¶ 5; Mason Decl. ¶ 6; Reese Decl. ¶¶ 4, 5; Lawrie Decl. ¶ 5; Darby Decl. ¶ 5; Till Decl. ¶ 11; Dodson Decl. ¶5; Landers Decl. ¶ 5).

### B.    Smith's Employment With Sears

Smith began working for Sears in April of 1998 as a sales associate at Sears' Auburn store. (Pltf. depo. p. 64:1-7; Mason Decl. ¶ 7, Ex. B). She was initially hired to work part-time selling primarily vacuums and microwaves. (Pltf. depo. pp. 67:19-70:2; Mason Decl. ¶ 7; Reese Decl. ¶ 30). In April 2004, Kenny Reese (white male), who was the Store General Manager ("SGM") at the time, promoted Smith to a full-time position in the appliance department. (Pltf. depo. pp. 70:8-22, 81:7-82:7; Reese Decl. ¶ 30; Lawrie Decl. ¶ 3; Mason Decl. ¶ 8, Ex. B). Her duties included selling appliances (such as washers, dryers, refrigerators, ovens, and other in-home appliances), assisting customers, ringing up sales, monitoring Sears' promotions and discounts of merchandise, keeping the sales area clean, unpacking appliances and the accessories that went with these appliances for display on the sales floor, and other miscellaneous duties as assigned. (Pltf. depo. pp. 78:12-79:2, 82:8-13; Mason Decl. ¶ 9; Reese Decl. ¶ 40; Lawrie Decl. ¶ 30; Darby Decl. ¶ 10; Till Decl. ¶ 6; Dodson Decl. ¶ 4 Landers Decl. ¶ 3).

Smith received Sears' Associate Handbook during her employment with Sears. (Pltf. depo. pp. 18:10-19:9, Ex. 1). She knew that Sears' handbook stated that giving customers an unauthorized discount violated Sears' policy and was cause for termination. (Pltf. depo. pp. 87:9-88:4, Ex. 1). Additionally, several times during Smith's employment, management held mandatory meetings with sales associates to discuss

company policies, including its policy against providing unauthorized discounts to customers. (Pltf. depo. p. 143:16-19; Mason Decl. ¶ 10; Lawrie Decl. ¶ 6; Reese Decl. ¶ 5; Dodson Decl. ¶ 7; Darby Decl. ¶ 6; Till Decl. ¶ 11; Landers Decl. ¶ 5).

At all times during her employment, the plaintiff worked on straight commissions. (Pltf. depo. p. 69:13-15).   Plaintiff worked as a sales associate in the appliance department in Auburn from April 2004 until her termination on November 14, 2004. (Pltf. depo. pp. 70:13-21, 267:12-268:15; Gandy Decl. ¶ 7; Reese Decl. ¶ 18; Mason Decl. ¶¶ 8, 12, Ex. B).   At the time of her termination, Kenny Reese was the store's SGM, Terry Gandy (white male) was the Loss Prevention Manager, John Lawrie (white male) was the Hardlines Manager (which includes the appliance, electronics, lawn and garden, fitness, vacuums, and hardware departments) and Byron Mason (African-American male) was the Softlines Manager (which includes apparel, home fashions, luggage and the shoe departments). (Pltf. depo. pp. 172:9-173:22, 234:3-5; Reese Decl. ¶ 3; Gandy Decl. ¶ 6; Mason Decl. ¶ 13; Lawrie Decl. ¶ 3).   In November 2004, the appliance sales associates included Denise Smith, Beatrice Willis (African-American), Jackie Dodson (African-American),  Carolyn Landers (white), and Merle Miller (white). (Pltf. depo. p. 79:3-80:15, Gandy Decl. ¶ 13; Reese Decl. ¶ 12; Dodson Decl. ¶2, 16; Landers Decl. ¶ 17).

**C.    Sears' Service Coupon**

Sears has a service department that employs service technicians to service the merchandise it sells. (Gandy Decl. ¶ 4; Mason Decl. ¶ 4).   These service technicians travel to customers' homes to repair and perform preventive maintenance checks on these products. (Gandy Decl. ¶ 4; Mason Decl. ¶ 4).   Sears' service technicians distribute a

$65.00 coupon to Sears' customers who decline a service repair on their appliance because they would rather replace the item  than pay for the repair.  (Pltf. depo. pp. 115:2-116:21; Gandy Decl. ¶ 10; Reese Decl. ¶ 7; Lawrie Decl. ¶ 8).  Sears offers the $65.00 discount to these customers as an incentive for them to purchase their replacement item at Sears rather than one of Sears' competitors.  (Pltf. depo. pp. 115:2-116:21, Ex. 5; Gandy Decl. ¶ 10; Reese Decl. ¶ 7; Lawrie Decl. ¶ 8).  *Only customers who receive a service call and decline a repair* are eligible to receive this coupon.  (Pltf. depo. pp. 115:2-116:21, Ex. 5; Gandy Decl. ¶ 10; Reese Decl. ¶ 7; Lawrie Decl. ¶ 8; Darby Decl. ¶ 8; Landers Decl. ¶ 7; Dodson Decl. ¶¶ 8,10).  No other customers are permitted to receive the discount.  (Pltf. depo. pp. 119:12-120:1, Ex. 5; Gandy Decl. ¶ 10; Reese Decl. ¶ 7; Lawrie Decl. ¶ 8; Darby Decl. ¶ 8; Landers Decl. ¶ 7; Dodson Decl. ¶ 8).  The coupon itself clearly instructs the sales associates to award the discount to customers who have received a service call and have declined a repair; it also specifically instructs the sales associates to *collect and destroy* the coupon once it is used; it provides:  "Sales Associate:  Please verify declined service receipt is dated within 2 weeks from today. . . . Please collect the coupon and destroy."  (Pltf. depo. pp. 115:2-118:3, Ex. 5; Gandy Decl. ¶ 11, Ex. B; Reese Decl. ¶ 8; Lawrie Decl. ¶ 9; Darby Decl. ¶ 8; Landers Decl. ¶ 7).

### D.    Plaintiff's Misuse of Sears' Service Coupon

In October 2004, Smith gave several customers a discount using Sears' $65.00 service coupon even though these customers were *not eligible* to receive this discount. (Pltf. depo. pp. 119:6-120:14, Ex. 6; Gandy Decl. ¶¶ 15, 16; Reese Decl. ¶¶ 14,15). Specifically, Smith took a service coupon from the register that had already been used for one customer and gave it to several customers whom she knew had not received a service

call and declined a service repair. (Pltf. depo. pp. 118-134:10; Gandy Decl. ¶ 16). Smith awarded the discounts to these individuals despite the fact that Sears has a clear policy (which she had received) prohibiting her actions <u>and</u> even though the terms of the discount were clearly stated on the coupon. (Pltf. depo. pp. 118:4-134:10, Ex. 6; Gandy Decl. ¶ 16). Smith knew that Sears' coupons included terms defining who was eligible to receive the discount and to what items the coupon could be applied. (Pltf. depo. pp. 93:2-94:13, 115:17-118:3, Ex. 5). None of Sears' managers ever instructed her to use the service coupon or any other coupon to close a sale if the customer was not eligible for the discount. (Pltf. depo. pp. 97-98:4, 102:1-10, 110:2-6, 111:9-112:3; Reese Decl. ¶ 9; Lawrie Decl. ¶ 10; Gandy Decl. ¶ 29; Mason Decl. ¶ 21).

**E.    Sears' Investigation and Plaintiff's Termination for Misusing the Service Coupon**

On or about October 31, 2004, Joel Smith, an independent contractor who handled Sears' deliveries for the appliance department, informed Terry Gandy (Sears' Loss Prevention Manager) and John Lawrie (Sears' Hardlines Manager) that he thought Beatrice Willis (African-American), another sales associate in the appliance department, was providing unauthorized free delivery to Sears' customers. (Gandy Decl. ¶ 12; Lawrie Decl. ¶ 11). Gandy immediately began investigating this allegation. (Gandy Decl. ¶ 12). During his investigation, Gandy noticed that Willis had given numerous customers an unusually high number of $65.00 discounts. (Gandy Decl. ¶ 12). Gandy eventually linked these discounts to Sears' $65.00 service coupon and subsequently confirmed that Willis was improperly using service coupons to give ineligible customers

unauthorized discounts.[1]   (Gandy Decl. ¶ 12; Pltf. depo. p. 289:17-23).   Thus, Sears terminated Willis' employment in early November 2004 for misusing Sears' service coupon.  (Gandy Decl. ¶ 12).

