**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    EASTERN DIVISION

4                                          ORIGINAL

5    CASE NUMBER:  3:05-CV1018-M

6    DENISE L. SMITH,

7              Plaintiff,

8              vs.

9    SEARS,

10             Defendant.

11


12              S T I P U L A T I O N

13         IT IS STIPULATED AND AGREED by

14   and between the parties through their

15   respective counsel, that the deposition of

16   Denise L. Smith may be taken before Anita

17   Thebo, Commissioner, at the offices of

18   Burr & Forman, at 201 Monroe Street,

19   Montgomery, Alabama 36104, on the 28th day

20   of April, 2006.

21

22         DEPOSITION OF DENISE L. SMITH

23                              (48094)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 2

1    IT IS FURTHER STIPULATED AND

2    AGREED that the signature to and the

3    reading of the deposition by the witness

4    is waived, the deposition to have the same

5    force and effect as if full compliance had

6    been had with all laws and rules of Court

7    relating to the taking of depositions.

8    IT IS FURTHER STIPULATED AND

9    AGREED that it shall not be necessary for

10   any objections to be made by counsel to

11   any questions except as to form or leading

12   questions, and that counsel for the

13   parties may make objections and assign

14   grounds at the time of the trial, or at

15   the time said deposition is offered in

16   evidence, or prior thereto.

17   IT IS FURTHER STIPULATED AND

18   AGREED that in accordance with Rule 5(d)

19   of The Alabama Rules of Civil Procedure,

20   as Amended, effective May 15, 1988, I,

21   Anita Thebo, am hereby delivering to Mieke

22   A. Hemstreet the original transcript of

23   the oral testimony taken on the 28th day

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 3

1    of April, 2006, along with the exhibits.

2         Please be advised that this is

3    the same and not retained by the Court

4    Reporter, nor filed with the Court.

5         * * * * * * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 4

```
1              I N D E X

2            EXAMINATION

3                                    Page

4    By Ms. Hemstreet ...................... 7

5            DEFENDANT'S EXHIBITS

6                                    Page

7    Exhibit 1 ............................. 18

8    Exhibit 2 ............................. 50

9    Exhibit 3 ............................. 51

10   Exhibit 4 ............................. 52

11   Exhibit 5 ............................. 116

12   Exhibit 6 ............................. 120

13   Exhibit 7 ............................. 142

14   Exhibit 8 ............................. 187

15   Exhibit 9 ............................. 188

16   Exhibit 10 ............................ 190

17   Exhibit 11 ............................ 245

18   Exhibit 12 ............................ 253

19   Exhibit 13 ............................ 260

20   Exhibit 14 ............................ 261

21   Exhibit 15 ............................ 270

22   Exhibit 16 ............................ 275

23   Exhibit 17 ............................ 276
```

Page 5

1    Exhibit 18 ........................... 285

2    Exhibit 19 ........................... 287

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 6

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    EASTERN DIVISION

4

5     CASE NUMBER:  3:05-CV1018-M

6     DENISE L. SMITH,

7               Plaintiff,

8               vs.

9     SEARS,

10              Defendant.

11

12    BEFORE:

13              Anita Thebo, Commissioner.

14

15    APPEARANCES:

16              ROBIN T. MCINTYRE, ESQUIRE,

17    Attorney at Law, 2101 Executive Park

18    Drive, Opelika, Alabama 36801, appearing

19    on behalf of the Plaintiff.

20              MIEKE A. HEMSTREET, ESQUIRE, of

21    Burr & Forman, 420 North 20th Stree, Suite

22    3100, Birmingham, Alabama 35203, appearing

23    on behalf of the Defendant.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 7

1    I, Anita Thebo, a Court Reporter

2  of Prattville, Alabama, acting as

3  Commissioner, certify that on this date,

4  as provided by the Federal Rules of Civil

5  Procedure and the foregoing stipulation of

6  counsel, there came before me at the

7  offices of Burr & Forman, 201 Monroe

8  Street, Montgomery, Alabama 36104,

9  beginning at 10:30 a.m., Denise L. Smith,

10  witness in the above cause, for oral

11  examination, whereupon the following

12  proceedings were had:

13    DENISE L. SMITH,

14  being first duly sworn, was examined and

15  testified as follows:

16    EXAMINATION

17  BY MS. HEMSTREET:

18    COURT REPORTER:  Usual

19  stipulations?

20    MS. HEMSTREET:  That's fine.

21  MR. MCINTYRE:  Yes.

22    Q.    Ms. Smith, my name is Mieke

23  Hemstreet, and I met you just a few

Page 8

1    minutes ago.  And I am an attorney for

2    Sears, and I am representing them in the

3    lawsuit that you have filed against them.

