LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 51

1      A.      Yes.

2      Q.      This is referring to the

3  incident that you referred to, the

4  confrontation you had with Ms. Holt; is

5  that right?

6      A.      Right.

7      Q.      And you were suspended; is

8  that right?

9      A.      Yes, we were.

10      Q.      And what was the outcome of

11  that?  Did they let you come back to work?

12      A.      Uh-huh (positive response).

13  They did.

14                  (Whereupon, Defendant's

15                  Exhibit No. 3 was

16                  marked for

17                  identification.)

18      Q.      I'm going to mark also

19  Defendant's Exhibit 3; this is another

20  document from Auburn City Schools.  Do you

21  recognize that document?

22      A.      This is the same thing.

23      Q.      This is concerning the same

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 52

1    incident; is that right?

2         A.    Uh-huh (positive response).

3                    (Whereupon, Defendant's

4                    Exhibit No. 4 was

5                    marked for

6                    identification.)

7         Q.    And Defendant's Exhibit 4,

8    this is another document, now, this is

9    dated September 15, 2000, from Auburn City

10   Schools?

11        A.    This is the one that I had

12   told you about when he had recommended for

13   me to be terminated.

14        Q.    And the basis of recommending

15   your termination was -- What did he base

16   that on?

17        A.    Just based on what Don had

18   said is that I told him he was prejudiced

19   and that I had yelled at him.

20        Q.    Any other places where you've

21   been suspended?

22        A.    No.

23        Q.    Any other places where you've

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 53

1    worked where you've been disciplined?

2         A.    No.

3         Q.    Now, at any of these places

4    that you've named where you've worked so

5    far, did you ever complain about

6    discrimination while you were there?

7         A.    No.

8         No other than Auburn City Schools,

9    what I stated before.

10        Q.    What we've already covered?

11        A.    Right.

12        Q.    Now, did you ever hold any

13   other jobs while you were working at Sears

14   besides the ones that you've mentioned?

15   You mentioned Auburn City Schools, then

16   the Darden Oaks Apartments?

17        A.    No.

18        Q.    Now, I'm going to come back to

19   Sears in a minute.

20        After you were terminated from

21   Sears, where did you work after that?

22        A.    I went to Dillards.

23        Q.    And you were terminated from

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 54

1    Sears in November 2004, correct?

2        A.    Right.

3        Q.    When did you start working at

4    Dillards?

5        A.    December 1, of 2004.

6        Q.    And what did you do there?

7        A.    I was a sales associate in the

8    shoe department.

9        Q.    Who was your supervisor?

10       A.    Sharon Ann Sealy.

11       Q.    Sealy?

12       A.    Yes.  S-E-A-L-Y I believe.

13       Q.    And what was your rate of pay?

14       A.    Nine fifty an hour.

15       Q.    And how long were you there?

16       A.    I stayed there till either

17   June or July of last year, 2005.

18       And I left there and went to Belk.

19       Q.    While you were there, were you

20   ever disciplined?

21       A.    No.

22       Q.    Did you work on commission?

23       A.    Yes.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 55

1          Hourly plus commission.

2          Q.    So it was nine fifty an hour

3    plus commission?

4          A.    Right.

5          Q.    And you said after that you

6    went to Belk?

7          A.    Right.

8          Q.    What was your reason for

9    leaving Dillards?

10         A.    I just did not like selling

11   shoes.  Dillards was just -- saved me from

12   not having a job.  And I just didn't like

13   the way things was ran there.  So a couple

14   of people had left from Dillards and went

15   to Belk and said they enjoyed there.

16         Q.    And you started there in July

17   2005?

18         A.    Uh-huh (positive response).

19         Q.    Was there any lapse of

20   unemployment between Dillards and Belk?

21         A.    Only a month because they --

22   getting the paperwork and all that

23   straight.  Meeting with -- Getting the

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 56

1    human resource person getting on schedule,

2    that was the only reason.

3         Q.    So do you remember when you

4    started at Belk?

5         A.    I think it was in August,

6    maybe August, July or August, something

7    like that.

8         Q.    2005?

9         A.    Right.

10        Q.    And what did you do at Belk?

11        A.    I was a sales associate in

12   home department.

13        Q.    And who was your supervisor?

14        A.    Scott Wallace.

15        Q.    And are both these places

16   located in Auburn?

17        A.    Yes.  At the mall.

18        Q.    And what was your wage there?

19        A.    Nine fifty an hour.

20        Q.    Plus commission?

21        A.    No.  Just nine fifty.

22        Q.    Were you ever disciplined

23   while you worked at Belk?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 57

 1          A.      No.

 2          Q.      And your reason for leaving

 3    there?

 4          A.      I started having blood

 5    pressure problems.  And I thought maybe I

 6    was pushing myself too much, so I decided

 7    to let the part-time job go and just work

 8    one job.

