LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 101

1    A.    I can't say specific

2    conversations.  I just can't say that

3    because I'm not going to sit up and, like

4    I say, tell something false.

5    Q.    Any other managers besides

6    Mr. Newton?

7    A.    You have -- What's his name in

8    Columbus.  Mr. Smith, Robert Smith, he

9    knew we used coupons; Byron Mason knew we

10   used coupons.

11   Q.    Hang on a second.

12   A.    Now, Byron Mason I can give

13   you specific --

14   Q.    Hang on a second.  Ms. Smith,

15   hang on a second.

16   Robert Smith, do you recall any

17   specific conversations where they told you

18   to use the coupon inconsistent with the

19   terms on the coupon to close the sale?

20   A.    Not a specific conversation,

21   no.

22   Q.    What about -- You mentioned

23   Byron Mason?

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

1    A.    Uh-huh (positive response).

2  He's a store manager there now.

3    Q.    Right.  He's African-American,

4  correct?

5    A.    Correct.

6    Q.    Now, do you recall him telling

7  you to use the coupons inconsistent with

8  what's printed on the coupon to close a

9  sale?

10    A.    Not that specific.

11    Q.    What do you recall?

12    A.    He was one that would ask us

13  to give him a coupon that he knew we had

14  coupons in the drawer.  And not only the

15  appliance department, he's done that on

16  the soft side also.

17    Because it wasn't just a hardware

18  thing, it was throughout the store where

19  coupon --

20    Q.    He asked you to give him a

21  coupon?

22    A.    Yes.  He's asked several

23  associates to give him a coupon:  I know

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 103

1    you have a coupon, let me have a coupon.

2    Because coupons are kept in the drawer at

3    all the registers.

4          Q.    Do you know what he used it

5    for?

6          A.    No.

7          Q.    Do you know if he knew you

8    were using them inconsistent with the

9    terms on the coupon?

10         A.    I can't say that.

11         Like I said, we would scan the

12    coupon, if the coupons worked, we used

13    them.

14         Q.    What about Mr. Reese, did he

15    ever tell you to use the coupons

16    inconsistent with what's printed on there

17    to close a sale?

18         A.    Not that specific

19    conversation.

20         Now, Kenny did tell us to use the

21    coupons to straighten out delivery

22    problems.

23         Q.    But that wasn't the service

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 104

1   coupon, correct?

2         A.    He didn't say a specific

3   coupon.

4         Q.    Well, my understanding is that

5   it was a ten-dollar overcharge, so you

6   wouldn't use a sixty-five dollar

7   reduction --

8         A.    Not necessary.

9         Q.    -- to use it, correct?

10        A.    Not necessarily.  It wasn't

11  just ten dollars.

12        Q.    Because there was a glitch in

13  the system, is that right, and it was

14  overcharging customers for delivery?

15        A.    That's correct.

16        Q.    So he said, hey, use the

17  coupons to correct that because we don't

18  want to overcharge the customers and

19  there's something wrong --

20        A.    Right, because we --

21        Q.    -- with the delivery charge.

22        Other than that, did he authorize

23  you to use a coupon inconsistent --

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 105

1        A.        Yes.

2        Q.        -- with its term?

3        A.        Kenny told me, I asked him

4   about a customer that I had let walk

5   because of delivery, that they wanted

6   delivery free, and I could not give them

7   delivery free.  And we had this meeting

8   right at the appliance door, several

9   people, and he said -- and he said that's

10  not a problem.  He said, don't you have

11  coupons in your drawer; we could have

12  always worked around that, you should not

13  have let them walk.  And I said, now I

14  know.

15        And that was not just me --

16        Q.        Let me back up --

17        A.        He was having a meeting with

18  the Brand Central appliances and

19  electronics.

20        Q.        Now, you said Kenny -- You

21  were talking to Kenny who was the SGM at

22  the time?

23        A.        Right.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 106

1    Q.    About what?

2    A.    About -- He was asking us what

3    problems that we were having, trying to

4    generate sales, not letting customers

5    walk.  And he had the appliance department

6    and the electronics, everybody, over in

7    the corner, the doors facing Kmart.  And

8    we were all standing there, and I brought

9    up the thing about a customer that I did

10   let walk that went to Home Depot because

11   of delivery.

12   Q.    Okay.  Because of delivery.

13   A.    Right.  I could not give them

14   free delivery.  They didn't want the free

15   delivery rebate.

16        MR. MCINTYRE:  Let them walk,

17   you mean what?

18        THE WITNESS:  I didn't close

19   the sale because I could not give them

20   free delivery.  There was nothing -- I

21   couldn't take delivery off.  The only

22   thing I probably could have done was given

23   them a rebate for delivery.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 107

1          Q.      Tell me who was there at that

2     meeting.

3          A.      I can't say specifically who

4     all was there.  I just know it was a

5     meeting.