Gandy subsequently investigated the entire appliance department to determine whether any other sales associates misused service coupons.  (Gandy Decl. ¶¶ 13-21; Pltf. depo. p. 289:17-23).  Gandy reviewed a summary of each sales associate's transactions and the journal tapes associated with these transactions in the appliance department. (Gandy Decl. ¶ 14; Pltf. depo. p. 289:17-23).  The journal tapes provide details for each transaction, including the customer's name, the sales person's associate number, and the bar code number pertaining to any coupons that the associate used.  (Gandy Decl. ¶ 14; Pltf. depo. pp. 121:2-122:10, Ex. 6, 185:4-19).  Examining the bar code numbers on the journal tapes is the <u>only</u> way Sears can determine the exact coupon the sales associates used to give the discounts.  (Gandy Decl. ¶ 14; Pltf. depo. p. 284:19-23).  Because there are memory limitations on Sears' register system, Gandy was only able to pull the journal tapes for the past 30 days.  (Pltf. depo. p. 185:4-19; Gandy Decl. ¶ 14).  Thus, he was only able to investigate each sales associate's transaction for the month of October 2004. (Pltf. depo. p. 183:3-9; Gandy Decl. ¶ 14).

In reviewing Smith's transactions, Gandy discovered that she had used the service coupon 9 times within the last 30 days.  (Gandy Decl. ¶ 15; Pltf. depo. pp. 120:2-136:4, Ex. 6, 182:7-183:9, 289:17-290:12).  This was highly suspicious, especially for such a small store; a store the size of the Auburn store usually has only a total of 4 to 8 service

---

[1]     Sears charged $65.00 for out of area delivery, so Gandy initially suspected that these discounts were related to Joel Smith's allegations regarding the delivery fees. (Lawrie Decl. ¶ 12).

coupon markdowns in the entire department per month. (Gandy Decl. ¶ 12; Reese Decl. ¶ 14). Gandy contacted the service department and confirmed that 7 of Smith's 9 customers had not received a service call. (Gandy Decl. ¶ 15; Pltf. depo. pp. 120:2-136:4, Ex. 6, 182:7-183.9, 289:17-290:12). Gandy discussed these findings with Kenny Reese, the SGM. (Gandy Decl. ¶ 15; Reese Decl. ¶ 15). Gandy and Reese subsequently contacted Sears' corporate human resources consultants located at the corporate office in Illinois. (Gandy Decl. ¶ 15; Reese Decl. ¶ 15; Pltf. depo. p. 173:5-17). The HR consultant advised Gandy and Reese to present their findings to Smith to see if she could explain these unauthorized discounts. (Gandy Decl. ¶ 15; Reese Decl. ¶ 15; Pltf. depo. p. 173:5-17).

On or about November 8, 2004, Gandy and Nina Fitzwater, who was the HR Lead at the Auburn store at the time, questioned Smith about the service coupons she had awarded to ineligible customers. (Pltf. depo. p. 136:5-10, 138:11-141:2; Gandy Decl. ¶ 16). During her interview, Smith admitted that she was reusing the service coupon and giving it to customers who were not eligible to receive it. (Pltf. depo pp. 138:11-141:2; Gandy Decl. ¶ 16). Smith's only explanation was that she did not know she was not supposed to do this even though (1) she had received and been trained on Sears' policy prohibiting unauthorized discounts, and (2) the coupon says on its very face the customers who are eligible and that she was supposed to "collect and destroy" the coupon after using it. (Gandy Decl. ¶ 16; Pltf. depo. pp. 18:6-19:9, Ex. 1, 138:11-141:2, Ex. 5).

Based on Gandy's investigation and Smith's admission that she had misused the coupon, the corporate HR consultant, Reese, and Gandy made the decision to terminate Smith for giving customers unauthorized discounts using Sears' service coupon. (Gandy

Decl. ¶ 17; Reese Decl. ¶ 18; Pltf. depo. pp. 170:3-10, 173:5-17). On November 14, 2004, Gandy contacted the plaintiff at home, per her request, and informed her that Sears was terminating her employment for misusing the service coupon. (Pltf. depo. pp. 267:6-268:20; Gandy Decl. ¶ 18, Ex. C & D).

Gandy also investigated the sales transactions of the other sales associates who worked in the appliance department. (Pltf. depo. pp. 289:20-290:2; Gandy Decl. ¶ 19). Gandy's investigation revealed that associate Dodson had completed four sales transactions using the $65.00 service coupon in October 2004, associate Landers had completed one transaction using the $65.00 service coupon, and associate Miller had completed none. (Pltf. depo. pp. 289:20-290:12; Gandy Decl. ¶ 19, Ex. E & F; Reese Decl. ¶ 19). Gandy subsequently contacted Sears' service department to verify whether the customers receiving the discount had received a service call from a Sears technician. (Gandy Decl. ¶¶ 20, 21; Pltf. depo. pp. 289-290). The service department informed Gandy that the one customer Landers assisted had received a service call. (Pltf. depo. pp. 197:1-17, 289:20-290:12, 198:19-199:3; Gandy Decl. ¶ 20). Thus, Gandy and Reese concluded that Landers did not violate Sears' service coupon policy. (Gandy Decl. ¶ 20; Reese Decl. ¶ 20; Pltf. depo pp. 289:20-290:12).

The service department reported to Gandy that three out of four of Dodson's customers who received the discount in October 2004 had recently received a service call. (Gandy Decl. ¶ 21, Ex. F; Pltf. depo. pp. 206:19-207:20, 289:20-290-12). Gandy and Fitzwater questioned Dodson about the fourth transaction. (Gandy Decl. ¶ 22; Dodson Decl. ¶ 14). During their meeting, Dodson did not generally admit or deny giving unauthorized discounts using the service coupon but explained to Gandy and

Fitzwater that this particular customer had obtained the coupon from her daughter who had received a service call and declined a repair. (Gandy Decl. ¶ 22, Ex. G; Dodson Decl. ¶14). Dodson was told that the customer was purchasing the appliance as a gift for her daughter and believed that to be a proper use of the service coupon. (Gandy Decl. ¶ 22, Ex. G; Dodson Decl. ¶ 14). Based on Dodson's explanation, Gandy and Reese concluded that Dodson had not misused the service coupon and should not be disciplined. (Gandy Decl. ¶ 23, Ex. G; Reese Decl. ¶ 22; Dodson Decl. ¶ 15; Pltf. depo. pp. 206:19-207:20, 289:20-290:12).

Additionally, Gandy investigated all of the sales associates in the electronics department because the service coupons were available for those products as well. (Pltf. depo. pp. 207:21-208:1; Gandy Decl. ¶ 24). Both black and white associates were working in this department, and both black and white associates were investigated. (Gandy Decl. ¶ 24; Pltf. depo. p. 289:20-290:12). His investigation revealed that no associates in the electronics department had completed transactions using Sears' $65.00 service coupon in October 2004. (Pltf. depo. pp. 207:21-208:1, 289:20-290:12; Gandy Decl. ¶ 24).

### F.    Plaintiff's Violation of Sears Records Policy

Sears also has a policy prohibiting its employees from obtaining and using information about its customers, associates and suppliers for <u>any</u> <u>non-business</u> related reason. (Pltf. depo. p. 86:17-91:20, Ex. 1; Gandy Decl. ¶ 30, Ex. A; Mason Decl. ¶ 24; Reese Decl. ¶ 27). <u>Violation</u> can result in <u>termination</u>. (Pltf. depo. p.88:13-89:3; Gandy Decl. ¶ 30; Mason Decl. ¶ 24; Reese Decl. ¶ 27). This policy is clearly stated in Sears' Associate Handbook. (Pltf. depo. pp. 88:13-89:3, Ex. 1; Gandy Decl. ¶ 30; Mason Decl.

¶ 24; Reese Decl. ¶ 27). Smith received this policy during her employment. (Pltf. depo. p. 18:5-19:6, 86:13-16, Ex. 1; Reese Decl. ¶ 27; Mason Decl. ¶ 24; Gandy Decl. ¶ 30).

On or about November 5, 2004, Smith began taking information from Sears' computers pertaining to the sales transactions of other associates, information relating to managers' purchases from Sears, and other documents. (Pltf. depo. pp. 281:20-283:10; Gandy Decl. ¶ 31; Mason Decl. ¶ 25). Some of these documents contained confidential and proprietary information, including credit card information. (Pltf. depo. pp. 282:17-83:10, Ex. 18; Gandy Decl. ¶ 31; Mason Decl. ¶ 25). Smith admittedly accessed and removed these documents from Sears for non-business related reasons--namely to "protect herself" and Beatrice Willis who had been terminated as a result of the same investigation a few days before. (Pltf. depo. pp. 170:12-172:8, 282:1-19). On or about April 26, 2006, when Smith produced documents in response to Sears' Request for Production, Sears discovered that Smith had accessed and removed this confidential information. (Mason Decl. ¶ 25; Gandy Decl. ¶ 31; Reese Decl. ¶ 28). Had Sears been aware that Smith had accessed and obtained this information in violation of Sears' records policy in early November 2004, it would have terminated her employment immediately. (Mason Decl. ¶ 25; Reese Decl. ¶ 28; Gandy Decl. ¶ 31).