4         Can you state your full name for the

5    Record for me, please.

6         A.    Denise Lorraine Smith.

7         Q.    Now, I'm here to ask you some

8    questions regarding the law that you have

9    filed against Sears.  Have you ever had

10   your deposition taken before?

11        A.    No.

12        Q.    In that case, I'd like to go

13   over a few rules.  These go for me as well

14   as -- some of them go for me as well as

15   for you.

16        First of all, you can take a break

17   any time you need it.  The only thing I

18   ask, if I've asked a question, if you

19   could go ahead and answer it before you

20   take that break.

21        If you don't understand something I

22   ask, just let me know, and I'll be happy

23   to rephrase it, because I want to make

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 9

1    sure that you understand all of my

2    questions today.

3          A.      Okay.

4          Q.      And if you don't ask me to

5    rephrase it and you do answer the

6    question, then I'm going to assume that

7    you understood the question that I asked;

8    is that fair?

9          A.      That's fair.

10         Q.      Throughout the afternoon and

11   the morning your attorney may object, and

12   primarily that's for the Record.  He's

13   probably already gone over that with you.

14         Have you taken any medications today

15   or anything else that would impair your

16   ability to answer my questions truthfully?

17         A.      No.

18         Q.      Have you done anything else

19   that would impair you from answering my

20   questions truthfully today?

21         A.      No.

22         Q.      Are there any medical

23   conditions that you have that I need to be

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 10

1   aware of as we go throughout the day, just

2   for my knowledge?

3        A.     No.

4        Q.     The other thing is, please

5   answer verbally, that means yesses or nos;

6   try to avoid the head shakes, the head

7   nods, and that kind of thing.  It makes it

8   much easier for the court reporter to take

9   down.

10       A.     Okay.

11       Q.     The other thing is I have a

12  habit of doing this, we get into a

13  conversation, and we tend to interrupt and

14  talk over each other.  I'll try to let you

15  finish the answers to my questions; and at

16  the same time, if you'll let me finish my

17  questions, again, it will be a lot easier

18  for the court reporter to take down and we

19  won't be talking over each other.

20       A.     Okay.

21       Q.     Now, Ms. Smith, did you review

22  any documents in preparation for your

23  deposition today?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 11

```
 1        A.     Today?

 2        Q.     No.   Just at all, in

 3   preparation for the deposition, did you

 4   look over any documents?

 5        A.     Yes.   Mine.

 6        Q.     And what documents were those?

 7        A.     All the packet that we

 8   submitted.

 9        Q.     So all the papers you gave to

10   your attorney that he in turn --

11        A.     Yes.

12        Q.     -- supplied to us?

13        Okay.   And we'll probably look at

14   those a little bit later.

15        Did you review anything else?

16        A.     No.

17        Q.     How much time did you spend

18   looking at those documents?

19        A.     About two hours.

20        Q.     Did you discuss this

21   deposition with anybody else besides your

22   attorney?

23        A.     Yes.   Beatrice Willis.
```

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 12

1     Q.     And what --

2     A.     And Shannon Bryant.

3     Q.     And both of those individuals

4  used to work for Sears; is that correct?

5     A.     That's correct.

6     Q.     And it's your understanding

7  that Ms. Willis also has a lawsuit against

8  Sears; is that correct?

9     A.     That's correct.

10     Q.     What about Ms. Bryant, do you

11  know if she has a lawsuit against Sears?

12     A.     No.

13     Q.     What did you and Ms. Willis

14  talk about?

15     A.     Just basically the generation

16  -- the general case, specifics of what we

17  had written down, we went over the reasons

18  that we had different witnesses on the

19  list.

20     Q.     What witnesses on the list are

21  you referring to?

22     A.     Can I get my packet out?

23     Q.     Sure.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 13

1      A.     On the one where you submitted

2    the questions for the interrogatories, the

3    number eight, we went basically over

4    those.

5          MS. HEMSTREET:   Let the Record

6    reflect that Ms. Smith is referring to the

7    interrogatories that plaintiff has

8    produced to the defendant, and she's

9    specifically referring to number eight.

10     Q.     So Ms. Willis has different

11   individuals on her list, is that what

12   you're saying?

13     A.     No.  We just went over to

14   explain to our attorney --

15     Q.     Okay.  I don't want to know

16   about conversations you had with your

17   attorney.  Just between you and

18   Ms. Willis.

19     A.     We didn't discuss it alone.

20     Q.     Okay.

21     A.     We discussed it with our

22   attorney.

23     Q.     Okay.  Anything that you and

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 14

1    Ms. Willis discussed alone?

2         A.    No.

3         Q.    I'm sorry, I should have made

4    that clear.   No, I don't want to know any

5    conversations you've had with

6    Mr. McIntyre.

7         A.    That's when all that

8    discussion took place.

9         Q.    Okay.   Anybody else you had a

10   conversation -- You said you had a

11   conversation with Shannon Bryant?