 9          I couldn't -- Had a hard time

10    getting my blood pressure down.

11          Q.      So backup.  At Belk you were

12    working full-time?

13          A.      I was working part-time.  I

14    was working full-time at the university

15    where I am now, plus the part time, I was

16    doing that at Dillards and Belk.

17          Q.      Part time at Dillards?

18          A.      Well, I started off full-time.

19    Then I got my job at the university, so I

20    went part-time at Dillards.  And then from

21    there, part-time at Belk plus my full-time

22    at the university.

23          And I was having to stay probably

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 58

1    until 10 and 10:30 at night, and I was

2    working five days there.

3        Q.    Were these blood pressure

4    problems due to --

5        A.    We haven't figured it out yet

6    because it's still not really stable yet.

7        Q.    Have you ever had them before?

8        A.    I've had blood pressure

9    problems, but it's always been stable.

10       Q.    And when did those start?

11       A.    My blood pressure problems?

12       Q.    Yes.

13       A.    Probably in about 2002,

14   somewhere like that.

15       Q.    When did you start working at

16   Auburn again?

17       A.    I started March 14, 2005.

18       Q.    And is that where you're still

19   working?

20       A.    Uh-huh (positive response).

21       Q.    And what do you do there?

22       A.    I am an office administrative

23   assistant.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 59

1    Q.    In political --

2    A.    In the political science

3 department, uh-huh (positive response).

4    Q.    And what is your rate of pay

5 there?

6    A.    I make -- It's twenty thousand

7 and a few dollars a year.

8    Q.    Twenty thousand a year?

9    A.    Yeah.  Twenty thousand and a

10 few more dollars.

11    I started off at nineteen and got a

12 raise.

13    Q.    And how many hours did you

14 work at Belk, about, when you were working

15 there part-time?

16    A.    Mostly twenty-five.  So range

17 between twenty and twenty-five, but mostly

18 twenty-five.

19    Q.    And how many hours do you work

20 at Auburn?

21    A.    Forty.

22    Q.    And what about Dillards when

23 you were working full-time, how many hours

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 60

1    were you working there?

2         A.    About thirty, thirty-five.

3         Q.    And when you went to

4    part-time, how many hours were you

5    working?

6         A.    Probably about twenty --

7    sixteen to twenty, somewhere in there.

8         Q.    Who is your supervisor at

9    Auburn?

10         A.    Phillis Hodge; P-H-I-L-L-I-S,

11    she don't like the Y.

12         Q.    So that month when you were

13    out of work between -- Well, let me

14    rephrase.  That month between Dillards and

15    Belk, you still were working at Auburn,

16    correct?

17         A.    That's correct.

18         Q.    Okay.

19         Have you been disciplined or

20    reprimanded at -- since you've been at

21    Auburn University?

22         A.    No.  I got a very, very good

23    evaluation.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 61

1          And matter of fact, this week is

2     office administrative week, and I was

3     given several, several gifts from monetary

4     on up to flowers, cards, gift cards.

5          And during Christmas, I was given

6     over five hundred dollars in gifts for my

7     work.

8          Q.     Did you ever complain of

9     discrimination at either Belk or Dillards?

10         A.     No.

11         Q.     What about at Auburn

12    University?

13         A.     No.

14         Q.     And you applied for

15    unemployment benefits; is that correct?

16         A.     That's correct.

17         Q.     And do you recall when that

18    was?

19         A.     I probably applied the next

20    day after I got terminated, which was that

21    Monday, probably the 14th.

22         Q.     And where did you file that

23    application?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 62

1      A.      Through the State of Alabama.

2      Q.      Do you remember where did you

3   file it in Auburn at their office?

4      A.      Did it over the phone.

5      Q.      Okay.

6   Were you awarded unemployment?

7      A.      Four hundred dollars.  For two

8   weeks.

9      Q.      So that was the only time you

10  were without any kind of job were those

11  two weeks after you were terminated from

12  Sears; is that right?

13     A.      That's correct.

14     Q.      Since your termination from

15  Sears?

16     A.      That's correct.

17     Q.      What was your reason for going

18  back to being an administrative assistant?

19     A.      Because I'm getting older and

20  I was getting tired of standing on my feet

21  for less money than what I was making

22  before.  So I thought I had that skill, I

23  might as well use that skill.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 63

1    And Dillards or any other retailer

2  is not, I guess, more stable; Sears was

3  more stable than they were.  And I wanted

4  something -- you know, a solid income.

5    Q.    You mean as far as more likely

6  to lay people off, that kind of thing?

7    A.    Lay people off and not

8  working.  At Sears when we was in

9  appliances, you got -- pretty much you got

10  your hours.  But in other retails, if

11  you're in the shoe department or the home

12  department, it depends on when the sale

13  area is when you get more hours, so it

14  wasn't as stable as far as getting your

15  hours to make your income.