6          Q.      Okay.  You don't recall who

7     was there specifically?

8          A.      Huh-uh (negative response).

9          Q.      Were the other sales

10     associates there?

11          A.      It was other sales associates.

12     Because it was -- It was all of a sudden,

13     if it's slow or something like that,

14     they'll pull us in a corner, wherever, and

15     we'll have a general, quick meeting to go

16     over some things, anything like that.

17          Q.      So you don't recall anybody

18     specifically who was there?

19          A.      No.

20          Q.      Do you recall if any other

21     managers were there, standing there?

22          A.      No.

23          Q.      And you brought up the -- that

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 108

1    a customer had essentially gone somewhere

2    else because you couldn't give them free

3    delivery?

4          A.    Right.

5          Q.    And Mr. Reese said to you --

6    what did he say to you then?

7          A.    He said I should not have let

8    them walk because we could get around

9    that; that I could have called him, I

10   could have used coupons, different things,

11   different avenues; we could have worked

12   around that, and for me not to let that

13   happen again. And I told him, now I know.

14        Because at that point I was -- To me

15   it wouldn't have been a need of calling a

16   manager, because I felt like the manager

17   was not going to take the delivery off,

18   you know.

19        Q.    So you took that to mean,

20   well, if a sale is going to walk out, then

21   if I notify a manager, maybe they can give

22   me authorization to give them a discount;

23   is that right?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 109

1    A.    At that point in time I didn't

2  know that we could do that.  I didn't know

3  that he wanted us to use different avenues

4  to keep customers here, like, you know,

5  that specific way with delivery.

6    Q.    Well, my question is -- Okay.

7  So basically what I'm hearing you say is

8  that Mr. Reese said if it comes down to

9  it, a customer is going to leave and

10  you're not going to close a sale, then

11  call me, and we'll get the markdown and

12  we'll --

13    A.    No, that's not it.  He said

14  that was one of the avenues, or I could

15  use the coupons that we have.

16    Q.    Now, when he said use the

17  coupons that you have, did he say anything

18  about using them inconsistent with the

19  terms on the coupon?

20    A.    He didn't say a specific

21  coupon.

22    Q.    Did he say anything about

23  using the terms inconsistent with the

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 110

1     terms -- Let me rephrase.

2            Did he say anything to you saying

3     it's okay to use a coupon inconsistent

4     with what's written on the coupon to close

5     a sale?

6            A.     No, he didn't say that.

7            But me working under -- with him,

8     I've been made aware that you could do

9     that because he did things that was not

10    consistent with Sears's policy on

11    markdowns.  But when it came to delivery,

12    we always was known that there was nothing

13    anyone could do to touch delivery.

14           Q.     When you say he would do

15    things inconsistent with Sears's policy,

16    what do you mean by that?  Were you

17    talking specifically with regard to

18    coupons?

19           A.     Not coupons.

20           It was one day that I had a customer

21    that was looking for an airconditioner,

22    and Sears' policy is to price match, and

23    it has to be the exact model, make, and

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 111

1    all that have to match up.  And he was --

2    And the customer was going to Lowe's.

3    Lowe's does not sell Kenmore

4    airconditioners, but he did price match a

5    Kenmore airconditioner with a Whirlpool

6    airconditioner, which that's against

7    Sears' policy.  Kenny's thing was whatever

8    you had to do to make a sale, you did it.

9         Q.    Did he tell you that, whatever

10   you had to do to make a sale you need to

11   do that?

12        A.    That's what he promoted,

13   that's what he showed us.

14        Q.    I'm asking you, Ms. Smith, if

15   he told you that, if he instructed you to

16   do that?

17        A.    In so many words, yes.

18        Q.    Did he specifically tell you

19   to violate Sears' policy to close a sale?

20        A.    If he's showing us this way to

21   do, that's saying violate the policy.

22        Q.    I'm asking you, did he

23   specifically tell you that, did he say

Page 112

1    that?

2        A.    Nobody's going to say violate

3    the policy, no.

4        Q.    Now, do you know if managers

5    have the authority to give certain

6    discounts in order to close a sale at

7    their discretion?

8        A.    They have a limited knowledge

9    -- limited ability.

10        Q.    How do you know that?

11        A.    We just -- From word of mouth.

12    Sears is like one big family, when you --

13        Q.    That's just hearsay then.

14    That's just what you've heard?

15        A.    And we have heard of managers

16    getting terminated for taking -- for doing

17    markdowns and marking things down too low.

18        Q.    But they do have the ability

19    to make markdowns that you don't have,

20    correct?