## G.    Smith's Allegations of Race Discrimination

Smith filed her EEOC charge on April 28, 2005, alleging a single claim of race discrimination based on her <u>termination</u>. (Pltf. depo. p. 187:2-188:6, Ex. 8). On October 24, 2005, Smith filed a lawsuit claiming that Sears discriminated against her on the basis of her race in violation of Title VII of the Civil Rights Act of 1964. (Pltf. depo. p.

189:19-190:20, Ex. 10). Plaintiff's Complaint and EEOC charge are limited exclusively to her termination. (Pltf. depo. pp. 187:2-190:20, Ex. 8 & 10).

It is undisputed that no one in management, including Terry Gandy, Kenny Reese, or John Lawrie, ever told Smith that she was being terminated because of her race. (Pltf. depo. p. 242:1-20; Reese Decl. ¶ 47; Gandy Decl. ¶ 51; Lawrie Decl. ¶ 14). Likewise, Smith never heard anyone in management ever say anything derogatory about African-Americans. (Pltf. depo. p. 242:17-20; Reese Decl. ¶ 46; Gandy Decl. ¶ 50; Lawrie Decl. ¶ 39). Smith understood that Sears terminated her employment because she had used Sears' $65.00 service coupon to give customers unauthorized discounts. (Pltf. depo. p. 170:3-10). Smith does not know if anyone was hired to replace her. (Pltf. depo. p. 186:7-15). Since plaintiff's termination, Sears has hired African-Americans to work as sales associates in the appliance department. (Mason Decl. ¶ 34; Lawrie Decl. ¶ 28).

## H.    Plaintiff's Alleged Comparators

Smith alleges that employees Stephanie Darby (white), Clint Till (white), and Carolyn Landers (white) were not terminated for misusing the service coupon. (Pltf. depo. p. 191:11-19). But Smith has no admissible evidence that Till, Darby, or Landers misused the service coupon to give customers unauthorized discounts or that management know about any alleged misconduct. (Pltf. depo. pp. 192:5-13, 194:3-199:8, 204:3-207:20). Smith admits that she does not have any personal knowledge as to who was investigated, what the investigation revealed or how the investigation regarding other sales associates' transactions compared to hers. (Pltf. depo. pp. 289:20-90:12).

Smith offers no specific facts suggesting that Clint Till used the service coupon to give a customer an unauthorized discount. (Pltf. depo. p. 204:3-205:20). The record

evidence establishes that Till <u>never</u> <u>completed</u> <u>a</u> <u>transaction</u> using the service coupon during the 30 day time frame Gandy was able to investigate. (Till Decl. ¶ 26; Gandy Decl. ¶ 13 ; Pltf. depo. pp. 204:8-16, 289:20-90:12). The only evidence Smith has linking Till to the service coupon involves a transaction where Till was the customer and not the sales associate. (Pltf. depo. pp. 204:8-205:20). There is <u>no</u> <u>evidence</u> management believed Till had misused the service coupon to give customers an unauthorized discount. (Till Decl. ¶¶ 10, 12, 26; Gandy Decl. ¶¶ 13, 26; Reese Decl. ¶¶ 19, 25; Pltf. depo. pp. 204:8-16, 289:20-290:12). Smith's own testimony confirms this as she admits that she has no knowledge whatsoever regarding Gandy's investigation or its results. (Till Decl. ¶ 12; Gandy Decl. ¶ 14; Reese Decl. ¶ 13; Pltf. depo. pp. 204:8-16, 289:20-290:12). In fact, it is undisputed that Till was <u>not</u> <u>even</u> <u>employed</u> as a sales associate during the time frame investigated. (Pltf. depo. p. 203:14-204:2, 205:11-20; Till Decl.¶ 26; Gandy Decl. ¶ 13).

Smith also alleges that Stephanie Darby misused Sears' service coupon but was not terminated. (Pltf. depo. p. 191:11-19). The record evidence, however, clearly establishes that Darby did not misuse the service coupon. (Darby Decl. ¶ 9; Gandy Decl. ¶ 19; Pltf. depo. p. 191:20-192:17, 194:3-5, 289:20-290:12). Smith concedes that she does not know if any of Darby's transactions involving the service coupon were unauthorized. (Pltf. depo. p. 194:3-52, 289:20-290:12). The only evidence in the record demonstrates that Darby either destroyed the service coupons or turned them in to the cash office with her transactions for the day after she used them. (Darby Decl. ¶ 10; Pltf. depo. p. 195:20-196:17).

There is likewise no evidence that anyone in management <u>believed</u> that Darby misused the service coupon. (Pltf. depo. pp. 196:10-22, 289:20-290:12; Gandy Decl. ¶¶ 13, 14; Reese Decl. ¶¶ 12, 13). Gandy's investigation undisputedly established that Darby had not completed <u>any</u> transactions using the service coupon during the investigated time period. (Gandy Decl. ¶¶ 13, 14; Pltf. depo. p. 289:20-290:12). Moreover, Darby, like Till, was not even working as a sales associate when Gandy investigated the misuse of the service coupon. (Gandy Decl. ¶ 13; Darby Decl. ¶ 30; Pltf. depo. p. 191:20-192:13, 289:20-290:12).

Smith further <u>speculates</u> that Carolyn Landers misused Sears' service coupon. (Pltf. depo. p. 191:11-19; 197:1-199:2). The undisputed record evidence establishes, however, that Landers did not award the service coupon to customers who were not eligible to receive it, and the plaintiff has no factual basis for her speculation. (Landers Decl. ¶¶ 7, 8, 9; Pltf. depo. p. 197:13-17. Additionally, Gandy's investigation revealed that Landers had <u>not</u> misused the service coupon. (Gandy Decl. ¶¶ 19, 20; Reese Decl. ¶ 20; Pltf. depo. p. 197:1-17, 198:19-199:3, 289:20-290:12). The one customer to whom Landers awarded this discount <u>did have a service call</u>. (Gandy Decl. ¶ 20; Pltf. depo. p. 198:19-199:3). Moreover, Landers collected and destroyed the service coupon from the customer, and she never used a service coupon other than when she received it from a customer. (Landers Decl. ¶ 10; Pltf. depo. pp. 197:1-198:18).

## I.    Plaintiff's Alleged "Differences" in Treatment

Smith also contends that while she was employed at Sears, Gandy, Lawrie and Reese generally treated her differently than white associates on occasion and that this somehow supports her allegation that Sears terminated her because of her race. (Pltf.

depo. pp. 209:3-11). Smith alleges without citing any specific instances that Reese would not speak to her or other black employees, that Reese asked her and Willis (who is black) to make copies for him, that Reese would tell only the black associates to go back to work rather than stand around the televisions to watch football, and that Reese asked only about Landers' sales. (Pltf depo. pp. 209:12-210:20). Smith concedes, however, that she does not know if Reese always spoke to all of the white associates, what he said to any white associates who were watching football, or whether he asked white associates to make copies for him. (Pltf. depo. pp. 229:6-13, 234:20, 235:1). She also testified that she does not know if Reese asked other employees about her sales. (Pltf. depo. p. 238:1-3).

Reese did not treat Sears' black employees less favorably than Sears' white employees. (Mason Decl. ¶ 26; Reese Decl. ¶ 29; Landers Decl. ¶ 16; Till Decl. ¶ 16; Darby Decl. ¶ 16; Dodson Decl ¶ 31; Pltf. depo. pp. 234:20-235:1-22, 238:1-3). Reese did not always speak only to white associates. (Reese Decl. ¶ 33; Landers Decl. ¶ 17; Till Decl. ¶ 17; Darby Decl. ¶ 18; Pltf. depo. p. 229:6-13). Reese frequently told all store employees, including the white associates, that they needed to stop watching football and return to work. (Reese Decl. ¶ 34; Mason Decl. ¶ 27; Till Decl. ¶ 18; Landers Decl. ¶ 18; Darby Decl. ¶ 19; Pltf. depo. pp. 234:20-235:1). Reese asked white associates to make copies for him. (Reese Decl. ¶ 35; Till Decl. ¶ 19; Landers Decl. ¶ 19; Darby Decl. ¶ 20; Dodson Decl. ¶ 25; Pltf. depo. p. 235:19-22). Reese had lunch with Byron Mason, who was Sears' Softlines Manager, several times per week when Reese worked at the Auburn store. (Reese Decl. ¶ 32; Mason Decl. ¶ 32; Darby Decl. ¶ 17; Lawrie Decl. ¶ 27). Mason is black. (Reese Decl. ¶ 32; Mason Decl. ¶ 32). Reese also promoted Smith from

selling vacuums to the appliance department in April 2004, which was only a few months prior to the decision to terminate her. (Reese Decl. ¶ 39; Lawrie Decl. ¶ 21; Mason Decl. ¶ 30; Pltf. depo. pp. 70:8-22, 81:7-82:7). Additionally, he promoted several other black employees in his capacity as SGM, including Tammy Calhoun from Merchandising Associate to Merchandising Lead, and Stacy Dumas from Softlines Lead to Automotive Manager. (Reese Decl. ¶ 31; Mason Decl. ¶ 31).