12        A.    That was the same time.

13        Q.    So that was also in front

14   of --

15        A.    Uh-huh (positive response).

16        Q.    -- your attorney.

17   Have you ever had any conversations

18   with Ms. Bryant about this lawsuit amongst

19   yourselves?

20        A.    We have.

21        Q.    And what were those

22   conversations about?

23        A.    Basically the same thing, we

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 15

1  just talked about the case, the

2  generalities of the case, nothing that we

3  didn't discuss with him.

4      Q.    Well, I want to know

5  specifically what conversations you had

6  with Ms. Bryant outside of the presence of

7  your attorney.

8      Let's start with this:  When was the

9  first conversation that you recall that

10  you had with Ms. Bryant about the case?

11     A.    Can I ask a question?

12          MR. MCINTYRE:  Sure.

13     A.    Are you talking about after we

14  filed the lawsuit, before we filed the

15  lawsuit, or --

16     Q.    I'm talking about in

17  preparation for today, so it would be

18  after that you filed the lawsuit.

19     A.    Oh, we didn't talk about

20  preparation.  That conversation didn't

21  exist.

22     Q.    Okay.  Same thing with

23  Ms. Willis, did you talk to Ms. Willis --

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 16

1    A.    Not in preparation.

2    Q.    -- in preparation for today?

3    A.    No.

4    Q.    Now, Ms. Smith, you're present

5    today based on a deposition notice that I

6    sent to your attorney; is that correct?

7    A.    That's correct.

8    Q.    Now, your attorney and I have

9    had a conversation prior to this

10   indicating that y'all have produced any

11   documents that we've referred to in this

12   deposition notice with the exception of

13   your 2000 tax returns, which we only asked

14   for 2001; is that correct?

15   So you've given us all the

16   information?

17   A.    All except for the 2001.

18   Q.    2001 tax return, okay.

19   Now --

20   MR. MCINTYRE:  I guess I ought

21   to interject.  I discussed that we didn't

22   produce any medicals because there's no

23   medical part of this.  You asked for that,

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 17

1   we didn't produce it.

2           MS. HEMSTREET:  Correct.

3           MR. MCINTYRE:  So that's the

4   only thing, I was just making sure the

5   Record is clear.

6           MS. HEMSTREET:  So in response

7   to the deposition notice, we asked for

8   information referring to medical records,

9   hospital records, psychiatric treatment,

10  or any medical treatment that you may have

11  received pursuant to this claim, and y'all

12  are saying --

13          MR. MCINTYRE:  There is none,

14  and there is not going to be.

15          MS. HEMSTREET:  Okay.

16      Q.    Now, you brought with you

17  today some documents that were responsive

18  to some questions that we asked; is that

19  correct?

20      A.    That's correct.

21      Q.    And one of those was a

22  handbook; is that correct?

23      A.    Yes, that's correct.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 18

1      Q.      Who provided you that

2  handbook?

3      A.      If I'm correct, I had it in my

4  possession.

5      Q.      But did you get it from Sears?

6      A.      I got it from Sears.

7                      (Whereupon, Defendant's

8                      Exhibit No. 1 was

9                      marked for

10                     identification.)

11     Q.      I'm going to go ahead and mark

12  this as Exhibit 1.

13     Now, Ms. Smith, is that the handbook

14  that you gave me this morning?

15     A.      Yes.

16     Q.      And it's from Sears; is that

17  correct?

18     A.      That's correct.

19     Q.      And it's entitled Associate

20  Handbook, Code of Conduct, Company

21  Policies, Benefits, Safety, and Loss

22  Prevention; is that right?

23     A.      That's right.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

1        Q.     Do you remember when you

2    received this handbook from Sears?

3        A.      Not really.   Normally we

4    receive them when we get employed, and

5    that's probably when I got it.   But I

6    can't say truthfully that's when I got it.

7        Q.      But sometime while you were

8    employed there you received it?

9        A.     Yes.

10       Q.      We're going to come back to

11   that.

12        Have you ever been a party in a

13   lawsuit?

14       A.      Yes, I have.

15       Q.     And what lawsuit was that?

16       A.      That was myself against Auburn

17   City School Board of Education.

18       Q.      And when was that?

19       A.      That was in 2001 I believe.

20       Q.      And what was the nature of

21   that lawsuit?

22       A.      Can I ask him something?

23            MR. MCINTYRE:   Yeah.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 20

1              (Off-the-Record

2              discussion was held.)

3         MR. MCINTYRE:  They've settled

4    it, so --

5         MS. HEMSTREET:  Well, she

6    can -- I'm not asking her to discuss the

7    terms of agreement.  All I'm asking is

8    what the nature of the lawsuit is.  That's

9    a matter of public record.