16    Q.    So basically at Sears you were

17  getting better hours?

18    A.    Right.

19    Q.    You said earlier you think you

20  began working at Sears around 1998; is

21  that right?

22    A.    Uh-huh (positive response).

23    Q.    Do you remember what month?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 64

1    I think it was April --

2    A.    April, something like that.

3    Q.    -- 1998?

4    A.    Uh-huh (positive response).

5    Q.    Did you fill out an

6    application?

7    A.    I did.

8    Q.    Do you recall who hired you?

9    A.    Mr. Collins, Louis Collins,

10    and also I interviewed Hillkay (sic) Brad,

11    and I can't think of Brad's last name.  He

12    was the Brand Central manager at that

13    time.  I just don't recall his last name

14    right now, I can't remember.

15    Q.    And was Louis Collins the SGM?

16    A.    Yes.

17    Q.    And you went to work in

18    appliances; is that right?

19    A.    That's right.

20    Q.    Were you part-time or

21    full-time?

22    A.    Part-time.

23    Q.    And how many hours a week were

Page 65

1    you working, about?

2         A.    About twenty, twenty-five

3    hours.

4         Q.    Now, my understanding is that

5    Sears, when you go to work part-time, they

6    have you sign something indicating that

7    you recognize that you're a part-time

8    employment -- part-time employee, do you

9    recall that?

10        A.    Not offhand.

11        Q.    And that they'll give you

12   hours as they come available; is that

13   right?

14        A.    Not that I'm aware of.

15        Q.    So as a part-time employee,

16   how did you understand that your schedule

17   would be made out?

18        A.    When I got hired, I told them

19   what my situation was; that I drove the

20   bus and at the time when I worked at the

21   apartments, I worked from nine to one.

22   And they told me that they could give me

23   those same hours plus work on Saturdays

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 66

1  and Sundays -- rotate Saturdays and

2  Sundays, and I would work mostly every

3  Saturday.

4      Q.    So do you know if they

5  scheduled their full-time people first and

6  then filled that in with their part-time

7  people?

8      A.    Most of the time they do.

9      Q.    But that was your

10  understanding that they used --

11      A.    Right.

12      Q.    -- their full-time people

13  first, correct?

14      A.    Right.  But I took the job

15  because they assured me I would get the

16  schedule that I had at my other job.

17  Because I wouldn't have taken the job had

18  I known that I wouldn't get hours for my

19  nine to one because I was driving the bus.

20      Q.    And who told you that, Louis?

21      A.    Both Louis Collins and Brad.

22  And I did get those hours.

23      Q.    Now, did you always work in

Page 67

1    appliances?

2         A.      I did up until they moved the

3    vacuum cleaner department over to

4    electronics.  And I think that was under

5    Greg Newton I believe, I'm not one hundred

6    percent sure.  And I asked them did they

7    have anybody over there, and I volunteered

8    to go over there to cover the vacuum

9    department, because I enjoyed selling

10   vacuum cleaners.

11        Q.      So when you were in

12   appliances, you were selling vacuum

13   cleaners?

14        A.      And appliances.

15        When I was in appliances we sold

16   vacuum cleaners, dishwashers, and stoves.

17   At that time you didn't sell the whole

18   area.

19        Q.      Let me just back up.

20        So when you started working in the

21   appliances section you were selling vacuum

22   cleaners, dishwashers --

23        A.      And the ranges and microwaves.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 68

1          Q.      -- ranges and microwaves.  And

2    then they moved the appliance department?

3          I mean, they moved the vacuums?

4          A.      Vacuums and microwaves and the

5    sewing over across the aisle.

6          Q.      So they moved that to

7    electronics, so you went over to the

8    electronics department at that time?

9          A.      Not at the beginning.  At the

10   beginning I only went to vacuums.

11         Q.      And that was under Greg Newton

12   you think?

13         A.      I think it was under Greg

14   Newton.

15         Q.      He was the SGM at that time?

16         A.      Yes.

17         Q.      Do you remember about when

18   that was?

19         A.      I don't offhand, no.

20         And then after a while, they

21   combined the vacuums and the electronics.

22         Q.      And you stayed then in

23   electronics?

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 69

1       A.      I sold both.  But my

2   primary -- I still did vacuums primarily.

3   We had the thing where if it was nobody in

4   electronics.  Actually I helped in

5   electronics, vacuums, and appliances all,

6   even though I was stationed in the

7   vacuums.

8       Q.      Now, in electronics, was that

9   commission, salary plus commission?

10      A.      It was commission only.

11      Q.      In electronics?

12      A.      I worked strictly commission.

13      Q.      So ever since you've been at

14  Sears it's been strictly --

15      A.      Strictly commission.

16      You were guaranteed a six-dollar

17  base pay, if someone like let you borrow

18  if you don't make it.