21        A.    Right.

22        Q.    Now, a customer comes in and

23    presents a coupon to you, and you said you

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 113

1    don't look at it to make sure it's valid,
2    you just scan it; is that right?
3        A.    We just scan.
4        Q.    You just scan it; is that
5    right?
6        A.    Yes.  Not just me, but
7    everybody.
8        Q.    Okay.  Well, so you're telling
9    me that you know that other people just
10   scan it and don't even look at it?
11       A.    Yes.
12       Q.    How do you know that?
13       A.    Because we're standing there
14   with each other.
15       Q.    They have bar codes on them,
16   correct?
17       A.    That's correct.
18       Q.    And then you scan them, and
19   then that enters into the computer, and
20   that is discounted, correct?
21       A.    That's correct.
22       Q.    And then after that, what do
23   you do with the coupon?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 114

1        A.      We put it in the drawer.

2        Q.      And you turn it in at night?

3        A.      No.  We never did.

4        Q.      You mark it up and then throw

5    it away?

6        A.      No.  Never did.

7        Q.      Do you know if --

8             MR. MCINTYRE:  Let me ask one

9    question.  Did any of the

10   supervisor/managers tell you to mark it up

11   or throw it away?

12            THE WITNESS:  No.  They didn't.

13            MR. MCINTYRE:  Let me ask you

14   one other question.  On the bar codes,

15   was --

16            MS. HEMSTREET:  Robin, can you

17   reserve your questions until the end if

18   you don't mind?

19            Thank you.

20       Q.      Now, the coupon itself, that

21   may tell the associate what to do with it,

22   correct?

23       A.      I can't say it does.  I don't

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 115

1    know.

2         Q.    Now, you recall that Sears has

3    a service coupon; is that right?

4         A.    That's correct.

5         Q.    And these coupons are provided

6    to customers who have had service calls

7    and then declined the service; is that

8    right?

9         A.    I just know they -- I don't

10   know what the procedure, how they get the

11   coupons.  I know service provide them with

12   some coupons when they have service.  I

13   don't know --

14        Q.    You don't know what the

15   details of that are?

16        A.    Right.

17        Q.    So, anyway, you do know that

18   they get these coupons, or service can

19   give them a coupon, after they've had a

20   service call?

21        A.    Right.

22        Q.    And are you aware that these

23   service coupons can be brought in by these

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 116

1    customers to -- towards a replacement

2    item?

3        A.    Yes.

4        Q.    And do you recall if this

5    coupon is a sixty-five-dollar value

6    coupon?

7        A.    Yes.

8                    (Whereupon, Defendant's

9                    Exhibit No. 5 was

10                   marked for

11                   identification.)

12       Q.    I'm going to mark Defendant's

13   Exhibit 5.  Is that a copy of the service

14   coupon?

15       A.    It is.

16       Q.    Now, it says it's sixty-five

17   dollars off, correct?

18       A.    That's correct.

19       Q.    Your replacement appliance,

20   correct?

21       A.    That's correct.

22       Q.    Now, on the right-hand side

23   there are terms of this coupon that we

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 117

1    talked about earlier, right?  You

2    mentioned that there are terms on coupons

3    that says when they're valid and that kind

4    of thing?

5         A.    That's correct.

6         Q.    And it says this is valid for

7    home appliance of three ninety-nine or

8    more, correct?

9         A.    That's correct.  On that one.

10        Q.    And it says that coupon

11   expires two weeks from the date of the

12   service receipt; is that right?

13        A.    That's what that says.

14        Q.    And it also says that it's not

15   valid with any other coupons?

16        A.    Where is it at?

17        Q.    That is -- It's in the middle

18   of the first paragraph, may not be used

19   with other coupon offers, the sixth line

20   down.

21        A.    Yes, that's correct.

22        Q.    And then the third line from

23   the bottom of the first paragraph, any

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 118

1    other use constitutes fraud; is that what

2    that says?

3         A.    That's correct.

4         Q.    Now, this coupon also has a

5    bar code on it, correct?

6         A.    Yes, that's correct.

7         Q.    And the bar code for the

8    sixty-five dollars off is on the second

9    page.

10        A.    Yes.

11        Q.    And that number is 5770200195,

12   is that what that says?

13        A.    That's correct.

14        Q.    Now, you applied these service

15   coupons to several transactions, correct?

16        A.    That's correct.

17        Q.    Did all the customers bring

18   the coupon in with them?

19        A.    No.

20        Q.    Do you know if these customers

21   had a service call?

22        A.    I don't know.  I can't say, I

23   don't know.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 119

1    Q.    Did you apply this coupon to

2  purchases that were less than three

3  hundred ninety-nine dollars?

4    A.    I can't say I did.  It's a

5  sale that's under my number that is.

6    Q.    Did you destroy this coupon or

7  mark it up or throw it in the trash after

8  you used it?

9    A.    Any coupons I've used, I've

10  never destroyed, never -- No coupons have

11  I destroyed or tore up.

12    Q.    So you admit that you would

13  used this coupon for a customer who didn't

14  bring it into the store themselves; is

15  that right?