Smith also contends that on one occasion; Gandy told Smith, who was eating on the sales floor, and not Landers, who was allegedly eating a sandwich in the same area, not to eat on the sales floor. (Pltf. depo. p. 266:1-21). Gandy frequently reminded all sales associates, including Landers, not to eat on the sales floor. (Gandy Decl. ¶ 42; Landers Decl. ¶ 22; Till Decl.¶ 20; Darby Decl. ¶ 16).

Smith also alleges that Lawrie, on one occasion, told Smith to hang up the range cords and to take an empty box to the back of the store. (Pltf. depo. pp. 226:9-228:10, 240:11-241:8). Smith believed that this was not her job but rather part of the remodeling team's job. (Pltf. depo. p. 227:5-13). Lawrie frequently asked the appliance associates to help set up appliances on the sales floor, as well as the accessories that went with them and to remove empty boxes from the floor. (Pltf. depo. p. 240:20-241:8; Lawrie Decl. ¶ 30; Till Decl. ¶ 4; Landers Decl.¶ 20; Darby Decl. ¶ 22).

Smith asserts that she was not given a set day off or always given the schedule that she requested. (Pltf. depo. p. 263:3-15). She <u>assumes</u> that Darby and Landers were. (Pltf. depo. p. 264:17-23). The evidence is undisputed that Lawrie did not always give Darby and Landers the time off they requested. (Lawrie Decl. ¶ 32; Landers Decl. ¶¶ 16, 24; Darby Decl. ¶ 24; Pltf. depo. p. 264:17-23). Smith also admits that Darby and

Landers only worked for Sears part-time and were full-time students. (Pltf. depo. p. 265:1-6). Lawrie did not participate in the decision to terminate Smith, and it was Lawrie's responsibility to make the schedule for the appliance department. (Lawrie Decl. ¶ 32; Reese Decl. ¶¶ 17, 38; Gandy Decl. ¶ 17; Pltf. depo. p. 173:5-11).

Smith also claims that "Sears" terminated several black associates and replaced them with white persons. (Pltf. depo. p. 191:2-10). But Smith could only identify two employees from the shoe department who were terminated. (Pltf. depo. p. 250:6-22). Smith does not know why these individuals were terminated, who made the decision to terminate them, or who was hired to replace them. (Pltf. depo. p. 250:6-251:15). Neither Reese nor Gandy were involved in these terminations. (Pltf. depo. p. 251:3-5; Reese Decl. ¶ 42; Mason Decl. ¶ 41). Byron Mason (who is black) made the decision to terminate these shoe department employees. (Mason Decl. ¶ 42; Pltf. depo. pp. 251:3-5). Reese and Gandy terminated several white persons for similar integrity issues like those involved in Smith's misconduct, including Michael Cunningham for attempting to give customers free delivery, and Christopher Pritchett and Brent Haney for re-ringing tickets to make their sales appear higher than they actually were. (Reese Decl. ¶ 45; Gandy ¶ 45; Mason Decl. ¶ 40; Lawrie Decl. ¶ 38; Pltf. depo. p. 249:11-21).

### III.    SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith" when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the defendant establishes that it is entitled to a judgment as a matter of law, the burden shifts to the plaintiff to show that summary judgment is not appropriate. Fed.

R. Civ. P. 56(e). The plaintiff may not rest upon the mere allegations in his complaint, but rather, must set forth "specific facts" showing a "genuine issue" for trial. Id. To create a "genuine issue" for Rule 56 purposes, a plaintiff must produce "'significant probative evidence'" showing an actual dispute as to a material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (quoting First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290 (1968)). "Significant probative evidence" is evidence upon which "reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. at 252 (emphasis added).

In employment discrimination cases such as this one, the plaintiff, to avoid summary judgment, "must present specific nonconclusory facts that would support a jury verdict against the particular defendant on the issue of discriminatory intent." Ratliff v. DeKalb County, Georgia, 62 F. 3d 338, 341 (11th Cir. 1995). The plaintiff "cannot rely on attenuated possibilities that a jury would infer a discriminatory motive." Pace v. Southern Ry. Sys., 701 F. 2d 1283, 1291 (11th Cir.), cert. denied, 464 U.S. 1018 (1983). Instead, she "must come forward with sufficient evidence to establish a *prima facie* case and respond sufficiently to any rebuttal by the defendant to create a genuine issue of material fact." Id. See, e.g., Maniccia v. Brown, 171 F. 3d 1364 (11th Cir. 1999); Standard v. A.B.E.L. Serv., Inc., 161 F. 3d 1318 (11th Cir. 1998); Raney v. Vinson Guard Serv., Inc., 120 F. 3d 1192 (11th Cir. 1997); Holifield v. Reno, 115 F. 3d 1555 (11th Cir. 1997).

The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The law is well settled that "'conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where an employer has offered extensive evidence of legitimate, non-discriminatory reasons for its actions.'" Young v. General Foods Corp., 840 F. 2d 825, 830 (11th Cir. 1988), cert. denied, 488 U.S. 1004 (1989)(quoting Grigsby v. Reynolds Metals Co., 821 F. 2d 590, 597 (11th Cir. 1987)). See generally Clay v. Equifax, Inc., 762 F. 2d 952, 959 (11th Cir. 1985) (a "broad, conclusory allegation . . . without more is not sufficient to withstand a motion for summary judgment").

Here, the plaintiff's claim cannot withstand summary judgment. She has completely failed to offer "significant probative evidence" showing an actual dispute of material fact as to Sears' reason for terminating her employment. Consequently, summary judgment is warranted.

## IV.    ARGUMENT

### A.    Smith has Failed to Produce Substantial Evidence that Sears Actually and Intentionally Discriminated Against her Because of her Race.

In a disparate treatment case such as this one, the plaintiff must prove "intentional discrimination" to prevail. Texas Dep't of Community Affairs v. Burdine, 450 U.S. at 256; see also Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 153 (2000) (the "ultimate question" in every disparate treatment case "is whether the plaintiff was the victim of intentional discrimination.") The Supreme Court has stated unequivocally that "[p]roof of discriminatory motive is critical" in disparate treatment cases. Teamsters v. United States, 431 U.S. 324, 335-36 n.15 (1977). See also United States Postal Service v.

Aikens, 460 U.S. 711, 715 (1983); Clark v. Huntsville City Bd. of Educ., 717 F. 2d 525, 528-29 (11th Cir. 1983). The Supreme Court has also held that "discriminatory intent" in a discrimination case "means actual motive; it is not a legal presumption to be drawn from a factual showing of something less than actual motive." Pullman-Standard v. Swint, 456 U.S. 273, 289-90 (1982).

To prove a case of intentional discrimination, "[p]laintiffs can present direct evidence, statistical evidence or circumstantial evidence (i.e., the McDonnell Douglas framework)." *Verbraeken v. Westinghouse Elec. Corp.*, 881 F. 2d 1041, 1045 (11th Cir. 1989). Smith offers no direct or statistical evidence.[2] Thus, the only evidentiary method available to Smith is through the McDonnell Douglas burden-shifting analysis.

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court held that a plaintiff must carry the initial burden of establishing a *prima facie* case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the defendant only has the burden of articulating or producing evidence, but not persuading, that the actions complained of were taken for a "legitimate, nondiscriminatory reason." Reeves, 530 U.S. at 142; Burdine, 450 U.S. at 253. Once the defendant articulates a "legitimate, nondiscriminatory reason" for its actions, any presumption of discrimination arising out of the *prima facie* case "simply drops out of the picture." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993); see also Burdine, 450 U.S. at 255 n.10 ("drops from the case"). This is true because once the defendant articulates a legitimate nondiscriminatory reason for its actions, the "nondiscriminatory reasons just as readily

---

[2]    Only "the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age [here race], constitute direct evidence of discrimination." Carter v. City of Miami, 870 F. 2d 578, 582 (11th Cir. 1989). Plaintiff in this case does not claim that there is any such evidence. (Pltf. depo. p. 242:1-20).

explain the difference in treatment." Nix v. WLCY Radio, 738 F. 2d 1181, 1186 (11th Cir. 1984).