10        MR. MCINTYRE:  What type of

11   lawsuit was it, I guess.  You don't have

12   to tell her what the outcome was, you just

13   tell her what was the complaint, what was

14   your complaint I guess.

15        A.    Basically what happened was

16   the supervisor, I told him that he was

17   prejudiced based on some things that

18   was -- rules that was going on, and he

19   thought that he could terminate me based

20   on that.  So we ended up in a lawsuit

21   behind that.

22        And we had settled the lawsuit that

23   I would get my job back and that it

Page 21

1  wouldn't be anything in my record,

2  wouldn't be anything in his record, but he

3  tried to put it on my evaluation, which

4  was wrong.  So that's where it came back

5  to be the lawsuit.

6      Q.    You said you told him that

7  something -- he was being prejudiced about

8  some things?

9      A.    Different routes, yes.

10      Q.    And what was the prejudice

11  based on?

12      A.    Because if it was different

13  things in different neighborhoods, he

14  didn't care what was going on; but I had a

15  neighborhood that was a rich neighborhood,

16  and he wanted me to bend my rules,

17  different rules, according to that

18  neighborhood.  And I just -- I told him

19  that I didn't do that, when a child got on

20  my bus, they were green, that means every

21  child was the same, whether it was mine or

22  anybody else's, and I just don't change my

23  rules because of -- for other kids.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 22

1     Q.     I guess my question isn't

2  clear.   What exactly was the nature of

3  your lawsuit?

4          Was it a race discrimination

5  lawsuit, was it a gender discrimination

6  lawsuit?   What kind of lawsuit was it?

7     A.     It didn't start off as

8  discrimination, but it ended as

9  discrimination because of one of the

10  supervisors that had started harassing me.

11  And then when they ended up doing a

12  survey, he harassed all but one female on

13  the lot.   So that's why it ended up as a

14  discrimination.

15     Q.     So when you filed your

16  complaint in court --

17     A.     I just filed -- I filed a

18  grievance to get my job back.

19     Q.     And then what happened after

20  you filed the grievance to get your job

21  back?   And that was because --

22     A.     We met and we -- That's when

23  we all met, the superintendent, myself,

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 23

1    the AEA representative, and that's when we

2    agreed that everything would be -- I would

3    get my job back, everything go back to

4    square one, because they found

5    discrepancies on his side also.  And I

6    admitted that I did tell him that he was

7    prejudiced.

8         Q.    Prejudiced in what way?

9         A.    That's what I told him.  I

10   said, you just prejudiced.

11        Q.    I'm asking you, what was your

12   complaint, prejudiced in what way?

13        A.    Based on what I just said

14   about the school bus:  Different routes --

15   Kids in the poor neighborhoods, they could

16   tear the bus apart and he didn't care.

17        Q.    When you said that he was

18   prejudiced, did it have anything to do

19   with your race, was that your complaint?

20        A.    Not my race per se, no.

21        Q.    And you said y'all settled

22   this; is that correct?

23        A.    Yes.  And I was reinstated.

Page 24

```
 1        Q.    And that's when you were
 2   driving a bus route; is that right?
 3        A.    Right.
 4        Q.    Did you file an EEOC charge
 5   or -- along with this lawsuit?
 6        A.    At the end we did.
 7        Q.    And what was the basis of that
 8   EEOC charge?
 9        A.    Sexual harassment.
10        Q.    And when you say we, who else
11   is we?
12        A.    Me and my attorney.
13        Q.    And who was the sexual
14   harassment against, who was the charge
15   against?
16        A.    The guy that was underneath my
17   immediate supervisor who was the lead
18   person.
19        Q.    Do you remember his name?
20        A.    Rush Tanner.
21        Q.    And that was your immediate
22   supervisor?
23        A.    No.  Don Ingram was my
```

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 25

1    immediate supervisor.  And then he was his

2    assistant.

3         Q.    Was Rush Tanner?

4         A.    Right.

5         Q.    Any other charges of

6    discrimination that you filed besides that

7    one and the one against Sears?

8         A.    No.

9         Q.    Any other lawsuits that you've

10   been a party to?

11        A.    No.

12        Q.    Have you ever filed for

13   worker's compensation --

14        A.    Wait a minute, let me take

15   that back.

16        It wasn't my -- My first husband

17   settled a case because he got electrocuted

18   on a job, and by me being a spouse, I had

19   to sign off.  But I didn't attend anything

20   with it, but me being a spouse, they

21   required me to sign.  So I don't know if

22   that's me being a party or --

23        Q.    You didn't actually sue

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 26

1    anybody?

2            A.     I didn't.

3            Q.     You weren't named as a party?

4            A.     No.  No.

5            Q.     So indirectly you had to sign

6    some sort of agreement in conjunction with

7    that?