19      Q.      A draw?

20      A.      Right.

21      Q.      So then you were -- When they

22  combined the electronics and the vacuums

23  and you worked primarily in vacuums?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 70

1    A.    Vacuums and sewing and

2  microwaves.

3    Q.    And that was -- Do you recall,

4  was that still under Greg Newton?

5    A.    That was under -- That might

6  have been under Kenny when it got changed,

7  but I can't say for sure.

8    Q.    And then at some point in time

9  you went back to --

10   A.    Appliances.

11   Q.    -- appliances, correct?

12   A.    Uh-huh (positive response).

13   Q.    And do you recall when that

14  was?

15   A.    Had to be April -- I was --

16  Actually I was -- I actually went in

17  March, but not officially until April.

18   Q.    2004?

19   A.    Right.

20   Q.    And Kenny Reese was the SGM at

21  that time?

22   A.    Right.

23   Q.    Did you have to apply for

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 71

1  that?

2          A.      No.

3          Q.      Do you know who made the

4  decision to move you?  Was it Kenny?

5          A.      Kenny Reese.

6          And that was when he put me one

7  hour.  This was one hour in the vacuum

8  department -- I mean one day, I'm sorry.

9  Not one hour, one day.

10         And I went to David Williams to ask

11  him about it; and he said that he didn't

12  do it, Kenny did it.  And I went to Kenny,

13  and this is when Kenny told me that I

14  would continue to get one day a week

15  unless I wanted to go full-time.

16         Q.      At this time you were

17  part-time, correct?

18         A.      Right.

19         Q.      Did you express an interest in

20  going to appliances?

21         A.      I told him I didn't have a

22  heart for electronics, I didn't like

23  selling the electronics, and I would not

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 72

1    be an asset to the store in electronics.

2    And he asked me where would I be an asset

3    if I had to go full-time.  I told him if I

4    had to go full-time, I would have to go

5    back to appliances.

6           Q.     So he moved you to appliances

7    then?

8           A.     Yes.

9           And granted, you know, I would have

10   been -- I still would have been at Auburn

11   City Schools, because my insurance was

12   only two dollars a month, so that was one

13   of my reasons for staying at Auburn City

14   Schools.

15          Q.     You had expressed an interest,

16   correct, in going to appliances, correct?

17          A.     If I had to go full-time.  I

18   didn't go to him saying, well, I want

19   appliances, I want full-time, no, I didn't

20   do that.  If I would have had my part-time

21   position with my hours, I would have still

22   been part-time.

23          Q.     Well, Ms. Smith, Kenny Reese

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 73

1    didn't make you quit your job at Auburn

2    City Schools, did he?

3         A.    If you have a full-time --

4    Well, it's considered full-time, but it's

5    actually part-time hours, and another

6    part-time job for twenty hours,

7    twenty-five hours, whatever, and you're

8    only cut down to one hour, and your bills

9    is more than that, you had to make a

10   decision to either work one hour, not get

11   your --

12             MR. MCINTYRE:   One day.

13        A.    I mean, one day, not get your

14   bills paid or go full-time and get your

15   bills paid.   That wasn't a hard decision

16   to make.

17        Q.    But you told him that you

18   didn't have the heart for electronics,

19   correct?

20        A.    If I had to go full-time, I

21   didn't.

22        Q.    And he accommodated that

23   request, correct?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 74

1          A.      He did.

2          Q.      Do you know if they were

3   needing somebody in appliances at that

4   time?

5          A.      I can't say they did.  I don't

6   know.

7          Q.      Did you make more money

8   working at Sears full-time in appliances

9   than you did at Auburn?

10         A.      I did.

11         Q.      And you don't recall when you

12   moved to appliances -- I'm sorry, you said

13   you did.  April 2004; is that right?

14         A.      Yes.  It was, you know, March,

15   April, around that time period.

16         Q.      Now, when you moved to

17   appliances, who was working there with

18   you, do you recall?

19         A.      In appliances was Beatrice

20   Willis, Jackie Dodson, Stephanie Darby,

21   Carolyn Landers.

22         Q.      Anyone else?

23         A.      Not that I recall.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 75

1      MR. MCINTYRE:  Was Carolyn

2  there when you got there?

3      THE WITNESS:  She was.  When I

4  went back to appliances she was.

5      Q.    And Willis is -- Ms. Willis is

6  black, correct?

7      A.    Correct.

8      Q.    And Jackie Dodson is black,

9  correct?

10     A.    That's correct.

11     Q.    Stephanie Darby is white?

12     A.    That's right.

13     Q.    And Carolyn Landers is white?

14     A.    That's correct.

15     There was a guy that was working

16  there.  Who was the guy?