16    A.    That's correct.

17    Q.    So somebody who didn't have a

18  service call, you would have applied this

19  coupon to one of their sales?

20    A.    Yes.  On some sales, yes.

21    Q.    And you understand that this

22  would be inconsistent with the terms on

23  the coupon, correct?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 120

1       A.      Yes.

2       Q.      Now, is your associate number

3    190?

4       A.      Yes.

5                       (Whereupon, Defendant's

6                       Exhibit No. 6 was

7                       marked for

8                       identification.)

9       Q.      I'm going to mark Defendant's

10   Exhibit 6.  I'm going to give you

11   Defendant's Exhibit 6, and it's several

12   pages long.

13       Have you seen this before?

14       A.      Yes, I have.

15       Q.      Now, I'm going to refer -- For

16   ease, Ms. Smith, I'm going refer to these

17   numbers down at the bottom, if you can see

18   at the bottom right-hand -- most of them

19   are on the bottom right-hand corner.

20       A.      Yes, I see them.

21       Q.      Okay.

22       Now, is this document entitled An

23   Associate Summary at the top?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 121

1          A.      Yes.

2          Q.      And then there's a

3    receipt-looking thing copied onto it at

4    the bottom?

5          A.      Yes.

6          Q.      And those are referred to as

7    journal entries, correct?

8          A.      That's correct.

9          Q.      Now, do you see in the column

10   on the Associate Summary where it says

11   reduction amount?

12         A.      Yes.

13         Q.      Now, do you see for sales

14   check that ends in 0056 --

15         A.      Yes.

16         Q.      -- that there's a reduction

17   amount of sixty-five dollars?

18         A.      Yes.

19         Q.      And if you look on the journal

20   tape, that corresponds to that

21   transaction?  The transaction information

22   is at the bottom, 0056.

23         A.      Yes.

Page 122

1    Q.    You see that sixty-five-dollar

2    discount was given using coupon with the

3    number 5870200195?

4    A.    Yes.

5    Q.    And that matches the bar code

6    on the service coupon, correct?

7    A.    Yes.

8    Q.    And that's your associate

9    number down at the bottom, right, 190?

10    A.    Yes.

11    Q.    Now, do you know if this

12    particular customer had a service call?

13    A.    I don't remember this sale, so

14    I couldn't remember.

15    Q.    So you don't know?

16    A.    I don't know.

17    Q.    Now, on the next page, for

18    sales check number -- ends in 0659 --

19    A.    Yes.

20    Q.    -- there is a reduction amount

21    of one eighty-nine total?

22    A.    Right.

23    Q.    And if you look on the

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 123

1    following page, sixty-eight is the number.

2         A.    Uh-huh (positive response).

3         Q.    You see in the right hand

4    column on the journal tape where there's a

5    sixty-five-dollar discount?

6         A.    Yes.

7         Q.    And that's done for coupon

8    number 5870200195?

9         A.    Yes.

10        Q.    And that's the bar code on the

11   sixty-five-dollar coupon, correct?

12        A.    Yes.

13        Q.    And this is for transaction

14   that ends in 0659?

15        A.    Yes.

16        Q.    And your associate number is

17   190?

18        A.    Yes.

19        Q.    Do you know if this customer

20   had a service call?

21        A.    She didn't.  I remember this

22   customer.

23        Q.    So she wasn't eligible,

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 124

1    according to the terms of the coupon, to

2    have this coupon, correct?

3         A.    Not according to the terms of

4    the coupon.  But she was eligible by other

5    means.

6         Q.    How do you mean by other

7    means?

8         A.    Because I went to John Lawrie

9    and got this preapproved.

10         Q.    Now, on page seventy, I think

11    it's two pages over, the sales check

12    ending in 0247 on 10/10/04, there's a

13    reduction amount of the sixty-five

14    dollars; is that right?

15         A.    That's correct.

16         Q.    Now, if you flip onto the next

17    page, seventy-one, about halfway down that

18    journal tape there's a sixty-five-dollar

19    discount, correct?

20         A.    That's correct.

21         Q.    And again, the coupon number

22    is the same as that on the service coupon;

23    is that right?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 125

1          A.       That's correct.

2          Q.       And this again corresponds to

3   transaction ending in 0247; is that right?

4          A.       That's correct.

5          Q.       And it shows that you made the

6   sale, associate 190?

7          A.       That's correct.

8          Q.       Do you know if this customer

9   had a service call?

10         A.       I don't remember the sale.

11         Q.       So you don't know?

12         A.       No.

13         Q.       Then flip to page

14   seventy-five.

15         A.       (Witness complies.)

16         Q.       The first transaction ending

17   in 0195.

18         A.       Uh-huh (positive response).

19         Q.       Again, the reduction amount is

20   sixty-five dollars?