If the defendant succeeds in rebutting plaintiff's prima facie case, the plaintiff still must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253; see also Reeves, 530 U.S. at 143. To do so, the plaintiff must present "concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice." Earley v. Champion Int'l Corp., 907 F. 2d 1077, 1081 (11th Cir. 1990) (emphasis added).

Under the McDonnell Douglas/Burdine method of proof scheme, the plaintiff must persuade the court that "the defendant acted with a discriminatory purpose." Clark v. Huntsville City Bd. of Educ., 717 F. 2d at 529 n.5; Hawkins, 883 F. 2d at 980-81. Here, Smith has no evidence at all indicating any discriminatory purpose.

## B.    Sears is Entitled to Summary Judgment on Plaintiff's Sole Claim That She was Discharged Because of Her Race.

Smith relies exclusively on circumstantial evidence to support her claim for intentional race discrimination. Smith's claim, however, fails under this method of proof for two reasons. First, Smith cannot establish a prima facie case of discrimination because she cannot identify any white employees who are similarly-situated to her who were treated more favorably. Namely, there is no admissible evidence that any individual that Smith identifies misused the service coupon to give unauthorized discounts to customers or that Sears had any basis for believing that any white employees misused the service coupon. Second, she cannot show that Sears' legitimate, non-discriminatory reason for her discharge--her blatant and admitted misuse of Sears' service coupon--was

a pretext for intentional race discrimination.   Sears is therefore entitled to summary judgment.

            1.     <u>Plaintiff cannot establish a prima facie case of race discrimination.</u>

To establish a prima facie case of racial discrimination based on disparate treatment using circumstantial evidence, a plaintiff must show that "(1) [she] belongs to a racial minority; (2) [she] was subjected to an adverse job action; (3) [her] employer treated similarly situated employees outside [her] classification more favorably; and (4) [she] was qualified to do the job." <u>Holifield v. Reno</u>, 115 F. 3d 1555, 1561-62 (11th Cir. 1997); <u>See</u> <u>Knight v. Baptist Hosp. of Miami, Inc.</u>, 330 F. 3d 1313, 1316 (11th Cir. 2003); <u>Scott v. Suncoast Beverage Sales, Ltd</u>, 295 F. 3d 1223, 1228 (11th Cir. 2002). Here, Smith cannot establish the third element of her prima facie case.[3]

The Eleventh Circuit has stated:

"In determining whether employees are similarly situated for purposes of establishing a prima facie case it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." <u>Jones v. Bessemer Carraway Medical Center</u>, 137 F. 3d 1306, 1311 (11th Cir.), <u>opinion modified by</u> 151 F. 3d 1321 (1998) (<u>quoting</u> <u>Holifield v. Reno</u>, 115 F. 3d 1555, 1562 (11th Cir. 1997)). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." <u>Id.</u> (internal quotations and citations omitted). *We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.*

---

     [3]     <u>See</u> *Kelliher v. Veneman,* 313 F. 3d 1270, 1271-72 (11th Cir. 2002) (stating that a plaintiff can attempt to show that she was replaced by someone outside of her protected class rather than establishing that she was similarly situated to a white employee). Smith offers no evidence that she was replaced by anyone, let alone someone outside her protected class. (Pltf. depo. p. 186:7-18).

Maniccia v. Brown, 171 F. 3d 1364, 1368-69 (11th Cir. 1999) (emphasis added). "[T]o meet the comparability requirement a plaintiff is required to show that [she] is similarly situated in all relevant respects to the non-minority employee." Silvera v. Orange Cty. School Bd., 244 F. 3d 1253, 1259 (11th Cir. 2001) (internal citations omitted). Where there are clear differences in either the *quantity* or *quality* of the acts of misconduct committed by the plaintiff and her alleged comparators, it cannot be said that they are "nearly identical." Silvera, 244 F. 3d at 1259. "Absent some other similarly situated but differently disciplined worker, there can be no disparate treatment." Abel v. Dubberly, 210 F. 3d 1334, 1339 (11th Cir. 2000); see Jones v. Bessemer Carraway Med. Ctr., 137 F. 3d 1306, 1311 (11th Cir. 1998) ("[i]f plaintiff fails to identify similarly situated, nonminority employees who were treated more favorably, her case must fail because the burden is on her to establish her prima facie case.").

The law is clear that a plaintiff must offer evidence other than "information and belief assertions" that the alleged comparators are similarly situated to the plaintiff. In Jacobs v. Henderson, the plaintiff assumed in his deposition that white employees were given light-duty or some other accommodation that allowed them to continue working, and that he, a black employee, was not. 2001 WL 34866606 *14 (M.D. Ala. 2001) (J. Myron Thompson). The plaintiff admitted, however, that he did not know about the physical restrictions and the nature of these employees' accommodations. Id. This court concluded that the plaintiff's evidence amounted to little more than "information-and-belief assertions" and that "[t]his evidence [was] simply too skimpy to permit an inference that [any of the comparators] were similarly situated to [the plaintiff]." Id. at

*14.[4]  See also  Sasser v. Alabama Dept. of Corrections, 373 F. Supp. 2d 1276, 1285 (M.D. Ala. 2005) (awarding the employer summary judgment because the "plaintiff [had] merely presented unsubstantiated assertions [that white employees had engaged in the same misconduct and were treated more favorably], which alone, [were] not enough to withstand a motion for summary judgment.").

Here, Smith offers nothing more than her "information and belief assertions" that these sales associates misused the service coupons like she did.  Smith testified that she would take a service coupon that had previously been used and place in the register and give it to customers who were not eligible for it.  (Pltf. depo. pp. 118:14-23, 133:18-134:10).  Smith merely speculates that the alleged comparators did the same.  (Pltf. depo. pp. 192:5-13, 194:13-199:8, 204:8-207:20).  Her conclusion is based solely on a broad and unsubstantiated assumption that "nobody turned [the service coupons] in" to the cash office or destroyed them as the coupon directed, but that everyone left them in the register.  (Pltf. depo. p. 194:22).  Smith concedes, however, that she did not work with these associates all of the time and, therefore, does not know what they did in each instance.  (Pltf. depo. pp. 196:10-22, 197:1-16; 203:15-22).  She also does not know whether any of them improperly used them.  (Pltf. depo. pp. 193:18-194:12, 289:20-290:12).  This complete conjecture is clearly "too skimpy" to establish that Till, Darby,

_____

[4]      See Ingalsbe v. Chertoff, 2006 WL 908678 * 9 (N.D. Ga. 2006) (finding that the plaintiff's general allegation that he had witnessed other employees fail to follow proper procedures and that they were not terminated was not sufficient to establish a prima facie case of race discrimination).  Pierri v. Cingular Wireless, 397 F. Supp. 2d 1364, 1378 (N.D. Ga. 2005) (finding that the plaintiff's allegations that her supervisor treated male employees differently than her were not based on her personal knowledge, but were merely hearsay, conjecture or speculation; thus they could not be considered on a motion for summary judgment and the plaintiff therefore had no evidence beyond her subjective belief to establish a prima facie case of discrimination).

or Landers misused the service coupon are similarly situated to the plaintiff. For this reason alone, Sears is entitled to summary judgment.[5]

Additionally, it is well established that the employer must be aware of the alleged similar violations of the named comparators to be similarly situated. See Jones v. Gerwen, 874 F. 2d 1534, 1541-1542 (11th Cir. 1989) (holding that because the plaintiff had failed to produce any evidence that the decision makers knew of the comparators unauthorized use of the Unit truck, he could not establish that these comparators were similarly situated); Key v. Advanced Stores, Co., 2005 WL 1026062 (M.D. Fla. 2005) ("Absent a showing that [the decision makers] were aware of, or consciously overlooked [the comparators] allegedly similar violation, this court cannot find that [the comparator] and [the plaintiff] were similarly situated."); Moreland v. Miami-Dade County, 255 F. Supp. 2d 1304, 1314 (M.D. Fla. 2002) ("[I]t is impossible to identify any non-African American employee . . . that [the decision-maker treated] more favorably for violating a

---

[5]    To the extent Smith contends that other employees were not disciplined for using the coupons in register; her argument is misplaced. Smith was not terminated for using coupons from the register, but specifically for using the service coupon to give customers unauthorized discounts. She is attempting to compare apples to oranges. "Under Eleventh Circuit precedent if two employees are not similarly situated, the different application of workplace rules does not constitute illegal discrimination." Smith v. International Paper Co., 160 F. Supp. 2d 1335, 1340 (M.D. Ala. 2001) (Citing Lathem v. Dept. of Children and Youth Services, 172 F. 3d 786, 793 (11th Cir. 1999)). See also Ingalsbe v. Chertoff, 2006 WL 908678 *9 (N.D. Ga. 2006) ("To establish a prima facie case of discriminatory discipline, Plaintiff would have to point to evidence that the identified comparator committed the same or similar infractions as the plaintiff . . . but did not receive disciplinary treatment as a result."); Daniel v. Spectrum Stores, Inc., 381 F. Supp. 2d 1368, 1377 (M.D. Ga. 2005) (finding that the plaintiff was not similarly situated to the alleged comparator for purposes of his sex discrimination claim because the evidence showed that the plaintiff had missed a scheduled shift and the comparator had only objected to it); Rayborn v. Auburn University, 350 F. Supp. 2d 954, 962 (M.D. Ala. 2004) (awarding summary judgment in favor of the employer because the alleged comparator had merely acted without authorization by sending his shift workers to provide security to the stadium; he had not, like the plaintiff, blatantly ignored a direct order from his supervisor).