8            A.     By being a spouse.

9            Q.     When was that?

10           A.     Probably 1989.

11           Q.     Okay.  Around 1989, okay.

12           Have you ever made any claims of

13   race discrimination besides the one you

14   made against Sears?

15           A.     No.

16           With Don, telling him he was

17   prejudiced, but that wasn't the basis of

18   the lawsuit though.

19           Q.     So when you told Don he was

20   prejudiced, you were --

21           A.     He terminated me based on

22   that.

23           He couldn't terminate me, he --

Page 27

1    Q.    Recommended --

2    A.    -- recommended.

3    Q.    -- you be terminated?

4    A.    Uh-huh (positive response).

5    And when I went to the

6    superintendent -- Because after he did

7    that I went to the superintendent.  And

8    the superintendent at that time was new;

9    and when he called me and told me that he

10   had to go along with the recommendation

11   because he was new, three times he told me

12   not to let that go.

13   Q.    So did you feel that either

14   one of your supervisors were

15   discriminating against you on the basis of

16   your race?

17   A.    Not against me.

18   Q.    But against the children, is

19   that the bus route?

20   A.    Right.

21   Q.    And was your supervisor white

22   or black?

23   A.    One was white and one was

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 28

1    black.

2         Q.     Who was white?

3         A.     Don Ingram was white.   Rush

4    Tanner was black.

5         And Rush Tanner was eventually -- He

6    was made to retire.   He had to resign or

7    be terminated.

8         Q.     Tell me, have you ever gone by

9    another name besides Denise Smith?

10        A.     My maiden last name is Baker,

11   and my first married name was Dowdell.

12        Q.     Can you spell that for me?

13        A.     D-O-W-D-E-L-L.

14        Q.     What is your current address?

15        A.     930 Holmes, H-O-L-M-E-S,

16   Avenue, Auburn, Alabama 36832.

17        Q.     And how long have you lived

18   there?

19        A.     I've lived there approximately

20   four years.

21        Q.     Anybody live there with you?

22        A.     Off and on, my husband,

23   children.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 29

1      Q.      What's your husband's name?

2      A.      Boris Smith.

3      Q.      Any of your kids over the age

4  of eighteen?

5      A.      My oldest daughter, she's

6  nineteen.

7      Q.      Does she live with you?

8      A.      Yes.

9      Q.      And what is her name?

10     A.      Tashira, T-A-S-H-I-R-A,

11  Dowdell.

12     Q.      That's a pretty name.

13     A.      Thank you.

14     Q.      And you have other children,

15  is that right, but they're under the age

16  of eighteen?

17     A.      Yes.  I have one daughter that

18  live with me.

19     I mean one other daughter besides

20  the oldest one.

21     Q.      Okay.

22     Anybody else live there with you?

23     A.      My aunt part-time when she's

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 30

1    -- She's up in age, so sometimes I take

2    care of her.

3            Q.     What is her name?

4            A.     Her name is Carrie Jones.

5            Q.     What was your previous

6    address, do you remember?

7            A.     I have to look back at this

8    (indicating).   I had to look in the phone

9    book to get it.

10           It's on Thorpe Street.  I think it's

11   645 Thorpe Street.  I'm almost positive

12   it's 645 Thorpe Street in Auburn.

13           Q.     Let me just ask you, you're

14   again looking at your interrogatories

15   which we'll introduce as an exhibit later,

16   but you think the information of your last

17   address is listed in there?

18           A.     It's listed in here because I

19   had to look it up.

20           Q.     Okay.  And how long did you

21   live at that address?

22           A.     I lived there about a year and

23   a half.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 31

1      Q.      Was that still in Opelika?

2      A.      In Auburn.

3      Q.      Are you currently renting your

4  house or do you have a mortgage or --

5      A.      I actually own my home with my

6  mother.

7          And I do have a mortgage.

8      Q.      What is your social security

9  number?

10     A.      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.

11     Q.      And what is your date of

12  birth?

13     A.      9/16/65.

14     Q.      And you're currently married;

15  is that right?

16     A.      Yes.

17     Q.      And you said your husband's

18  name is Boris?

19     A.      Boris, B-O-R-I-S, Smith.

20     Q.      And when did you get married

21  to him?

22     A.      June 17, 2000.

23     Q.      Were you married before that?

Page 32

1      A.      Yes.

2      Q.      And who was that to?

3      A.      Jonathan, J-O-N-A-T-H-A-N,

4  Dowdell.

5      Q.      And when did you marry him?

6      A.      March 15, 1985.

7      Q.      And how long were you married

8  to him?

9      A.      We divorced October 1998.  It

10  was final then.

11      Q.      Any other marriages?

12      A.      No.

13      Q.      And you have three children;

14  is that correct?

15      A.      I have two by -- biological

16  kids and I have two stepchildren.

17      Q.      Any of your stepchildren over

18  the age of eighteen?