17     We had a guy in the department.

18     Q.    Do you recall his name?

19     A.    Who was that guy?

20     Clint Teal might have been -- It was

21  either Clint Teal or Robert, and it could

22  have been both of them.  And I don't

23  remember -- I can't remember, offhand,

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 76

1     Robert's name.

2          Q.     So you don't recall if they

3     were working there?

4          A.     It was always a guy in the

5     department.

6          Q.     But my question is, you don't

7     recall if Clint or Robert were working

8     there when you went back in April 2004?

9          A.     It was one or the other or

10    both.

11         Q.     But you don't recall which

12    one?

13         A.     I don't.  Not offhand, I

14    don't.

15         Q.     Do you have any reason to

16    dispute their employment records if it

17    shows that one, both, or none of them were

18    there at that time?

19         A.     They were there.

20         Q.     Okay.

21         A.     They were at Sears.

22         Q.     Right.  In the appliance

23    department?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 77

1      A.      I know Stephanie and Carolyn
2    was there.
3      Q.      Correct.
4      A.      Clint or Robert or both was
5    there,
6      Q.      I guess what I'm asking --
7      A.      They both worked in hardware
8    also.  So, you know, we made different
9    transitions, so I can't -- they were in
10   the store.
11     Q.      But you're unsure as to what
12   department they were in at that time?
13     A.      Right.
14     Q.      Okay.
15     Who was your immediate supervisor
16   when you went back to appliances?
17     A.      David Williams.
18     Q.      In April 2004?
19     A.      Right.
20     Q.      Is he white or black?
21     A.      White.
22     Q.      And how many hours were you
23   working when you went full-time?

Page 78

1        A.      I was getting at least

2    thirty-five to forty hours, ranging.

3        And a lot of time, even though our

4    schedule say something, we might work more

5    hours, we might work less.

6        Q.      So your immediate supervisor

7    at that time was David Williams?

8        A.      Right.

9        Q.      And the SGM at that time was

10   Kenny Reese?

11       A.      Right.

12       Q.      And in the appliances

13   department, what are your duties exactly?

14       A.      To sell appliances.

15       Q.      And in doing so, you need to

16   be familiar with how to ring up customers;

17   is that correct?

18       A.      That's correct.

19       Q.      Do you have to also be

20   familiar with the types of appliances and

21   what they can do and things like that?

22       A.      Yes.

23       Q.      Familiar with how to give

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 79

1    discounts and those kinds of things?

2        A.    Yes.

3        Q.    Now, you named Willis, Dodson,

4    Darby, and Landers and you said you

5    weren't sure which department Clint or

6    Robert were in when you first came over

7    there --

8        A.    That's correct.

9        Q.    -- back to appliances in 2004?

10       Did you work with anybody else

11   besides those people that you named?

12       A.    I worked with Merle Miller,

13       Q.    Did he come after you had

14   started working --

15       A.    Yes.

16       Q.    -- in appliances?

17       Anybody else that you can recall?

18       A.    Andrea Pugh and a few that

19   only lasted a couple of days.  I don't

20   remember their names.

21       Q.    Is Andrea white or black?

22       A.    White.

23       Q.    And --

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 80

1      A.      Merle is white.

2      And another guy named Robert, he

3   came, he's white.

4      Q.      Is that different than the

5   Robert --

6      A.      The other Robert.

7      Q.      -- Godwin?

8      A.      Uh-huh (positive response).

9   He's no longer there.  Neither one is no

10   longer there.

11      Q.      And you worked with them

12   sometime between 2000 -- April 2004 and

13   the time of your termination in November

14   of 2004?

15      A.      That's correct.

16      The other person that was over

17   there, I just thought about her, she works

18   for the telephone company now.  I can't

19   think of what her name is.

20      Q.      Did you ever receive any kind

21   of verbal warning while you were employed

22   with Sears?

23      A.      No.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 81

1    Q.    Were you ever given any kind

2  of written warning?

3    A.    No.

4    Q.    Were you ever suspended while

5  working at Sears?

6    A.    No.

7    Q.    Now, as appliances, that's

8  considered where you can make the most

9  money; is that correct?

10    A.    Correct.

11    Q.    That's where you need your

12  most experienced sales people; is that

13  correct?

14    A.    That's correct.

15    Q.    So moving from electronics to

16  appliances, Sears would want to put their

17  better sales people in the appliances

18  department, right?

19    A.    Rephrase that again.  I'm

20  sorry.

21    Q.    Sears tries to put their

22  better sales people in the appliances

23  department, correct?  Is that your

1   understanding.

2        A.      They'll put them anywhere in

3   the hardlines.

4        Q.      Is appliances considered a

5   better position than electronics or other

6   hardwares?

7        A.      It is.

8        Q.      Now, part of the job duties

9   also, other than assisting customers and

10  being familiar with the products, was it

11  also part of your duties to keep the area

12  clean and those kinds of things?