21         A.       Uh-huh (positive response).

22         Q.       Then if you look on page

23   seventy-six?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 126

1          A.     Are you looking on

2   seventy-five one reduction or two

3   reductions of sixty-five on page

4   seventy-five?

5          Q.     I'm looking at the sales check

6   number that ends in 0195, that's the

7   second from the top, customer King, a

8   reduction amount of sixty-five dollars.

9          A.     So is this saying he had a

10  service -- I can't read this writing on

11  here.

12         Q.     Well, what I'm asking you is

13  just do you see that -- Are you looking

14  with me on 0195 sales check number, and

15  you see in the column on the associate

16  summary that it says a reduction amount of

17  sixty-five dollars, right?

18         A.     Uh-huh (positive response).

19         Q.     If you flip onto page

20  seventy-six?

21         A.     (Witness complies.)

22         Q.     For that particular

23  transaction, it's on the right-hand side

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 127

1    of the page, do you see a

2    sixty-five-dollar reduction?

3         A.    I do.

4         Q.    Again, that's using coupon bar

5    code, that's the same as what's on the

6    service coupon?

7         A.    Yes.

8         Q.    And it was done by associate

9    190 which is you, correct?

10        A.    That's correct.

11        Q.    Do you know if this particular

12   person had a service call?

13        A.    I don't know.

14        Q.    What about the transaction

15   below that, sales check number ending in

16   0263 on page seventy-five as well, and

17   reduction amount of sixty-five dollars?

18        A.    That might be a re-ring.  Same

19   customer.

20        Give me a second, okay?

21        Q.    Okay.

22        A.    It's a transaction re-ring.

23   That means a sale earlier.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 128

1    Q.    What is a re-ring?

2    A.    That means a transaction had

3    already taken place, and that it was

4    something that was just redone over.

5    Q.    Okay.  And that was redone

6    over by you that; is that right?

7    A.    I can't say it was because --

8    Q.    Associate 190 --

9    A.    It's under my number.

10   Q.    It's under your number, okay.

11   And that's transaction 0263; is that

12   right?

13   It's on the very bottom on the

14   left-hand side.

15   A.    Yes.

16   Q.    And that is your associate

17   number there; is that correct?

18   A.    It is.

19   Q.    Now, look on again page

20   seventy-six --

21   A.    Uh-huh (positive response).

22   Q.    -- at that journal tape on the

23   right-hand side where you have the

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 129

1    sixty-five-dollar transaction or

2    sixty-five-dollar discount.  Do you see

3    that at the top?

4         A.    For King?

5         Q.    I'm looking up here at the

6    top, right there (indicating).

7         A.    Yeah.  That's King.

8         Q.    Okay.  You see above there it

9    says merchandise does not qualify for

10   coupon reduction?

11        A.    Uh-huh (positive response).

12        But that's coupon 5870200197.

13        Q.    They got that discount anyway,

14   though, correct?

15        A.    No, they didn't.

16        Q.    How do you know that?

17        A.    Because the next coupon

18   number, that 580200195, is sixty-five.

19   That coupon didn't show a reduction at

20   all.  So, no, they didn't.

21        Q.    They didn't get the five

22   forty-five reduction?

23        A.    That's a price matching.

Page 130

1       Q.      And that doesn't pertain to a

2    sixty-five-dollar coupon --

3       A.      No.

4       Q.      -- is what you're saying?

5       A.      Huh-uh (negative response)

6    That was a coupon that was scanned

7    that didn't qualify.

8       It will show -- If it had showed and

9    where it used it, it would have had that

10   negative right below the coupon number.

11   The five forty-five is above, and that's

12   what the price matching is.  So there was

13   a coupon that was scanned that didn't

14   qualify, and we didn't use it.

15      And another thing it would have did,

16   if it -- if I did -- because some coupons

17   we did accept that had been expired, it

18   would have showed accept and that amount

19   also; or declined or accept, you had one

20   of two that you could do.

21      Q.      Because this had two bar codes

22   on it, correct?

23      A.      No.  That one was for

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 131

1    maintenance agreement.

2         Q.    Right.

3         A.    We never use maintenance

4    agreements.

5         Q.    That's also on this --

6         A.    Right.

7         Q.    -- coupon number?

8         A.    Right.  We never used --

9         Q.    So basically you used the 0195

10   one instead?

11        A.    Right.

12        Q.    Now, on page seventy-seven,

13   sales check number ending in 0686, do you

14   see that, third one from the bottom, total

15   reduction amount was eighty-five dollars?

16        A.    Uh-huh (positive response).

17        Q.    And then flip to the next

18   page, seventy-eight, you see the coupon

19   number 5870200195, discount of sixty-five

20   dollars; is that right?

21        A.    Yes.  But that could have been

22   used by another coupon too, same type

23   coupon.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 132

1    Q.    Well, the bar codes are unique

2    to the coupons, correct?

3    A.    But at the same bar code

4    though.