[workplace] rule [because] [the plaintiff's] evidence fails to show that [the decision maker] knew that these purported comparators committed misconduct similar to [the plaintiff's].").

Here, Smith has absolutely no evidence that Gandy, Reese, or the human resources representative in Sears' corporate office in Illinois who participated in the decision to terminate Smith was aware of or consciously overlooked any associate's misuse of the service coupon. (Gandy Decl. ¶¶ 13, 14, 26; Reese Decl. ¶ 19, 24; Pltf. depo. p. 173:5-17, 289:20-290:12). It is undisputed that Smith's termination arose out of a single investigation in November 2004 specifically relating to misuse of Sears' $65.00 service coupon. (Gandy Decl. ¶ 12-15; Reese Decl. ¶ 10-13; Pltf. depo. pp. 138:11-141:4, 170:7-10). It is further undisputed that the only means of determining who misused the service coupon was to review each sales associate's transactions and the journal tapes corresponding to these transactions[6] and then contact the service department to see if these customers had recently had a service call. (Gandy Decl. ¶ 14; Pltf. depo. pp. 284:19-23).

Sears undisputedly reviewed the transactions of all the sales associates who worked in the appliances and electronics departments in November 2004. (Gandy Decl. ¶¶ 14, 24; Pltf depo. pp. 289:20-290:12). Neither Till nor Darby were working as a sales associate in any department during this time; Till had stopped working as a sales associate in December 2003 and Darby in early September 2004. (Till Decl. ¶¶ 3, 26;

---

[6]     The journal tapes identify which sales associate completed the transaction, and specifically what coupons were used in each transaction. (Gandy Aff ¶ 14; Pltf. depo. pp. 121-122:1-10, Ex. 6, 185:4-19). Sears was only able to review the sales transactions for the previous 30 days due to the memory limitations of Sears' register system.

Darby Decl. ¶ 2; Gandy Decl. ¶ 13; Pltf. depo. pp. 193:1-2, 203:14-204:2, 289:20-22).

Thus, Sears had no reason to know, let alone the opportunity to "consciously overlook,"

Till's and Darby's alleged misuse of the service coupon. (Pltf. depo. p. 193:1-2, 203:14-

204:2, 289:20-22; Darby Decl. ¶ 28). Smith herself never told anyone she knew about

specific instances of coupon misuse. (Pltf. depo. p. 138:1-142:21).

Likewise, there is no evidence that Sears had any knowledge that Landers had

misused the service coupon. Sears' investigation undisputedly showed that Landers only

had <u>one</u> transaction involving the service coupon and that this customer <u>had</u> <u>received</u> a

service call and had declined a repair. (Gandy Decl. ¶ 20; Reese Decl. ¶ 20; Pltf. depo.

pp. 289:20-290:12). Smith admits that she does not know what Sears' investigation into

Landers' transactions revealed or what the service department told Gandy about Lander's

transactions. (Pltf. depo. pp. 197:13-17, 289:20-290:12). Thus, Smith's own admission

has no evidence that Sears knew about or "consciously overlooked" Landers' misuse of

the service coupon. In fact, Gandy's investigation undisputedly revealed that Landers

had <u>not</u> <u>misused</u> the service coupon. The customer she gave the $65.00 coupon to had

received a service call and therefore <u>was</u> <u>eligible</u> to receive this discount. (Pltf. depo. pp.

197:13-17, 289:20-290:12; Gandy Decl. ¶ 20). Because Smith cannot show that a

similarly situated white employee engaged in conduct nearly identical to hers or that

management was aware of it, summary judgment is due to be granted.

> 2. <u>Smith cannot establish that her termination was merely a pretext</u>
> <u>for intentional race discrimination.</u>

Even assuming that Smith could establish a prima facie case of race

discrimination, which she cannot, the court should still grant Sears' motion for summary

judgment. Sears has articulated a legitimate, nondiscriminatory reason for terminating

the plaintiff. See Combs v. Plantation Patterns, 106 F. 3d 1519, 1528 (11th Cir. 1997) (stating that the employer must articulate, but not persuade the trier of fact, that the allegedly adverse employment decision was made for "legitimate, nondiscriminatory reasons."). Specifically, Sears terminated the plaintiff because she used Sears' service coupon to give multiple customers unauthorized discounts. (Gandy Decl. ¶ 17; Reese Decl. ¶ 17). Her admitted misconduct clearly violated Sears' unambiguous unauthorized discount policy. (Gandy Decl. ¶¶ 16, 17; Reese Decl. ¶ 17; Pltf. depo. p. 86:17-88:4, Ex. 1). Once the defendant articulates a "legitimate, nondiscriminatory reason" for its actions, any presumption of discrimination arising out of the prima face case "drops from the case." Id. Thus, to prevail, the plaintiff must establish that the employer's articulated reason was a pretext for discrimination. Turlington v. Atlanta Gas Light Co., 135 F. 3d 1428, 1432 (11th Cir. 1998). See Hicks, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253). ("'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'") It is the plaintiff that has the burden of persuading the court that "the defendant acted with a discriminatory purpose." Clark v. Huntsville Bd. of Educ., 717 F. 2d 525, 529 n.5 (11th Cir. 1983).

To establish pretext a plaintiff must establish BOTH that the articulated reason is false and that race is the true reason for the termination. See Hicks, 509 U.S. at 515 (1993). Here, Smith cannot do either. First, there is absolutely no evidence that Sears' reason for terminating her is false. Smith admitted in her interview with management during Gandy's investigation, and again in her deposition, that she was giving Sears' service coupon to customers who were not eligible for it. (Pltf. depo. p. 139:14-140:1-

21).  Her actions clearly violated Sears' unauthorized discount policy.  (Pltf. depo. pp.
86:17-88:4, Ex. 1; Gandy Decl. ¶¶ 15, 16).  Furthermore, the plaintiff understood at the
time she was terminated that her misuse of the service coupon was <u>the</u> <u>reason</u> for her
termination.  (Pltf. depo. p. 170:3-10).  Consequently, there simply can be no argument
that Sears' reason for terminating her is false.

    Additionally, Smith cannot show that her race was the <u>real</u> <u>reason</u> for her
discharge.  It is well established that the plaintiff must present "concrete evidence in the
form of specific facts which show that the defendant's proffered reason is mere pretext.
Mere conclusory allegations and assertions will not suffice."  <u>Earley v. Champion Int'l</u>
<u>Corp.</u>, 907 F. 2d 1077, 1081 (11th Cir. 1990).  In an effort to establish that race is the real
reason, Smith relies solely on her vague and unsupported assumption that other white
employees misused the service coupon and were not terminated.  (Pltf. depo. pp. 192:5-
13, 194:3-199:8, 204:3-207:20).  As stated above (<u>see</u> Section III.B.1), Smith offers <u>no</u>
<u>specific</u> <u>facts</u> establishing that any white employees misused the service coupon and were
not terminated or that Sears knew that other white associates were guilty of the same
misconduct but retained them.[7]   Smith's unsubstantiated assumptions, alone, are not
enough.  <u>See</u> <u>Grigsby v. Reynolds Metals, Co.</u>, 821 F. 2d 590, 597 (11th Cir. 1987)
("conclusory allegations of discrimination, without more, are not sufficient to raise an
inference of pretext or intentional discrimination").