19      A.      No.

20      Q.      Do you have lots of relatives

21  in Alabama?

22      A.      Yes.

23          MS. HEMSTREET:  What I'm

Page 33

1  probably going to do rather that spend

2  time, Robin, I'll probably ask, just get a

3  list of all of her relatives in Alabama.

4  But instead of taking time doing that

5  today, if you could go ahead and make a

6  list for me, then that would be helpful.

7          MR. MCINTYRE:   Relatives to how

8  far?

9          MS. HEMSTREET:   Just those over

10  the age of eighteen.

11          THE WITNESS:   What type

12  relatives?

13          MS. HEMSTREET:   Those in the

14  middle district of Alabama.   I would say

15  those including brothers, sisters,

16  grandparents, parents, kids, first -- up

17  through first cousins, aunts, uncles, and

18  first cousins that would be sufficient.

19      A.      I can name them real quick.

20      Q.      There aren't many that live in

21  Alabama?

22      A.      Not that live in Alabama.

23      Q.      Okay.   Let's go ahead and go

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 34

1    through it then.    That will be fine.

2         A.    My mother is Janet Baker.

3         Q.    Where does she live?

4         A.    548 North Donahue Drive.    I

5    don't know the addresses of the others.

6         Q.    That's fine.    Just the general

7    area, if you can.

8         Is that in Auburn?

9         A.    Auburn.

10        Q.    Who else?

11        A.    I have a brother that live in

12   Auburn, his name is Derrick Gentry; I have

13   a sister in Opelika, her name is Kathy

14   Stewart; then I have a aunt Dorothy

15   Dowdell in Auburn.

16        All these are going to be in Auburn.

17        Q.    Okay.

18        A.    Bernice Echols.

19        Q.    What's the relation?

20        A.    Aunt.    All these are aunt.

21   Mary Echols, aunt; and then Carrie Jones,

22   but you can use her as Opelika and Auburn,

23   because she stays with me sometimes.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 35

```
 1        Q.        Anyone else?
 2        A.        Callaway Baker, my uncle in
 3   Opelika.
 4        Q.        Who else?
 5        A.        And then cousins is Iris
 6   Cannon.
 7        Q.        Where does she live?
 8        A.        Auburn.  These are all Auburn.
 9   -- Well, and Willie Cannon, Lafayette.
10        Q.        Okay.
11        Also Auburn?
12        A.        Lafayette.
13        Q.        Okay.
14        A.        Betty Cannon, and I don't know
15   where she lives.
16        Q.        Somewhere in the center of
17   Alabama?
18        A.        She live everywhere.
19             MR. MCINTYRE:    Auburn/Opelika?
20        A.        Auburn, Opelika, Mobile -- not
21   Mobile, Huntsville.  She floats back and
22   forth.
23        Q.        Okay.
```

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 36

1      A.      And Nokia Echols, and I don't

2   know where he is.

3      Q.      Anyone else?

4      A.      And that's it.

5      I forgot about my mom's brother's

6   kids because he's passed.  Patricia -- I

7   don't know their last names.  But they're

8   in Auburn.  Patricia --

9      Q.      Well, if you think of any

10  others, if you can just put that on a list

11  and provide it to your attorney, he'll get

12  it to us and that would be helpful.

13     A.      Okay.

14     Q.      Now, Ms. Smith, have you ever

15  been arrested or convicted of a crime?

16     A.      Yes.

17     Q.      And was that trespassing?

18     A.      Trespassing.

19     Q.      In 2000?

20     A.      Yes.

21     Q.      And that was in Lee County?

22     A.      Yes.

23     Q.      Can you tell me about that?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 37

1      A.    Yes.   My husband that I have

2   now was being unfaithful, and he has --

3   that's when he got a daughter; and he was

4   at the girl's house, his daughter's

5   mother's house.  And I had just purchased

6   some tires for his car because he had --

7   put four tires on the car, and he went to

8   see her.  I didn't knock on the door,

9   didn't say anything to either one of them.

10  My thing was, if you're going to go see

11  her, you go see her on your own tires, so

12  I cut my own tires.  And that was it.

13      Q.    And they called the police; is

14  that right?

15      A.    Yes.   Well, they called the

16  police because they didn't -- They just

17  assumed it had to have been me because I

18  had just bought the tires.  You know,

19  nobody else, you know, would have any

20  interest in the tires.  And I didn't knock

21  on the door, didn't say anything to either

22  one.

23      Q.    Did you have a trial?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 38

1    A.    Well, we went to court, we had

2  a court date, and when -- It wasn't any

3  discussion, I just went ahead and pled

4  guilty because I did go on her property.

5    Q.    Pled guilty?

6    A.    Uh-huh (positive response).

7  It lasted about three minutes.

8    Q.    What was your -- Did you --

9  Were you fined?

10    A.    I was fined like two hundred

11  dollars.