13       A.      That's correct.

14       Q.      Now, Sears would often give

15  coupons to its customers, correct?

16       A.      That's correct.

17       Q.      And part of your job was to --

18  if a customer brought in a coupon was to

19  look at it, scan it, and give them the

20  proper discount, correct?

21       A.      Some of it's correct.  Some of

22  it -- That might be corporate policy, but

23  that wasn't the policy at local level.  We

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 83

1    never -- We never looked at it.  If it

2    scanned, we used it.  If it didn't scan,

3    we didn't use it.  That's just -- That's

4    the way it was before I got at Sears,

5    that's the way it probably still is now.

6         Q.    So you never looked at the

7    terms of the coupon to see if it was valid

8    or not?

9         A.    No, we never did.

10        Q.    So if a customer brought it

11   in, you just assumed that it was good and

12   you scanned it and gave the customer that

13   discount?

14        A.    Right.  Because -- If it's

15   expired or one that will expire, the

16   system will tell you that it's expired or

17   whatever.

18        And a lot of times the best thing to

19   do is go ahead and try it anyway so that

20   the customer would know that you did try.

21   It's not your decision.

22        Q.    They have different coupons

23   though for different products, correct?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 84

1    A.    That's correct.

2    Q.    So what you're saying is that

3  the computer wouldn't -- your

4  understanding was the computer would not

5  let it go through?

6    A.    If it did not qualify.

7    Q.    If it didn't go through, did

8  you ever key it in?

9    A.    Yes, we did.

10    Q.    So did you look at the coupon

11  at that time to see if it was valid?

12    A.    You have to look at it to get

13  the number.

14    Q.    Right.  But if it wasn't

15  scanning to go through, did you look at it

16  at that time to see if it was valid if it

17  wasn't scanning to go through?

18    A.    Most of them have a picture

19  sometimes on the coupon:  If it's for

20  hardware, it's going to have a lawn mower

21  on it; if it's for appliances, it's going

22  to have appliances on it.  So you don't

23  have to -- you didn't have a read to if it

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 85

1    didn't go through, you just punch it in.

2         Q.    So even if it was expired, you

3    would still just punch it in?

4         A.    It's going come up expired.

5    If you scan it and it's expired, it's

6    going to say coupon expired.  If you punch

7    it in, it's expired, it's going to say

8    coupon expired.

9         And that's if it expires.

10        Q.    So you never bothered to look

11   at a coupon to see if a customer was

12   eligible for that discount?

13        A.    Most of the time we didn't.

14        Q.    Did you?  I'm not asking about

15   we, I'm saying did you ever look at the

16   coupon to see if a customer was eligible

17   to use that coupon?

18        A.    If a coupon came in and it

19   says not eligible or something like that,

20   I would look at it and explain to the

21   customer, you know, this is what it says

22   is the reason we can't use it or something

23   like that.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 86

1        Q.      So you would look at the

2    coupon then to see --

3        A.      Right.  Once it go through and

4    it says it's expired or it's not valid or

5    something like that, you know, I look at

6    it and tell the customer, well, you can't

7    use it because it's supposed to be for

8    hardware or something like that.

9        Q.      So the only time you looked at

10   the coupon then was if it didn't scan

11   through for some reason?

12       A.      Right.

13       Q.      Now, we already talked about

14   earlier that you received a handbook from

15   Sears; is that correct?

16       A.      That's correct.

17       Q.      Now, if you could, this is

18   Defendant's Exhibit 1, if you could look

19   at Defendant's Exhibit 1 for me on page

20   eight.

21       A.      (Witness complies.)

22       Q.      And do you see where it says

23   at the top, it says:  The following are

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 87

1    examples of business and personal conduct

2    that can lead to termination of

3    employment, at the very top under

4    workplace conduct in italics.

5         A.    In the middle?

6         Q.    The very first paragraph at

7    the top.

8         A.    Okay.

9         Q.    You see where it says these

10   are examples of personal conduct that can

11   lead to termination of employment?

12        A.    Uh-huh (positive response).

13        Q.    Now, do you see about the

14   fifth circle down --

15        A.    Yes.

16        Q.    -- where it says, violating

17   associate discount policy, giving

18   unauthorized markdowns to customers or

19   associates?

20        A.    Yes.

21        Q.    So you understand that to mean

22   that unauthorized markdowns to customers

23   are a terminable offense?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 88

1          A.     It can be.

2          Q.     But that's what that says,

3     correct?

4          A.     That's correct.

5          Q.     And also, the third circle

6     from the bottom, another example is

7     failing to follow proper procedures for

8     handling sales and cash; is that right?

9          A.     That's correct.

10         Q.     So that's another example of a

11    terminable offense; is that right?