5    Q.    So you're saying that

6    different service -- different --

7    A.    There is one for two

8    ninety-nine, there is one for three

9    ninety-nine with the same bar code.

10    Q.    What do you mean one for two

11    ninety-nine?

12    A.    It's the same type coupon that

13    we have, there is one that is two

14    ninety-nine.

15    Q.    Do you have a copy of that

16    coupon?

17    A.    Yeah.  We sent you a copy.

18    Right here (indicating).  Three

19    ninety-nine, two ninety-nine, same

20    numbers.

21    Q.    And that is in the information

22    that you produced to us; is that right?

23    A.    Right.

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 133

1       Q.      Do you know if that customer

2   had a service call?

3       A.      I can't say.  I don't know.

4       Q.      And your associate number is

5   associated with that transaction, correct?

6       A.      That's correct.

7       Q.      Now, Ms. Smith, how did you

8   know to use that two ninety-nine one?

9       A.      They were in the register.

10  And actually, to be --

11      Q.      Did you look at the terms of

12  the coupon to know to use the two

13  ninety-nine one rather than three

14  ninety-nine?

15      A.      No.

16      Q.      You just happened to pick up

17  the right one?

18      A.      No.  You just pick up a coupon

19  and you scan it and you use it.  We

20  didn't --

21      Q.      You just keep scanning coupons

22  to see which ones go through?

23      A.      Uh-huh (positive response).

Page 134

1    We do.

2         And that was something --

3         Q.    Even though the customer

4    wasn't eligible and didn't have a service

5    call, you would do that?

6         A.    Yes, we did.

7         Q.    And, again, according to the

8    handbook, that's an unauthorized discount,

9    correct?

10        A.    According to the handbook.

11        Q.    Now, on -- This might be the

12   same -- I might just have duplicates in

13   here, I'll have to look and figure that

14   out.  I think it is, yeah.  So never mind

15   about that one.

16        Yeah, that's a duplicate in there.

17        A.    That's a duplicate right

18   there.

19        Q.    Yeah.  I think I just printed

20   the page twice.

21        A.    Yeah.  All these are

22   duplicates.

23        Q.    Now, flip to page eighty-five

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 135

1    for me.

2          A.      (Witness complies.)

3          Q.      Where the sales check number

4    is 0612, you see that one?

5          A.      Uh-huh (positive response).

6          Q.      And the total discount

7    reduction amount is one forty; is that

8    right?

9          A.      Uh-huh (positive response).

10         Q.      And on page eighty-six, the

11   journal tape associated with that

12   transaction indicated at the bottom, 0612.

13   And it shows that you made that

14   transaction; is that right?  You completed

15   that transaction?

16         A.      It's under my number.

17         Q.      Sales associate 190, okay.

18   That also shows a sixty-five-dollar

19   discount, correct --

20         A.      Yes.

21         Q.      -- using coupon with the bar

22   code that's on -- the same as the one on

23   the service coupon?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 136

1      A.      That's correct.

2      Q.      Do you know if that customer

3  had a service call?

4      A.      I don't know.

5      Q.      Now, do you recall that on

6  November 8, 2004, Terry and Nina Fitzwater

7  talked to you about your abuse of the

8  service coupon?

9      A.      Not abuse, no.  They talked to

10  me about the coupon.

11      Q.      And was this the first you had

12  heard of this?

13      A.      Yes.

14      Q.      So you had no idea this was

15  going on?

16      A.      As far as what, the

17  interrogations?

18      Q.      Yes.

19      A.      I had heard it earlier that

20  day when I came in at one o'clock.

21      Q.      So this was the first you

22  learned that --

23          Let me back up.  This was the first

Page 137

1    you learned that there was an

2    investigation going on for coupon abuse?

3         A.    It was within that -- If it

4    wasn't that day, it was within that week.

5         Q.    Do you recall when you first

6    heard it?

7         A.    It was one day when I worked

8    nights, I came in at one.

9         Q.    Do you know who you heard it

10   from?

11        A.    Yes.   I heard it -- Well, no.

12   What I heard was that there was an

13   investigation going on.

14        Q.    Who told you that?

15        A.    Beatrice Willis and Jackie

16   Dodson, but they were not at liberty to

17   discuss it, and that I would find out

18   soon.

19        Q.    Now, did they say anything

20   else to you about it?

21        A.    Not about -- They didn't give

22   me any specifics about what the

23   interrogation was.

Page 138

1        Q.      What the investigation was

2    about, they didn't tell you?

3        A.      No.

4        Q.      So you had no idea it really

5    had to do with coupon abuse?

6        A.      Not until I got back in the

7    back.

8        Q.      Did they allude to you at all

9    what it was about?

10       A.      No.

11       Q.      Now, when you went to talk to

12   Terry and Nina, what did they say to you?

13       A.      Nina didn't say anything.

14       Q.      Okay.  What did Terry say?

15       A.      Word for word, I can't

16   remember.  But he basically pulled the

17   receipts out and asked me was I aware of

18   those receipts.