    Additionally, Smith generally speculates that Sears terminated African-Americans
and replaced them with white individuals.  (Pltf. depo. p. 250:6-22).  But as purported

---

[7]    <u>Penn v. Department of Corrections</u>, 411 F. Supp. 2d 1326 (M.D. Ala.
2005) (finding that the plaintiff's evidence was not sufficient to establish pretext because
the plaintiff failed to identify any proper comparators).

support for her broad allegation, Smith only specifically identifies two individuals who worked in the <u>shoe</u> <u>department</u>. (Pltf. depo. p. 250:6-22). And Smith has absolutely <u>no</u> <u>evidence</u> to support even these general, irrelevant allegations. Smith admits that she <u>does</u> <u>not</u> <u>know</u> who terminated these persons, the circumstances surrounding their terminations, or if white persons were actually hired to replace them. (Pltf. depo. pp. 250:6-251:12). In fact, the undisputed evidence indicates that Byron Mason, an African-American manager, terminated these individuals and that race played no role in his decision. (Mason Decl. ¶ 41; Pltf. depo. pp. 250:6-251:12). Furthermore, it is undisputed that Gandy and Reese, who participated in the plaintiff's termination, had nothing to do with Mason's decision. (Reese Decl. ¶ 17; Mason Decl. ¶ 41; Pltf. depo. p. 250:6-251:12). Thus, Smith's evidence amounts to nothing more than mere conjecture, which will not suffice.

Smith also surmises that members of Sears' management treated whites differently than blacks.[8] Specifically, she alleges that: (1) Kenny Reese, the SGM, would not talk to her or other black associates or ask about the black associates' sales; (2) Reese would only tell her and the other black associates to stop watching the televisions in the electronics department; (3) Reese asked her and Beatrice Willis, another black associate, to make copies for him; (4) on one occasion, John Lawrie, her immediate

---

[8]    In the plaintiff's EEOC charge, her complaint, and in her deposition, the plaintiff limits her race discrimination claim to her termination. (Pltf. depo. p.187:2-190:20, Exs. 8 & 10). However, even if the plaintiff was attempting to assert a separate claim that Sears treated her differently than white associates with respect to the terms and conditions of her employment, these allegations neither collectively nor individually constitute adverse employment action(s) <u>See</u> <u>Davis v. Town of Lake Park</u>, 245 F. 3d 1232, 1238-39 (11th Cir. 2001) (to establish an adverse employment action, a plaintiff must show a "serious and material change" in the terms, conditions, and privileges of employment; Title VII is not a general civility code nor a statute making actionable the ordinary tribulations of the workplace).

supervisor, asked her to perform duties that were allegedly associated with the remodeling of the store, such as hanging up the accessories that went with the appliances and clearing boxes from the sales floor; (5) Lawrie gave white associates Darby and Landers the time off they requested; and (6) on one occasion, Gandy told her, and not Landers, that she should not eat while working on the sales floor. (Pltf. depo. pp. 209:3-120:20, 266:1-21, 227:5-13; 263:3-15). These allegations are not based in fact but on her own subjective belief.

Smith's allegations in this case are similar to but not even as specific as those unsuccessfully asserted by the plaintiff in Delong v. Best Buy Co., 206 WL 562195 (N.D. Ga. 2006). In Delong, the plaintiff alleged as evidence of pretext that her supervisor did not visit her store, that he treated her in a demeaning manner, that he refused to communicate with the plaintiff for long periods of time, and that he appointed assistant managers without her approval. 2006 WL 562195 *12 (N.D. Ga. 2006). The court concluded that these allegations were vague and that there was no evidence to support them. Id. at *12. Additionally, Smith admitted that she had no personal knowledge of how Best Buy treated other male managers in her district. Id. at *13. Based on this admission and the lack of evidence that Best Buy treated male managers more favorably, the court held that the plaintiff could not establish that her termination was a pretext for gender discrimination. Id. at *13.[9]

---

[9]    See Shah v. General Electric Co., 816 F. 2d 264, 271 (6th Cir. 1987) (finding that the following behavior of the plaintiff's supervisor was not sufficient to establish pretext for race discrimination: failing to respond to plaintiff's memos; refusing to shake the plaintiff's hand; isolating the plaintiff from the rest of the division; telling the plaintiff not to give their shared secretary his work; and not spelling the plaintiff's name correctly; the plaintiff also admitted he did not know if his supervisor treated anyone else differently); Hughes v. Chesapeake and Potomac Telephone Co., 583 F.

Like the plaintiff in <u>Delong</u>, Smith concedes that she has <u>no personal knowledge</u> of how Reese, Gandy, and Lawrie acted towards white associates. Specifically, she agrees that she <u>does not know</u> whether Reese spoke to white associates, whether he asked white associates to make copies for him, whether he told any white associates who were watching football to return to work, or whether he asked anyone about her sales. (Pltf. depo. pp. 229:6-13, 234:20-235:1, 238:1-3). Likewise, she testified that she <u>does not know</u> what duties Lawrie asked the white associates to perform or if they were similar to what he asked her to do. (Pltf. depo. p. 240:20-241:8). She also stated that she <u>does not know</u> if Landers or Darby always received the time off or the schedule they requested. (Pltf. depo. pp. 264:17-265:6). This again leaves only Smith's unsupported conclusions to establish discriminatory intent.

Also similar to <u>Delong</u>, the record is devoid of <u>any evidence</u> that Reese, Lawrie or Gandy treated black associates any less favorably than whites associates. In fact, the undisputed evidence demonstrates that Reese did not always talk to white employees either, that he asked white employees to make copies of documents for him, that he asked about <u>all</u> associates' sales, and that he told all associates to stop watching football and to get back to work. (Reese Decl. ¶ 34; Till Decl. ¶ 18; Landers Decl. ¶ 18; Darby Decl.¶ 19; Dodson Decl. ¶ 24; Mason Decl. ¶ 28; Pltf. depo. pp. 229:6-13, 234:20-235:1, 238:1-3).

---

Supp. 66, 73 (D.C. 1983) (concluding that the following evidence was not sufficient to establish pretext: the plaintiff's feelings that the white employees "talked and joked" with white supervisors; white supervisors listening to the suggestions of the white employees but not the plaintiff's; non-verbal acts of the white supervisors that made the plaintiff feel inferior; and a white employee getting up from her position to do other job-related tasks).

The undisputed evidence further establishes that Lawrie asked white sales associates to perform the same tasks he asked Smith to perform. Lawrie asked both the black and white sales associates to unpack appliances and take the empty boxes to the back. (Lawrie Decl. ¶ 30; Landers Decl. ¶ 20; Darby Decl. ¶ 22; Dodson Decl. ¶ 27; Pltf. depo. pp. 240:15-241:8). This was part of their job as an appliance associate. (Lawrie Decl. ¶ 30; Landers Decl. ¶ 20; Darby Decl. ¶ 22; Dodson Decl. ¶ 27). Additionally, it is undisputed that Lawrie did not always give white associates the time off they requested, and that Gandy frequently reminded all associates, including the white sales associates, not to eat on the sales floor. (Gandy Decl. ¶ 33; Lawrie Decl. ¶¶ 32, 33; Landers Decl. 22; Till Decl. ¶ 20; Darby Decl. ¶¶ 23, 24; Pltf depo. p. 264:17-23).[10]

The record in this case undisputedly reflects that Reese, Gandy and Lawrie treated black associates no differently than they treated white associates. Based on this and Smith's complete failure to present any concrete evidence of differential treatment, summary judgment is warranted.

Smith's allegations that her race is the true reason for her termination is even less convincing in light of the overwhelming evidence that both Reese and Gandy engaged in conduct wholly inconsistent with racial animus towards African-Americans. First, Reese, is the one who promoted the plaintiff to the appliance department. And, he did so

---

[10]    The plaintiff also appears to makes a vague allegation that it was a common practice for sales associates to use coupons by the register and that this somehow shows that Sears' reason for terminating her is based on discriminatory animus. (Pltf. depo. p.247-249). This is not only vague but irrelevant. The plaintiff was not terminated nor told that she was being terminated for using coupons that were in the register. (Pltf. depo. p. 170:3-10; Reese Decl. ¶ 17; Gandy Decl. ¶¶ 17, 18). She was terminated because she gave the service coupon to customers who were not eligible to receive it, which was a violation of Sears' well-known and published unauthorized discount policy. (Pltf. depo. p. 170:3-10; Reese Decl. ¶ 17; Gandy Decl. ¶ 17, 18).

just a <u>few</u> <u>months</u> before her termination.  (Pltf. depo. pp. 70:8-22, 81:7-82:7; Reese

Decl. ¶ 30; Mason Decl. ¶ 30; Lawrie Decl. ¶ 21).  It is well-settled that "[w]here the

same individual is alleged to have discriminated [against the plaintiff] was responsible for

hiring [her], the court may assume an inference of nondiscrimination."  <u>Gryczkowski v.</u>

<u>Astra USA, Inc.</u>, 1999 WL 688533 *6 (N.D. Ill 1999).[11]   Courts have likewise applied

this rule to cases where the decision maker was responsible for promoting the plaintiff

and then later terminated her.  <u>See</u> <u>Williams v. Vitro Services Corp.</u>, 144 F. 3d 1438,

1443 (11th Cir. 1998) (the fact that the person who promotes and/or hires the plaintiff is

the same as the person who terminates him may give rise to a permissible inference that

no discriminatory animus motivated the employer's actions).[12]   Clearly, the plaintiff's

already unsubstantiated allegations discussed above are insufficient to overcome this

inference.