12    Q.    Did you get any community

13  service or anything like that?

14    A.    Uh-huh (positive response).

15    I think it was twenty hours I had to

16  do.

17    And I did that working with my aunt

18  at her church.

19    Q.    Is this your only --

20    A.    That's it.

21    Q.    -- conviction?

22    A.    Uh-huh (positive response).

23    Q.    Only time you've been

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 39

1  arrested?

2       A.    Uh-huh (positive response).

3       Q.    And that was in 2000, correct?

4       A.    Uh-huh (positive response).

5       Q.    Did you notify anyone at Sears

6  about this?

7       A.    No.

8       Matter of fact, my mother didn't

9  even know until recently.

10      Q.    And this is when you were

11  working at Sears, correct?

12      A.    Yes.  Because I was

13  embarrassed about being silly.

14      Q.    You went to high school in

15  Auburn; is that correct?

16      A.    That's correct.

17      Q.    What high school was that?

18      A.    Auburn High School.

19      Q.    And you graduated; is that

20  correct?

21      A.    That's correct.

22      Q.    What year?

23      A.    1983.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 40

1        Q.      And did you go to college
2    after that?
3        A.      I went to Opelika Technical
4    College in business, about a year and
5    maybe three months or something like that.
6        Q.      Did you obtain a degree?
7        A.      I didn't.  I had one quarter
8    left.
9        Q.      Any other schools that you
10   went to?
11       A.      I took some classes at Auburn,
12   some continuing education classes at
13   Auburn, but it wasn't for degrees.
14       Q.      Have you ever been in the
15   military?
16       A.      No.
17       Q.      So after you graduated from
18   Auburn, you went to Opelika Technical
19   College.  Where did -- I assume you
20   started working after that; is that right?
21       A.      I worked while I was in
22   school.
23       Q.      And tell me the first job that

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 41

1   you recall having and when that was?

2         A.    My first actual job was Krispy

3   Kreme Doughnuts, it was a part-time

4   position.

5         Q.    And when was that?

6         A.    I was in high school.

7         Q.    Okay.

8         A.    I think I started at sixteen

9   years old.

10        Q.    And what about after you

11  graduated from --

12        A.    From Krispy Kreme I went to

13  Diversified Products.

14        Q.    Let me back up.  I'm wanting

15  to know about your jobs after high school.

16        A.    Well, after high school was

17  Diversified Products.  That's when I was

18  going to school at Opelika Tech also.

19        Q.    What did you do there?

20        A.    I worked in -- I was full-time

21  in metal fab, production.

22        Q.    What was your title?  Were you

23  working -- I don't know what they do, tell

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 42

1    me what they do.

2         A.    We made exercise equipment.

3    And I worked in the welding part.

4         Q.    Was this an hourly job?

5         A.    Yes.

6         Q.    Full-time?

7         A.    Yes.

8         Q.    Do you remember who your

9    supervisor was?

10        A.    I don't.

11        Q.    Do you remember about the

12   dates you were employed?

13        A.    Not offhand.  But I know it

14   was '83.  I know I was working, and I

15   stopped when I was pregnant with my oldest

16   daughter, and she was born in '86.

17        Q.    So roughly around '86?

18        A.    Uh-huh (positive response).

19        Q.    Okay.  What was the next job

20   you had after that?

21        A.    I worked at Opelika High

22   School.

23        Q.    What did you do there?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 43

1        A.      I was the computer classroom

2    aide.

3        Q.      And when was -- Do you

4    remember the dates of that?

5        A.      From '86 -- It was after she

6    was born till '89, I think, when I went to

7    Auburn.

8        Q.      And who was your supervisor,

9    do you remember?

10       A.      Susan -- What was Susan's last

11   name.

12       Q.      That's okay if you don't

13   remember.

14       A.      Susan Bruce.

15       Q.      Was that an hourly job also?

16       A.      It was contract job.

17       Q.      Do you remember how much you

18   were making?

19       A.      Not offhand I don't.

20       Q.      What about at Diversified

21   Products, do you remember what your rate

22   was?

23       A.      There it was around seven

Page 44

1   dollars.

2        Q.      What happened after you went

3   to Opelika High School, what was your

4   reason for leaving there?

5        A.      I went to Auburn for more

6   money.

7        Q.      And why did you leave

8   Diversified Products?

9        A.      Got laid off.

10       Q.      And then you started working

11  for Auburn?

12       A.      Uh-huh (positive response).

13       Q.      City Schools?

14       A.      No.  Auburn University.

15       Q.      Auburn University.

16       And what were the dates of those

17  employment?

18       A.      The first time was eleven --

19  1989 till '91 -- '92, '92.

20       Q.      What did you do there?

21       A.      I was office administrative.

22       Q.      In what department?

23       A.      That was in nutrition and food

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 45

1    science.