12         A.     That's correct.

13         Q.     And then about the sixth

14    circle down, another example is using

15    Sears's property, including confidential

16    information about associates solely for

17    business purposes, that's a terminable

18    offense too, isn't it?

19         A.     That's correct.

20         Q.     So it prohibits the

21    nonwork-related use, the theft, or

22    unauthorized disclosure to a third party

23    of computer resources, trade secrets, or

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 89

1    other confidential information; is that

2    what that says?

3         A.    That's correct.

4         Q.    So you understand that to mean

5    if you take anything from Sears from their

6    computers out of store that that's a

7    terminable offense; is that correct?

8         A.    But we did that all the time.

9         Q.    If you take somebody's -- You

10   took people's confidential information out

11   of the store all the time?

12        A.    We did make copies, and we

13   kept them in our blue book, and we took

14   our blue books with us, yes.

15        Q.    What kind of copies did you

16   make?

17        A.    Any sale copies that we had to

18   work on or make -- help the managers with

19   to solve or something like that.  And it

20   might be another associate's things.

21        Q.    So pertaining to you only?

22        A.    No.  Pertaining to anyone.  It

23   was several of us that they only used to

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 90

1  solve problems, and we were -- the top

2  sales people were one of them.  And, yes,

3  we solved other people's problems so --

4      Q.    What kind of problems are you

5  referring to, Ms. Smith?

6      A.    If they didn't make a sale

7  correct or they didn't do something

8  correct on the delivery or anything like

9  that --

10     Q.    And this would have the

11  associate's credit card information on it?

12     A.    Well, I don't know -- I mean,

13  it could have.  Because if we got copies

14  of it, yes, it could have their

15  information on it.

16     Q.    So why would it have their

17  credit card information on it?

18     A.    Because Sears information

19  prints it out at one time.  It stopped

20  doing it; but at one time if you ran this

21  sales check, everything came out.  But

22  then I think within the last maybe six

23  months or so it stopped printing those

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 91

1    numbers out on them.

2           Q.     And what about managers, would

3    you have access to managers' transactions

4    and their documents?

5           A.     If they bought something we

6    would.

7           Q.     But that policy forbids you

8    from taking it out of the store and using

9    it for nonwork-related reasons, correct?

10          A.     That's correct.

11          Q.     Now, on page five, you see

12   where it says company property and

13   records?

14          A.     Uh-huh (positive response), I

15   do.

16          Q.     It says:  Use Sears property,

17   including information about our customers,

18   suppliers, and associates solely for

19   business purposes, correct?

20          A.     That's correct.

21          Q.     And, also, right below that it

22   says, the company prohibits the use of any

23   electronic recording device during

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 92

1    conversations or meetings without the

2    knowledge and consent of all parties to

3    the conversation or meeting; is that what

4    that says?

5         A.    That's right.

6         Q.    Says:  Sears does not allow

7    you to record conversations of individuals

8    unless all parties agree; is that right?

9         A.    That's correct.

10        Q.    Now, on page thirty-three of

11   Exhibit 1, the last paragraph on page

12   thirty-three, that says:  According to

13   Sears's policy, associates are required to

14   report to the unit manager within five

15   days any felony or misdemeanor arrests

16   and/or convictions; is that what that

17   says?

18        A.    That's correct.

19        Q.    And then the last sentence of

20   that paragraph says:  Failure to report an

21   arrest or conviction within five days may

22   result up to disciplinary action including

23   termination, correct?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 93

1     A.     That's correct.

2     Q.     Now, we talked about briefly,

3  and I want to talk about it a little bit

4  more in detail, Sears offers coupons to

5  its customers, right?

6     A.     That's correct.

7     Q.     And they may offer them

8  through the mail or they may be in the

9  paper; is that right?

10     A.     That's correct.

11     Q.     And they also may offer

12  specific coupons to just particular

13  customers; is that right?

14     A.     That's correct.

15     Q.     So, like, somebody who has a

16  Sears card may get some sort of promotion

17  that another customer won't; is that

18  right?

19     A.     That's correct.

20     Q.     So then the customer who

21  doesn't have the Sears card is not

22  entitled to that particular promotion,

23  correct?

Page 94

1      A.      That's correct.

2      Q.      Now, are you aware that the

3  coupons have terms written on them saying

4  what items it may be good for, gives you

5  the expiration date?

6      A.      Yes.

7      Q.      Might tell you only valid for

8  certain items?

9      A.      Yes.

10      Q.      Or that the customer has to

11  fall in a particular category for it to be

12  valid; is that right?

13      A.      Yes.

14      Q.      And giving a customer a coupon

15  outside the terms of that particular

16  coupon is considered an unauthorized

17  discount, is it not?

18      A.      No.  Not at the Auburn store.

19      Q.      So you can just give any

20  coupon to anybody for any reason,

21  completely ignoring the terms of what's on

22  the coupon?