19       Q.      And what receipts are you

20   talking about, the ones we just

21   reviewed --

22       A.      Uh-huh (positive response).

23       Q.      -- in Defendant's Exhibit 6?

Page 139

1    A.    Right.

2    Q.    And what did you tell him?

3    A.    He asked me -- The first one

4  was about Clint Teal's receipt, he asked

5  me did I ring that up.  And I told him I

6  did not remember ringing that up, I didn't

7  remember that sale.

8        A few of them at that particular

9  time I did remember, but that's all he

10  asked me.

11    Q.    Did he ask you if they had had

12  a service call?

13    A.    No, he didn't.

14    Q.    Did he ask you if you were

15  using coupons that the customer had

16  brought in or were reusing the coupons?

17    A.    He asked me why was I using

18  coupons and under what circumstances.

19  And, you know, I just went on to explain

20  to him that we use coupons to, you know,

21  keep a customer from walking, make a

22  customer for life, make a customer happy.

23  And he asked me what was I to do with

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 140

1  coupons.  And I told him only thing I knew

2  was to put them in the drawer, that's what

3  I had been doing from the time that I had

4  been there.  He asked did I know that I

5  was supposed to tear them up and turn them

6  in at night.  And I told him, no, I

7  didn't; I had never been told that and had

8  never did that before.

9      Well, the first part of the

10  conversation was I told him I was going to

11  record the conversation.  He said, well,

12  we'll end it.  And I cut the recorder off,

13  so that's the first --

14      Q.    You didn't record anything?

15      A.    No, I didn't.  That was the

16  first thing.

17      Q.    So then he asked you under

18  what circumstances you were using the

19  coupon, and you told him basically you

20  were using it to close sales?

21      A.    Right.

22      Q.    And you told him that you

23  didn't throw coupons away, you just kept

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 141

1    them in the drawer?

2          A.    Yes.

3          Q.    And you would reuse them?

4          A.    Yes.

5          Q.    Did he ask you to explain any

6    of those transactions?

7          A.    The only one he really asked

8    to explain was the Clint Teal one.

9          Q.    Did you know if that

10   transaction actually went through?

11         A.    I don't know.

12         Q.    You don't know if it was

13   cancelled or not?

14         A.    I don't.

15         Q.    Did he ask you to explain why

16   you were misusing the coupons and giving

17   it to customers who weren't eligible for

18   it?

19         A.    He didn't.

20         Q.    Did he ask you to write a

21   statement?

22         A.    He did.

23                    (Whereupon, Defendant's

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 142

```
 1                    Exhibit No. 7 was

 2                    marked for

 3                    identification.)

 4       Q.    Is this the statement that you

 5  wrote?

 6       A.    It is.

 7       Q.    In here you say you've never

 8  been told by past or present managers not

 9  to use the coupons, not to turn in at

10  night or destroy.

11       A.    That's correct.

12       From my understanding, that was

13  discussed by a manager before I got there,

14  Chandler, and I didn't know him.  He was

15  the one they said made that rule -- make

16  everybody aware of that rule.  But after

17  him, nobody made that rule aware, and he

18  was before I got there.  That's what I

19  had -- Once I got terminated and found

20  out, that's what I was told.  I don't

21  know.

22       Q.    Told that they had to put

23  coupons in the drawer?
```

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 143

1    A.    That's when he -- No.  At the

2    time that he was the manager, he was

3    telling associates this is what you need

4    to do, and he was enforcing this rule.

5    But that was before I got to Sears.

6        Q.    Did y'all ever have meetings

7    about giving proper discounts to customers

8    or basically when you should use coupons

9    or anything like that?

10       A.    No.

11       Q.    So if other sales associates

12   -- Do you not recall that meeting or you

13   just say that there wasn't one?

14       A.    There wasn't one.  Not for

15   coupons, no.

16       Q.    What about giving unauthorized

17   discounts, was there a meeting for that?

18   Did y'all ever talk about that?

19       A.    Yes.

20       And the one -- The person that I

21   remember having that type meeting probably

22   was Louis Collins.  And his thing, he

23   would give you the answer to the test

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 144

1    before the test.

2          Q.    So in that meeting, you were

3    instructed not to give unauthorized

4    discounts or give discounts to people who

5    weren't eligible for them, correct?

6          A.    I can't remember exactly what

7    the conversation or the gist of the

8    meeting was.  But if somebody was doing

9    something wrong at that particular time,

10   he would have a meeting, and he would

11   discuss whatever was going on.  And it

12   could be taking unauthorized markdowns as

13   far as just marking stuff down just to be

14   marking them down.

15         Q.    Well, you said there was a

16   meeting about unauthorized discounts; you

17   said that there was one and Louis Collins

18   had that.