     Furthermore, it is undisputed that as a result of the investigation, Reese and

Gandy retained Dodson who is an African-American sales associate and who had a

questionable transaction involving the service coupon. (Reese Decl. ¶ 22; Gandy Decl.

¶¶ 21-23; Dodson Decl. ¶¶ 14, 15; Pltf. depo. pp. 206:23-207:20, 289:20-290:12).

Although Gandy's investigation revealed that Dodson had given the service coupon

discount to one customer who had not received a service call, both Gandy and Reese

---

[11]    <u>See</u> <u>Burgos v. Sullivan & Cromwell</u>, 2001 WL 709268 (S.D.N.Y. 2001)
(finding that the plaintiff's evidence of pretext was not sufficient partly because the same
individual who made the adverse decisions was the same person who hired the plaintiff;
"This makes it difficult to impute . . . an invidious motivation that would be consistent
with the decision to hire.").

[12]    <u>See</u> e.g. <u>Gryczkowski</u>, 1999 WL 688533 at *6 (holding that the plaintiff
failed to overcome the presumption that the employer had not terminated the plaintiff
because of his race where the same person who made the decision to discharge the
plaintiff was the same person who <u>promoted</u> him just months before).

chose to believe Dodson's explanation regarding this transaction and therefore made the decision to retain her. (Gandy Decl. ¶ 23; Reese Decl. ¶ 22; Dodson Decl. ¶¶ 14, 15; Pltf. depo. p. 206:3-10). This is clearly not consistent with the discriminatory motive necessary to establish pretext.

It is further undisputed that both Gandy and Reese participated in the decision to terminate several white employees for similar integrity issues. For example, Gandy and Reese participated in the decision to terminate Michael Cunningham for offering customers free delivery and Brent Haney and Christopher Pritchett for re-printing transactions to make their sales appear higher than they actually were. (Gandy Decl. ¶ 45; Reese Decl. ¶ 45; Pltf. depo. 249:12-21). Like Smith, these incidents involved integrity issues. And like Smith, Gandy and Reese recommended terminating their employment.

These facts clearly negate Smith's already weak and unsubstantiated evidence of pretext. Consequently, Smith cannot establish that her race was the real reason for her termination, and summary judgment is appropriate in this case.

**C.      The Plaintiff is Not Entitled to Any Form of Relief As a Matter of Law**

Even assuming for purposes of summary judgment only that Smith could succeed on her claim for intentional race discrimination, the plaintiff is not entitled to any damages. In her complaint, the plaintiff seeks only backpay, reinstatement, and "other relief that may be appropriate."[13] (Pltf. depo. p. 288:2-20, Ex. 10). These forms of relief are all effectively foreclosed by the mixed motive defense and/ or after-acquired

---

[13]      The plaintiff specifically stated in her deposition that she is not seeking any damages for mental anguish, emotional distress or other related compensatory damages. (Pltf. depo. p. 288:2-20).

evidence. Thus, at a minimum, Smith is precluded as a matter of law from recovering the requested relief.

      1.     <u>Plaintiff's claim for damages is limited by after-acquired evidence.</u>

Even if Smith can withstand summary judgment based on the record evidence, the plaintiff's claim for damages is limited as a matter of law because she undisputedly violated Sears' policy prohibiting sales associates from accessing or using Sears' company records for non-business reasons. In <u>McKennon v. Nashville Banner Publ'g Co.</u>, the Supreme Court held that an employee's claim for damages under Title VII is limited if during the investigation and/or litigation of the claim, the employer learned of misconduct that is a legitimate basis for discharging the employee.[14]  513 U.S. 352, 360-1 (1995). The after-acquired evidence rule applies to cases in which the after-acquired evidence "concerns the employee's misrepresentations in a job application or resume, as well as cases in which the after-acquired evidence relates to employee wrongdoing during employment." <u>Wallace</u>, 62 F. 3d at 379.

"Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." <u>McKennon v. Nashville Banner Publ'g Co.</u>, 513 U.S. 352, 362-3 (1995). "Once an employer learns about employee wrongdoing that would lead to a legitimate discharge, we [the court] cannot require the employer to ignore the

---

[14]     While <u>McKennon</u> dealt with a claim under the Age Discrimination in Employment Act ("ADEA,") its holding is applicable to claims brought under Title VII. <u>Wallace v. Dunn Constr. Co., Inc.</u>, 62 F. 3d 374, 378 (11th Cir. 1995). The after-acquired evidence rule also applies in §1981 cases. <u>See, e.g.</u>, <u>Weeks v. Coury</u>, 951 F. Supp. 1264, 1277 (S.D. Tex. 1996).

information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit." McKennon, 513 U.S. at 362. As a result, equity necessarily limits part of the damages that may be had by an employee. "[N]either reinstatement nor front pay is an appropriate remedy" where after-acquired evidence would have led to an employee's termination. Id. Injunctive relief will also not be appropriate. Wallace, 62 F. 3d at 380. A backpay award will also be limited; and it is calculated "from the date of the unlawful discharge to the date the new information was discovered." Id.

It is undisputed that the plaintiff violated Sears' company records and property policy on or about November 5, 2004, when she accessed and removed from Sears, company records relating to other associates, customers, and even managers for her own personal use. (Pltf. depo. pp. 281:20-283:10). The plaintiff admitted that despite having received Sears' handbook that clearly articulates this policy, she obtained copies of these documents, some of which contained credit card information, to "protect herself" and for Beatrice Willis, who was another Sears' associate who had been terminated for misusing the service coupon a few days before. (Pltf. depo. p. 281:20-283:10). It is also undisputed that this is a terminable offense and that had Sears been aware of the plaintiff's misconduct, it would have terminated her employment immediately. (Mason Decl. ¶ 25; Reese Decl. ¶ 28; Gandy Decl. ¶ 31; Pltf. depo. p. 88:13-89:3). As a result, any award she is granted cannot include frontpay, reinstatement, or any injunctions against Sears. Further, any backpay award granted is limited from November 14, 2004, the date when the plaintiff was terminated, to April 26, 2006, the date Sears discovered

that she violated Sears' records policy. This court should therefore limit the plaintiff's claim for damages as a matter of law.

        2.     The plaintiff's claim for relief is further limited by the mixed motive defense

Under Title VII, if the employer can show that it would have taken the same employment action despite any alleged impermissible motivating factor, the plaintiff is not entitled to backpay or reinstatement. Desert Palace, Inc. v. Costa, 539 U.S. 90, 94-95 (2003). Rather, a plaintiff's remedies are limited to declaratory relief, other injunctive relief, and attorney's fees and cost. 42 U.S.C. § 2000e-5(g)(2)(B). Here, the plaintiff is seeking reinstatement and backpay. It is undisputed, however, that Sears would have terminated the plaintiff regardless of her race. (Reese Decl. ¶ 17; Gandy Decl. ¶ 47). The record evidence clearly demonstrates that the plaintiff used Sears' service coupon to close numerous sales when the customer was not eligible to receive that discount. (Pltf. depo. p. 119, Ex. 6; Gandy Decl. ¶¶ 14-17; Reese Decl. ¶ 17). It is also undisputed that Sears takes integrity issues seriously and has consistently terminated associates who have engaged in such behavior regardless of their race. (Gandy Decl. ¶ 47; Reese Decl. ¶ 43; Mason Decl. ¶ 40; Pltf. depo. pp. 87:9-88:4, Ex. 1). Consequently, the plaintiff's relief is limited.

## V.    CONCLUSION

For the foregoing reasons, this court should grant the defendant's motion for summary judgment on all of the plaintiff's claims, dismiss the action and tax costs, or in the alternative, it should limited the plaintiff's damages as requested.

/s/MiekeA.Hemstreet
Mac B. Greaves (GRE007)
Mieke A. Hemstreet (HEM007)
Attorney for Defendant

SEARS, ROEBUCK AND CO.

OF COUNSEL:
BURR & FORMAN LLP
3100 Wachovia Tower
420 North 20th Street
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Defendant Sears, Roebuck & Co.'s Brief in Support of its Motion for Summary Judgment has been served on the following by directing same to her office address through first-class, United States mail, postage prepaid, on this the 15th day of June, 2006:

T. Robin McIntyre
2101 Executive Park Drive
Opelika, Al 36801

/s/ Mieke A. Hemstreet
OF COUNSEL