2        Now, I'm back at Auburn again, so I

3    don't know --

4        Q.    We'll get to that.

5        So in '92 you were office

6    administrative in nutrition department.

7        And do you remember who your

8    supervisor was?

9        A.    Nancy Green, Dr. Nancy Green.

10       Q.    And do you remember what your

11   pay was?

12       A.    Only guessing, it was around

13   eighteen thousand a year.

14       Q.    And then you left there; is

15   that right?

16       A.    Uh-huh (positive response).

17   I stayed home with my daughter, my

18   youngest daughter.

19       Q.    So you left to be a

20   stay-at-home mom?

21       A.    Right.

22       Q.    And then --

23       A.    Then I started driving a

Page 46

1    school bus at Auburn City Schools.

2         Q.    When was that?

3         A.    1995 I believe.  March 1995 I

4    believe.

5         Q.    Was that the only job you had

6    at that time?

7         A.    Yes.

8         Q.    And who was your supervisor?

9         A.    Don -- At that time when I got

10   hired was Mike Holden.  Then Don Ingram

11   became the supervisor there.  But they

12   changed, and they started telling us to

13   use Annie Sweeney as our supervisor.

14        Q.    So during the course of your

15   employment there was Mike Holden, Don

16   Ingram, and then Annie Sweeney?

17        A.    Right.

18        Q.    And how long did you work at

19   Auburn City Schools?

20        A.    Right at ten years.  It was a

21   little short of ten years.

22        Maybe nine years, something.  I

23   stopped in -- had to have been 2004.

Page 47

1          Q.     And why did you leave there?

2          A.     Because Kenny Reese gave me

3    one day a week on my schedule and told me

4    if I needed more time on the schedule at

5    Sears that I needed to become full-time

6    there.  And I could not afford not to have

7    a full-time income coming in, so I

8    resigned.

9          Q.     When did you start working at

10   Sears?

11         A.     I started working at Sears

12   in --

13         Q.     1998, does that sound about

14   right?

15         A.     That sounds right.

16         Q.     Do you have any reason to --

17   If your employment records showed you

18   began working sometime in 1998, from

19   Sears, do you have any reason to dispute

20   that?

21         A.     No.

22         Q.     So there's some overlap there;

23   you began working with Sears in 1998, but

Page 48

1    you were still also working for Auburn

2    City Schools; is that right?

3         A.    And I forgot about before

4    Sears, I worked at Darden Oaks Apartment.

5    I was the apartment manager.

6         And I only worked there maybe a

7    year.  I started off as temporary --

8    through temporary services.

9         Q.    And what temporary service was

10   that?

11        A.    Kelly Temporary Services.  And

12   then they hired me part-time for the

13   apartment manager, for a new complex.

14        Q.    And do you remember what the

15   dates were of that before --

16        A.    I started during the Christmas

17   holiday, maybe '96.  And I stopped when I

18   went to Sears.  And I went to Sears

19   because the store manager, Mr. Collins,

20   recruited me to come there.  Because I

21   used to go in Sears a lot.

22        Q.    What department did you start

23   working in?

Page 49

1    A.    Appliances.

2    Q.    Started in appliances?

3    A.    Uh-huh (positive response).

4    Q.    Who was your supervisor when

5   you were at Darden Oaks?

6    A.    Brenda Haslett, H-A-S-L-E-T-T.

7    Q.    Now, at these jobs that you've

8   named other than Sears -- Well, Yeah.  At

9   these jobs other than Sears, were you ever

10  disciplined or reprimanded for any reason?

11   A.    Only at Auburn City Schools.

12   Q.    And what was that about?

13   A.    One time that my husband now,

14  he used to work there, and he and I had

15  had a dispute at work, so we both were

16  reprimanded about that.

17   Q.    And do you remember when that

18  was?

19   A.    I don't.

20   Q.    Any other time you were

21  reprimanded at Auburn?

22   A.    No.

23   Q.    Were you ever reprimanded for

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 50

1    getting in an altercation with another bus

2    driver?

3        A.    Oh, yes I forgot -- Actually

4    that was all the same incident.  It was

5    with Elaine Holt and my husband now.  It's

6    the same incident.

7        She and I had -- we had some words

8    on the bus itself, he and I was off the

9    bus; but it was the same day.

10        Q.    Were you ever reprimanded for

11   any other reason at Auburn City Schools?

12        A.    Not that I remember.

13                (Whereupon, Defendant's

14                Exhibit No. 2 was

15                marked for

16                identification.)

17        Q.    I'm going to mark for you

18   Exhibit 2.

19        A.    Yeah.  This was that same

20   incident.

21        Q.    Do you recognize that letter?

22        A.    Yeah.  It's the same incident.

23        Q.    It's dated September 10, 1999?