23      A.      That's the way that we were

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 95

1    instructed and we were trained to do.

2        Q.    Well, now, Ms. Smith, you told

3    me that --

4        A.    I know what --

5        MS. HEMSTREET:  Let's take a

6    break while he's stepping out.

7            (Recess was taken.)

8        MS. HEMSTREET:  Can you read

9    back where I was if you don't mind?

10           (Requested portion was

11               read back.)

12       Q.    Who instructed you to do that?

13       A.    All the managers, the previous

14   managers.

15       Q.    I want to know names, tell me

16   the names.

17       A.    Louis Collins, Brad.

18       Q.    Hold on.  Louis Collins, what

19   did he tell you about it?

20       A.    I mean, we was instructed to

21   use the coupons, whatever we need to do,

22   to close a sale.

23       Q.    So Louis Collins specifically

Page 96

1    told you to use whatever coupon you could

2    to close a sale?

3          A.     Well, he didn't -- I mean,

4    that's not exactly his words.

5          Q.     What are his words, Ms. Smith?

6          A.     I can't say his exact words.

7    I just know what the interpretations is.

8          Q.     What do you recall him saying?

9          A.     We use what means we have to

10   close sales.

11         Q.     And did you -- Did he say that

12   that means was to use coupons that were

13   not for specific customers for just any

14   customer?

15         A.     No, he didn't say that.

16         Q.     So he told you what?

17         A.     What means that we had

18   available to us, that we use those things

19   to close the sales.

20         Q.     So when he said available to

21   you, did he mean to use coupons that were

22   not valid for certain customers for just

23   any customer?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 97

1      A.      He didn't say that.  I can't

2  say yes, he said that.

3      Q.      When did he tell you that?

4      A.      He was my first manager, so I

5  can't say.

6      Q.      Sometime after 1998?

7      A.      Right.

8      Q.      Who else told you that?  You

9  said your prior managers had told you

10  that, who else?

11      A.      Jason Yaxheimer.

12      Q.      Okay.  What did he say about

13  it?

14      A.      You know, they all said the

15  same thing.  They say these things in

16  meetings, when we have our store meetings.

17      Q.      I want to know specific

18  conversations.

19      A.      There are no specific

20  conversations.

21      Q.      So you don't recall any

22  specific conversations where these

23  managers told you to use coupons

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 98

1    inconsistent with the terms printed on the

2    coupon to close a sale?

3          A.    No.   I can't say they said

4    those particular words, no.

5          Q.    I'm asking you, Ms. Smith,

6    what they did say.

7          A.    I can't -- You want me to go

8    back and just say what they said for

9    years, I can't say that.

10         Q.    Yes, ma'am, I do.

11         A.    Well, I can't.  Because if I

12   say something and it's not true, and I'm

13   not going to tell a lie about that, so I

14   can't say word-for-word what they said or

15   verbatim what they said, I can't do that.

16         Q.    I'm asking you to recall to

17   the best of your recollection what these

18   individuals said about using coupons

19   inconsistent with what's printed on the

20   coupon in order to close a sale.

21         A.    Now, I can tell you what Terry

22   Gandy said at my last interview -- my

23   interrogation is I asked him --

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 99

1          Q.      Hold on.  I'm going to get to

2     Mr. Gandy in a minute.

3          A.      It has to do with coupons too.

4          Q.      I'm going to get to Mr. Gandy

5     in a minute, Ms. Smith.

6          Okay.  You told me Louis Collins,

7     but you can't remember any specific

8     conversations where he told you --

9          A.      No, I can't.

10          Q.      Let me finish my question.

11          -- where he told you to use a coupon

12     inconsistent with what was printed on it

13     to close a sale, you can't recall any

14     conversation?

15          A.      I can't.

16          Q.      And what about Jason

17     Yaxheimer, can you recall any

18     conversations with him?

19          A.      I can't recall a specific

20     conversation.

21          Q.      Now, who was he?

22          A.      He was my immediate manager,

23     he was Brand Central manager.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 100

1    Q.    Under Louis?

2    A.    Yes.

3    Q.    Any other managers before we

4    get to Mr. Gandy?

5    A.    You had Greg Newton.

6    Q.    Do you recall if Greg Newton

7    told you to use --

8    A.    All these people that I can

9    name, I can't say specific conversations.

10   Q.    So you don't recall --

11   A.    But they were --

12   Q.    Hang on.

13   A.    -- aware of coupons and

14   coupons being used --

15   Q.    Okay.  We're going to get to

16   that in a minute.

17   So you can't recall them

18   specifically instructing you to use a

19   coupon inconsistent with its terms to

20   close a sale as far as Mr. Newton goes?

21   We've already covered Mr. Collins

22   and Yaxheimer.  What about Greg Newton,

23   did he ever say that?