19         A.    Right.

20         Q.    So unauthorized discounts are

21   basically giving discounts to people who

22   are not eligible, correct?

23         A.    He wasn't talking about

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 145

1    coupons.  He was talking about people that

2    was taking markdowns at the register, just

3    giving people ten percent just to be

4    giving them ten percent or selling floor

5    models when there was some in the back or

6    something like that, just to give somebody

7    a discount.

8         Q.     So you didn't think he was

9    talking about using coupons when you

10   weren't supposed to or people who weren't

11   eligible for them?

12        A.     No.  Because we were still

13   using coupons, no.

14        Q.     When people weren't eligible

15   for them?

16        A.     Right.

17        You know, according to the way the

18   coupon is, they wasn't.  But, I guess we

19   didn't look at it like that because that's

20   not the way it was being handled.

21        Q.     Now, you say managers gave out

22   coupons in your statement.

23        A.     Right.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 146

1      Q.      What managers?

2      A.      David Williams gave us coupons

3  all the time to use.

4      Q.      Okay.  Did he give you service

5  coupons?

6      A.      Now, he gave us -- We got

7  these from him (indicating).

8      Q.      My question --

9      A.      These are service coupons too.

10     Q.      Did you give the service

11  coupons that --

12     A.      Not the sixty-five-dollar

13  coupon.  But these coupons that come from

14  service also he gave us (indicating).

15     Q.      But not the sixty-five-dollar

16  coupon that you were investigated for,

17  correct?

18     A.      No.

19     Q.      Did anybody else -- You said

20  managers have given coupons out to the

21  sales people, any other managers?

22     A.      We were given coupons, they

23  copied coupons during associate nights to

Page 147

1    use at different meetings.  They

2    probably --

3         Q.    Anybody give you the -- What

4    coupons are you saying?

5         A.    No manager gave us a

6    sixty-five-dollar coupon, no.  But other

7    coupons they did give us.

8         I can't say us.  They didn't give it

9    to me.

10        Q.    Do you recall what other

11   coupons they gave you?

12        A.    Various coupons.  Ten percent

13   coupons, just stacks of coupons to use,

14   just various.

15        Q.    Do you know who the managers

16   were that gave those to you?

17        A.    David Williams, Kenny Reese,

18   Jason Yaxheimer gave us coupons.

19        Q.    Did they tell you to use them

20   inconsistent with the terms on the

21   coupons?

22        A.    No.  They just give us coupons

23   to use.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 148

1      Q.     Do you recall when these

2   managers gave you these coupons?

3      A.     Not specific times, no.

4      Q.     In your statement you say that

5   the sixty-five-dollar coupon was always at

6   the register, so you assumed it was okay

7   to use; is that what that says?

8      A.     Yes.

9      Q.     So, again, nobody ever told

10  you to use it to close a sale, you just --

11     A.     Not a specific coupon, no.

12     Q.     -- you just assumed that that

13  was okay?

14     A.     Not a specific coupon, no.

15  Because they were there and we used them

16  all the time and they were being used when

17  I got to Sears, yes, I assumed that they

18  were okay to use.

19     Q.     Do you know if Terry Gandy was

20  aware before this investigation that you

21  were using coupons --

22     A.     Yes, he was.

23     Q.     -- inconsistent with the terms

Page 149

1 on the coupon?

2    A.    Yes, he was.  Because he used

3 them himself.

4    Q.    So he was aware that using

5 coupons inconsistent with the terms on the

6 coupon?

7    A.    Yes.

8    Q.    How do you know that?

9    A.    He used them for his personal

10 use, he used them when he was a sales

11 associate on the sales floor.

12    Q.    Okay.  Let's say he used them

13 for personal use.

14    A.    And when he was an associate.

15    Q.    When -- Personal use, when was

16 that?

17    A.    In the sales -- That's some of

18 the ones that we showed you, that we've

19 got in our proof.

20    Q.    Let's go ahead and look at

21 those then.

22    I am going to mark -- Well, we'll

23 just mark them as we go along I guess

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 150

1   then.  You're looking at your own copy, so

2   I have no idea of knowing --

3          A.    It's got sales check

4   02595022075.  It's the very first of the

5   transaction copies that we have.

6          Q.    I'm going to mark this as --

7   Let's talk about it first.  Now, you say

8   he used the coupons himself; is that

9   correct?

10         A.    Yes.

11         Q.    And where do you see that?

12         A.    There's a thirty-dollar coupon

13  under reductions.

14         Q.    Do you know if it was valid?

15         A.    It was in the register.  These

16  were coupons that was in the register.

17         Q.    I understand that.  But do you

18  know if it was applicable to that

19  purchase?

20         A.    It probably was because it

21  accepted it.

22         Q.    Did you do this transaction?

23         A.    No.  Stephanie Darby did it.