LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 151

1      Q.    Do you know what the coupon

2   was for?

3      A.    He used it for the dishwasher.

4      Q.    I know.  But do you know what

5   the discount was for?  Does it say what

6   the discount is for on there?

7      A.    No.  But it was a coupon.

8      Q.    How do you know it was a

9   coupon?

10      A.    Because someone was standing

11   there when the sale was done.

12      Q.    So it wasn't for a floor

13   model?

14      A.    No.

15      Q.    Who was standing there?

16      A.    Shannon Bryant.

17      Q.    So he didn't -- He didn't get

18   a ten percent reduction for a floor model?

19      A.    No.  It would have been

20   thirty-five dollars and twenty-something

21   cents if it was ten percent.

22      Q.    Do you have the actual coupon

23   that was used?

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 152

1        A.      No.

2        Q.      Did Shannon actually see the

3    coupon that was used?

4        A.      She did.

5        Q.      Did she read it to know if it

6    was eligible for him to use it?

7        A.      No.  But she saw him get --

8    she saw Stephanie get it out of the

9    register to use it for him.

10        Q.      Okay.  But even though the

11    coupon was kept in the register, did

12    she -- Let me finish my question.

13        Even though the coupon was in the

14    register, did Shannon know if the coupon

15    was valid for that particular transaction?

16        A.      Basically it should not have

17    been valid if you go by the rules.

18    Because it should have only been used for

19    one merchandise according to Sears's

20    policy.  So if it was in the register and

21    had already been used, it was an invalid

22    coupon.

23        Q.      Well, do you know if they had

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 153

1   coupons that were ten percent to use all

2   day or ten percent --

3        A.    No.

4        Q.    -- to use, you know, at any

5   particular time?

6        A.    Not if --

7        Q.    Or if they have a sale going

8   on on a weekend or anything like that?

9        A.    That wasn't going on then.

10       And for one reason I know it wasn't

11  going on --

12       Q.    You heard this from Shannon;

13  is that correct?

14       A.    He had came on the floor to

15  ask about these merchandise and went in

16  the back to find merchandise, that he was

17  looking for his parents merchandise, some

18  appliances.  So that's one of the reasons

19  I know that it wasn't anything going on.

20  These are merchandise not for himself but

21  for his parents.

22       Q.    But Shannon didn't actually

23  see the coupon, correct?

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 154

1       A.      Yes.  She --

2       Q.      Did she read the terms of the

3  coupon?

4       A.      She didn't read the coupon,

5  but she saw the coupon.

6       Q.      And this is what Shannon told

7  you?

8       A.      Yes.

9       Q.      Now, do you have personal

10  knowledge that this was in fact a coupon

11  that was being used outside its terms that

12  was in this transaction here for

13  Mr. Gandy --

14       A.      According to Sears's policy it

15  was.

16       Q.      That's not my question,

17  Ms. Smith.

18       My question is:  Do you know, do you

19  have personal knowledge, of any kind of

20  discount that was given on this

21  transaction that you're referring to for

22  Mr. Gandy?

23       Were you there when this transaction

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 155

1   occurred?

2       A.      I was not there when the

3   transaction occurred.

4       Q.      Did you see the coupon?

5       A.      No, I didn't.

6       Q.      So this is based on what

7   Shannon told you; is that correct?

8       A.      Basically, yes.

9       Q.      Any other reason why you think

10  Mr. Gandy was aware that you-all were

11  using the service coupon inconsistent with

12  its terms?

13      A.      Well, one sale, I can't

14  remember the sale, it was on a Saturday,

15  he was standing out at the register when I

16  pulled one out to use it is.

17      Q.      Do you know if he saw you?

18      A.      Yes.  Because he was standing

19  behind me.

20      Q.      Do you know if he saw you?

21      A.      Yes.  He had to.

22      Q.      Do you know if he was paying

23  attention to what you were doing?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 156

1    A.    He's always paying attention.

2    Q.    Do you know if he was paying

3  attention, Ms. Smith, to what you were

4  doing?

5    A.    Yes.    I mean, that's what --

6  that's Terry.

7    Q.    So he saw you take the service

8  coupon out of the drawer?

9    A.    Yes.    He was on the floor

10  talking to myself and Stephanie Darby, and

11  I was making a sale.    And I also -- I used

12  the sixty-five-dollar coupon along with

13  another coupon, and he was right on the

14  floor.

15    Q.    Do you know when that was?

16    A.    I can't recall when.

17    Q.    Do you know if he realized

18  what kind of coupon it was?

19    A.    I can't say that he did.

20    Q.    Do you know if he read the

21  coupon?

22    A.    I -- Probably not, like

23  everybody else didn't.    But I don't know.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 157

1    Q.    So then he didn't know that

2    you were using it inconsistent with its

3    terms, is that correct, if he didn't read

4    it?

5    A.    Well, he saw the coupon.

6    Q.    Right.  But you just said he

7    didn't read it; is that right?

8    A.    As far as I know.  I can't say

9    that he did or he didn't read the coupon,

10   I don't know.

11   Q.    Any other reason why you think

12   he knew that y'all were using coupons

13   inconsistent with its terms?

14   A.    Because when he was on the

15   sales floor, he was doing the same thing.

16   Q.    How do you know that?

17   A.    Because I was one of the ones

18   that helped train him, along with

19   everybody else that had been there before

20   he got there.  And when you get -- When

21   you get to Sears, whatever practice is

22   being practiced, it's from one person to

23   another, and you just pass on what your

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 158

1  knowledge is that you know.

2      Q.    And this is when he first

3  started working as a sales associate?

4      A.    Well, he didn't stay a sales

5  associate long because he couldn't sell.

6      Q.    And when was that, do you

7  recall?

8      A.    I don't.

9      Q.    How long ago?

10      A.    I really don't know.

11      Q.    Was it when you were first in

12  appliances or after 19- -- after 2004 when

13  you came back?

14      A.    No.  It was when I was first

15  in appliances.  It was when he first came

16  to Sears.

17      Q.    So you trained him?

18      A.    Me and everybody else that was

19  on the floor.

20      Q.    And did you train him how to

21  use discounts or coupons?

22      A.    If I trained him, I probably

23  did.  We pass on our knowledge to

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 159

1    everybody.

2         Q.    Do you recall training him

3    specifically on how to use coupons?

4         A.    I can't -- No, I can't say

5    that I did.

6         Q.    Do you know if he used a

7    coupon inconsistent with its terms?

8         A.    Well, he used them just like

9    everybody else did.  So if it's not

10   consistent, it's just not consistent,

11   whether he used them or not.

12        Q.    Do you know if he used --

13   applied coupons to sales that were

14   eligible?

15        A.    He went in the drawer to get

16   coupons just like everybody else did.

17        Q.    And you don't recall when that

18   was?  That was when he first started

19   working there?

20        A.    Right.  While he was on the

21   sales floor.

22        Q.    Do you recall a specific

23   incident where he used a coupon other than

Page 160

1    what's stated in the terms of the coupon?

2         A.    I can't say a specific.

3         But I know a sale that I sold for

4    him for his friend, a television, and I

5    went in the drawer myself and got coupons

6    out for that sale, and that's while he was

7    in asset protection.

8         Q.    That's when he was in loss

9    prevention?

10        A.    Right.

11        Q.    Do you remember what discount

12   you gave him?

13        A.    I just went in and got -- I

14   gave him ten percent for floor model, then

15   I went in and used --

16        Q.    Was it a floor model?

17        A.    It was a floor model.  Then I

18   used coupons.

19        Q.    Is that in this stack --

20        A.    Yes.

21        Q.    -- of papers?

22        A.    It is.

23        Q.    Again, I'm referring to the

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 161

1  documents that Ms. Smith has produced in

2  response to our request for production.

3      A.    It's almost to the back.  I

4  guess about halfway in between the

5  receipts.  My number is 190, so it would

6  be --

7      Q.    Where is your number located

8  on this?

9      A.    On here, it's going to be

10 right here (indicating).

11     Q.    In the middle of the page.

12     A.    Uh-huh (positive response).

13     What are you looking at now?  I can

14 tell you if you're close to it or not.

15     It's going to look different than

16 that type sheet (indicating).

17     That's it.  And that television he

18 bought for one of his friends that they

19 jump out of the airplane together.  And I

20 sold that.

21     Q.    You sold that to him?

22     A.    I did.

23     Q.    And you say a reduction total

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 162

1    of one ninety?

2          A.    Uh-huh (positive response).

3          Q.    And that's the associate

4    discount, correct?

5          A.    No.  Associate discount is

6    eighty-one dollars.

7          Q.    Right.  Right.

8          A.    And the reductions is the ten

9    percent plus coupons.

10          Q.    Do you recall which coupons

11   you used?

12          A.    No.  They were just in the

13   drawer.

14          Q.    Do you know if they were being

15   used consistent with their terms?

16          A.    I can't say they were.

17   Because I used those just like I did every

18   other coupon.

19          Q.    I guess what I'm saying, the

20   terms that were written on the coupon --

21          A.    I don't know what was on the

22   coupon.

23          Q.    Now, after you finished your

Page 163

1    meeting with Nina and Terry, how did that

2    end?  You wrote this statement?

3         Let me back up.  Let me back up.

4         Did you tell me everything that

5    basically transpired during that meeting?

6         A.    I didn't.

7         Q.    Finish telling me about that

8    meeting.

9         A.    The last thing that I said --

10   I asked him, I said, well, Terry, you know

11   we're still having problems with the

12   system, with the delivery.  I said, and we

13   still -- we've been using coupons to

14   straighten those out.  I said, how do you

15   want us to handle that.  He said, those

16   instances, go head and still use the

17   coupons.

18        Q.    Okay.  And that was what we

19   talked about before?

20        A.    Right.

21        Q.    Because it was overcharging,

22   so y'all were using coupons to fix that,

23   correct?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 164

1      A.      Right.

2      Q.      And they had told you that

3  that was okay, correct?

4      A.      At that time he said that.

5      Now, from what I understand -- They

6  called me at home and terminated me at

7  home.  And from what I heard, they said

8  that I said to call me at home.  That was

9  not true.

10      What I said was, don't let me work

11  all day and then terminate me.  And I told

12  him, if he was going to terminate me, to

13  terminate me then.

14      Q.      Do you know if Sears had

15  reached a decision at that point?

16      A.      Well, they probably did, had

17  already knew.

18      Q.      Do you know if --

19      A.      I don't know.

20      And the only reason --

21      Q.      Did you tell me all the

22  conversations you had with anyone before

23  you met with Gandy and Nina about the

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 165

1    coupon abuse?

2            A.      No, I didn't.

3            Q.      Okay.

4            A.      When they told me that they

5    couldn't discuss the conversation, I told

6    them they had a right to discuss it, that

7    they're -- I can't remember what amendment

8    I used --

9            Q.      Who had a right to discuss it?

10           A.      That was with them.  You

11   couldn't discuss anybody else.

12           Q.      I'm confused because you keep

13   referring to them.

14           A.      Beatrice and Jackie.  I can't

15   remember which one it was, but it was one

16   of the two.

17           Q.      Had -- This is when they came

18   out and said, I can't discuss it?

19           A.      No.  I came on the floor.

20   They had already had their discussion

21   earlier that morning or whatever, because

22   I came to work like at one or two o'clock

23   that evening.  And they told me that I was

1   going to be -- I had a meeting or I was

2   going to be made aware of something, but

3   they couldn't discuss it.  And I asked

4   what you mean you can't discuss it; they

5   told us we couldn't discuss it.  I said,

6   well, you can discuss anything that has to

7   do with you; you can't discuss anything

8   that has to do with anybody else.  They

9   said, well, if -- whatever they discuss,

10  if you discuss it, they're going to

11  terminate you.

12          I'm like, they can't do that.  So I

13  said, well, I'll tell you what, I'm going

14  to get me a tape recorder, because

15  whatever they say, I want to have it on a

16  recorder.  John Lawrie was standing there

17  when I said that, because it wasn't

18  anything I was trying to hide from

19  anybody, because if I was trying to hide

20  it, I definitely wouldn't say it in front

21  of a manager.  I went and I bought me a

22  tape recorder at Sears.

23          Q.    Is that the extent of the

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 167

1   conversation --

2        A.    That's the extent of that

3   conversation.

4        Q.    -- with Louis and/or Dodson

5   prior to?

6        A.    Right.

7        Q.    Did you have any conversations

8   about the coupon abuse investigation with

9   anybody else before you talked to Terry

10  and --

11       A.    No.

12       Q.    -- Nina?

13       A.    No.

14       Q.    Now, after you talked to Terry

15  and Nina, did you continue to work?

16       A.    That night, because I was

17  closing that night.

18       Q.    And that -- You had a

19  conversation with them on the 8th; is that

20  right?

21       A.    That's correct.

22       Q.    And you were terminated on

23  the --

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 168

1      A.      -- 13th at home.

2      Q.      And Terry called you, correct?

3      A.      Yes.

4      Q.      Did you have any conversations

5  with anybody in management between that

6  meeting with Terry and Nina and when Terry

7  called you at home to terminate you?

8      A.      Not about me, no.

9      Now, Byron Mason and I discussed it

10  after Beatrice was terminated.

11      Q.      What was that conversation?

12      A.      It wasn't right.  Any of you

13  terminate her, you've got to terminate

14  everybody, because everybody was doing the

15  same thing.

16      Q.      That's what Byron said?

17      A.      Yes.  That's what we all were

18  saying.

19      Q.      Do you know if he helped with

20  the investigation?

21      A.      Honestly, I don't think he

22  did.

23      Q.      Do you know?

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 169

1      A.    I don't know.  But I honestly

2  don't think he did.

3      Q.    Do you know if he knew what

4  the investigation showed?

5      A.    Probably after it was done he

6  did.

7      Q.    Did he have any input on the

8  decision, do you know?

9      A.    No.  I don't think so.

10     Q.    Do you know?

11     A.    According to what came back

12  from his conversation, he couldn't have.

13     Q.    Do you know if he knew the

14  details of the investigation?

15     A.    After it was over with.

16     Q.    But not while it was going on?

17     A.    No.

18     Q.    And not before the decision

19  was made?

20     A.    No.

21     Q.    Anybody else in management

22  that you discussed this with --

23     A.    No.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 170

1      Q.      -- before your termination?

2      A.      No.

3      Q.      Now, you said Terry called you

4    at home.  What did he say to you?

5      A.      He was just calling to let me

6    know my services was no longer needed.

7      Q.      And you understood that to be

8    for the coupon -- use of the service

9    coupon?

10     A.      Yes.

11     That's what I assumed it was.

12     Q.      So you basically continued to

13   work from 11/8/2004 to 11 -- through

14   11/13/2004, is that right, those five

15   days?

16     A.      That's correct.

17     Q.      Now, when you continued to

18   work, didn't you go and pull off

19   information from Sears's computer and

20   remove customer reports --

21     A.      I did.

22     Q.      -- on associate summaries and

23   things like that?

Page 171

1          A.     I did.

2          Q.     Were those for this particular

3    reason?

4          A.     Yes.

5          Q.     So they had nothing to do with

6    Sears's business, correct?

7          A.     Right.

8          Q.     And we discussed earlier that

9    that's a violation of Sears's policy,

10   correct?

11         A.     That's correct.

12         Q.     Who gave you access to

13   manager's information such as Terry Gandy

14   and these other customer reports?

15         A.     Associate access.  Associates

16   have access to that.

17         You put your password in and you log

18   on and you get it.

19         Q.     What about -- You have access

20   to other associate sales?

21         A.     Yes.

22         Q.     So the associate summaries

23   that we went over in Exhibit, I believe it

Page 172

1    was, 6, you have access to those?

2            A.      Yes.

3            Q.      Did you copy them at that

4    point in order to pursue a lawsuit?

5            A.      No.   To protect myself in case

6    I was terminated.

7            Actuality it was -- Yeah, I say

8    that, to protect myself.

9            Q.      Any other conversations at any

10   time with management about the service

11   coupon investigation and/or your

12   termination?

13           A.      Not that I recall.

14           Q.      Did you ever talk to Gandy

15   about it?

16           A.      Not after that.

17           Q.      You ever talk to Kenny Reese

18   about it?

19           A.      No.

20           Q.      You ever talk to John Lawrie

21   about it?

22           A.      No.

23           Q.      Just Byron Mason?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 173

1        A.    Yes.

2        And that was really -- It was only

3  the day that Beatrice got terminated.  And

4  after that we didn't discuss it.

5        Q.    Do you know who made the

6  decision to terminate you?

7        A.    Only Kenny Reese and Terry

8  Gandy, that's who I think.

9        Q.    Do you know if they made the

10 decision?

11       A.    No.

12       Q.    Do you know if they consulted

13 with anybody at the corporate office?

14       A.    No, I don't know.

15       Q.    Do you know if anybody at the

16 corporate office made the decision?

17       A.    No, I don't.

18       Q.    Have you talked to anyone in

19 management since your termination?

20       A.    Yes, I have.

21       Q.    Who is that?

22       A.    Byron Mason.

23       Q.    And when was that

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 174

1    conversation?

2         A.     Right before I was getting

3    ready to get hired at Auburn University.

4    And I asked him if I could put him down as

5    a reference.

6         Q.     And what did he say?

7         A.     He said sure, I could.

8         Q.     And when was this?

9         A.     I got hired in March, so it

10   was probably two weeks before that.

11        Q.     Anyone else present?

12        A.     That was on the telephone.

13        Q.     Did you list him as a

14   reference?

15        A.     I think I did.  I can't

16   remember, but I think I did.  I'm almost

17   positive I did, but I'm not sure.

18        Q.     So you don't know?

19        A.     No, I don't.

20        Q.     Any conversations with any

21   Sears associates or former associates

22   since your termination about the coupon

23   abuse and investigation?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 175

1          A.     Not about an investigation.

2     But just basically it was wrong what was

3     done to us.

4          Q.     And who did you talk to?

5          A.     Cymetria (phonetic) Simpson.

6          Q.     Who?

7          A.     Cymetria Simpson.

8          Q.     Who else?

9          A.     Beatrice Woods, Jackie,

10    Shannon Bryant.

11         Q.     Anybody else?

12         A.     No.

13         Q.     And what was your

14    conversation --

15         A.     Well, that's wrong.  James

16    Benson, Wilborn Sanders.

17         Just basically it was general

18    conversation, what had transpired, why

19    they were terminated, that was the gist of

20    it.

21         Q.     Who was Cymetria?

22         A.     She's an associate that's

23    there now.

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 176

1    Q.    Where does she work?

2    A.    In hardware.

3    Q.    Is she white or black?

4    A.    She's black.

5    Q.    And what did she say or what

6    was y'all's conversation?

7    A.    Nothing really. That was when

8    I first terminated as far as this go, and

9    I was just telling her what happened.

10   Because I don't think she knew what

11   happened, so I was telling her. And I was

12   just telling her to be careful and stop

13   using coupons.

14   Q.    What about Ms. Willis?

15   A.    Well, we just -- Basically the

16   same thing, what was done to us was wrong.

17   That's just the gist of the conversation.

18   Anytime we ever talked, that's the

19   gist of it, not details of anything, it

20   just was wrong, what's happening.

21   Q.    What about Shannon Bryant?

22   A.    Same thing.

23   Q.    And James Benson?

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 177

1      A.      Well, when I got terminated,

2  he was one of the ones I told, you know,

3  be careful, stop using coupons, don't --

4  watch --

5      Q.      Is he still there?

6      A.      No.

7      Q.      And what department was he in?

8      A.      Hardware.

9      And he did resign because he felt

10  like Kenny was getting after people, and

11  he would be next.

12      Q.      But he resigned?

13      A.      Yeah.   He took another job

14  somewhere.

15      Q.      Anything else that was said

16  between you and James?

17      A.      No.

18      Q.      What about Wilborn Sanders?

19      A.      Same thing.   And we

20  discussed --

21      Q.      When you say same thing --

22      A.      We discussed him being

23  terminated.   He was terminated also.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 178

1      Q.    And who terminated him, do you

2  know?

3      A.    Kenny Reese.

4      Q.    Do you know if Kenny

5  terminated him?

6      A.    Yes.

7      Q.    How do you know that?

8      A.    Because when he came in, Kenny

9  called him back in the office and

10  terminated him.

11      Q.    Let me rephrase.  Do you know

12  if Kenny made the decision to terminate

13  him?

14      A.    Well, Kenny is the one that

15  called over the loud speaker for him to

16  come back to the office.

17      Q.    Right.  I understand that.

18  But do you know if he actually made the

19  decision or if somebody else made the

20  decision?

21      A.    He made the decision.

22      Q.    How do you know?

23      A.    David Williams also said that

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 179

1    he made the decision.

2        Q.    So it's based on what Williams

3    told you?

4        A.    Yes.  Williams and Wilborn

5    Sanders.

6        Q.    And why was he terminated?

7        A.    He was terminated on the point

8    system that was getting ready to end the

9    next day.

10       Q.    Do you know what he got points

11   for?

12       A.    Being out, tardy; late or

13   tardiness.

14       Q.    Anybody else you had

15   conversations with since your termination

16   about the investigation, your termination?

17       A.    Jimmie Tyson and Geraldine

18   Barnes.

19       Q.    And who is Tyson?

20       A.    She was an associate there.

21   Both her and Geraldine were associates in

22   the shoe department, and they were let go

23   by Kenny and replaced by other people.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 180

1      Q.     Do you know if that -- Kenny

2  made the decision?

3      A.     Yes.

4      Q.     How do you know?

5      A.     That's what they said.

6      Q.     So it's based on what they

7  said?

8      A.     Yes.

9         And they also said Byron had told

10  them that his hands was tied.

11      Q.     Do you know if anybody in

12  corporate had anything to do with that?

13      A.     No.

14      Q.     You don't know?

15      A.     They didn't.

16      Q.     How do you know that?

17      A.     Because they didn't get

18  terminated, they got phased out.  Then two

19  weeks later, their position was put in the

20  paper and white women was hired in their

21  position.  So they didn't get terminated.

22      Q.     And you don't know if Byron

23  made the decision?

Page 181

1        A.    Well, like I said, both of

2   them said two different occasions that

3   Byron told both of them that it wasn't his

4   decision, his hands was tied.

5        Q.    That that's what Byron told

6   them?

7        A.    Right.

8        Q.    So you don't know if Byron

9   actually had any input in that decision or

10  not?

11       A.    No, I don't.

12       Q.    And Byron is African-American,

13  correct?

14       A.    That's correct.

15       But based on the way Kenny was

16  running things, nobody had any decisions

17  but Kenny.

18       Q.    Well, that's your assumption,

19  Ms. Smith, isn't it?

20       A.    No.  That's reality.

21       Q.    Do you know who investigated

22  the misuse of the service coupons?

23       A.    From what I understand, Terry

Page 182

1  Gandy did.  And they also used Ben

2  Burdette to pull receipts.

3          Q.    Do you know if that's --

4          A.    I don't know.

5          Q.    -- for sure?

6          A.    I don't.

7          Q.    Do you know if Gandy, or

8  whomever, pulled the records of your

9  transactions?

10         A.    I don't know who actually

11  pulled them.

12         Q.    Do you know if he's the one

13  who reviewed them?

14         A.    Yes, he did.  Because he said

15  he did.

16         Q.    Do you know if he called the

17  service department to verify if the

18  customers you gave the service coupon

19  discount to --

20         A.    No.  They never stated that to

21  me.

22         Q.    So he didn't -- You don't know

23  if he called to find out if they had

Page 183

1    received a service call?

2         A.    No.

3         Q.    Do you know what time frame of

4    your transactions or do you know what time

5    frame was investigated for coupon abuse?

6         A.    No.

7         Q.    Do you know how far back they

8    looked?

9         A.    No.

10        Q.    Do you know if they were

11   limited in their ability to look back

12   further than a certain period of time?

13        A.    No, they're not.  They might

14   say they were --

15        Q.    Do you know if they were?

16        A.    -- because if we can look

17   back, they can look back.

18        Q.    I'm sorry, let me rephrase.

19        A.    The maintenance agreement can

20   go -- If you can -- Sears has a system set

21   up that even if you can't look at

22   something within the store, you can call

23   the maintenance agreement department from

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 184

1    years, the life -- I know up until ten

2    years at least, the maintenance agreement

3    department can go back and pull the

4    transaction and send you the exact

5    transaction.

6         Q.    Can pull you up the journal

7    tapes?

8         A.    That's the way we were trained

9    to do, if we can't find the journal tape

10   or whatever in the system, we were

11   instructed to call the maintenance

12   department, that they can find the actual

13   transactions and things.

14        Q.    Do you know if they had

15   switched computer systems?

16        A.    Not when I got terminated,

17   they had not.

18        Q.    But do you know if they had,

19   do you know --

20        A.    Not when the investigation was

21   done, it was not switched.

22        Q.    How do you know?

23        A.    Because I went back and pulled

Page 185

1    transactions and I went back further.

2         Q.    Did you pull journal tapes

3    from prior to --

4         A.    Now, journal tapes you can

5    only pull, I think, up to thirty days.

6         Q.    That's what I'm asking.  So

7    they had limited ability to pull journal

8    tapes.

9         A.    Journal tapes.  But not into

10   the computer system.

11        Q.    That's what I'm asking.  I'm

12   sorry that wasn't clear.  So that's what

13   I'm referring to, not the associate

14   summaries, but the journal tapes, they're

15   limited; they can only pull the

16   transactions for the last thirty days,

17   correct?

18        A.    The journal tapes as far as I

19   know of.

20                (Recess was taken.)

21        Q.    Now, Ms. Smith, you said you

22   thought that Terry Gandy and Kenny Reese

23   made the decision to terminate you?

Page 186

1          A.      Yes.

2          Q.      Anybody else that you think --

3          A.      No.

4          Q.      -- made the decision to

5     terminate you?

6          A.      No.

7          Q.      Do you know if Sears hired

8     anybody else in the appliances department

9     after you left?

10         A.      I don't know.  Not afterwards

11    I don't know.  I'm sure they did, but I

12    don't know.

13         Q.      Don't know who or the details

14    or anything?

15         A.      No.

16         I know it was some people, I can't

17    say who they were or what their names

18    were.

19         Q.      Now, you filed a charge -- an

20    EEOC charge of discrimination, didn't you?

21         A.      I did.

22         Q.      Did you file that charge --

23    Well, let me just give you Defendant's

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 187

1    Exhibit 8.

2        Is that the charge -- Have you seen

3    that before?

4                    (Whereupon, Defendant's

5                    Exhibit No. 8 was

6                    marked for

7                    identification.)

8        A.    Yes, I have.

9        Q.    It's entitled charge of

10   discrimination?

11       A.    Yes.

12       Q.    And is that your signature

13   down at the bottom?

14       A.    It is.

15       Q.    And it says you signed it on

16   4/27/05; is that right?

17       A.    That's correct.

18       Q.    And according to this charge

19   you're claiming that Sears discriminated

20   against you on the basis of your race; is

21   that right?

22       A.    That's correct.

23       Q.    And the reason you think they

Page 188

1    discriminated against you is because you

2    were terminated; is that right?

3         A.    That's correct.

4         Q.    You feel you were wrongfully

5    terminated?

6         A.    That's right.

7         Q.    Now, are you aware that the

8    EEOC sent you a dismissal and notice of

9    rights to sue?

10        A.    That's correct.

11                    (Whereupon, Defendant's

12                    Exhibit No. 9 was

13                    marked for

14                    identification.)

15        Q.    Let me mark Defendant's

16   Exhibit 9.  Have you seen that before,

17   Defendant's Exhibit 9, entitled dismissal

18   and notice of rights?

19        A.    I don't remember.  I don't

20   remember this.

21        Q.    You don't remember receiving

22   that?

23        A.    I don't.

Page 189

1        Q.      Is it dated July 28, 2005, in

2    the right-hand corner?

3        A.      Yes.

4        Q.      And it shows that it was sent

5    to you, care of your attorney; is that

6    correct?

7        A.      That's correct.

8        Q.      Now, on the left-hand side

9    there's a box that's marked, correct?

10        A.      Yes.

11        Q.      And the box that's checked, it

12    says:  The EEOC issued the following

13    determination:  And based on its

14    investigation, the EEOC is unable to

15    conclude the information obtained

16    establishes a violation of the statutes.

17        Is that what that says?

18        A.      Yes.

19        Q.      Now, shortly after that on

20    October 24, 2005, you filed a complaint

21    alleging race discrimination based on your

22    termination; is that right?

23        A.      That's correct.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 190

1      Q.      I'll show that to you too.

2              (Whereupon, Defendant's

3              Exhibit No. 10 was

4              marked for

5              identification.)

6      Q.      Have you seen that document

7  before, entitled Denise L. Smith versus

8  Sears, and it's labeled complaint?

9      A.      I think I have.

10     Q.      Well, flip to page three,

11 Ms. Smith.  Is that your signature on the

12 third page?

13     A.      Yes.

14     Q.      So does that indicate that you

15 reviewed this; is that right?

16     A.      Right.

17     Q.      Now, this lawsuit is based

18 upon the fact that you believe you were

19 wrongfully terminated; is that right?

20     A.      That's correct.

21     Q.      And you believe that you were

22 terminated because of your race which is

23 black, correct?

Page 191

1          A.      That's correct.

2          Q.      Now, can you tell me every

3    reason that you think you were terminated

4    because you're black?

5          A.      For one, the other white

6    associates were not terminated, and only

7    two blacks as far as this coupon thing was

8    terminated.  And everybody that had lost

9    their jobs previously had been black and

10   replaced by whites.

11         Q.      Let's start with the first

12   thing, other white associates were not

13   terminated.

14         A.      Right.

15         Q.      Who are those associates?

16         A.      Stephanie Darby, Carolyn

17   Landers, Clint Teal.

18         Q.      Who else?

19         A.      That's the three there.

20         Q.      Now, do you know if Stephanie

21   Darby's -- if Stephanie Darby's

22   transactions were investigated?

23         A.      They should have been.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 192

1     Q.    Do you know if they were?

2     A.    I don't know.  But they should

3  have been, if everybody else's was.

4  Because why would you investigate --

5     Q.    I'm asking you, Ms. Smith, do

6  you know if they were investigated?

7     A.    If they were, they would have

8  found out that she used them too.  So

9  apparently they did not.

10     Q.    What I'm asking you is do you

11  have personal knowledge as to whether or

12  not --

13     A.    No.

14     Q.    -- Terry Gandy and whoever

15  else pulled these transactions of Darby,

16  Landers, and Teal?

17     A.    No.

18  Well, yes.  He pulled Teal's,

19  because Terry gave them -- showed it to

20  me.

21     Q.    When I say pulled

22  transactions, pulled the associate

23  summaries as well as the journal tapes for

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 193

1    Stephanie Darby, do you know if Sears did

2    that?

3         A.    I don't know.

4         Q.    So then you don't know what

5    those documents showed, do you?

6         A.    Some of them I do.

7         Q.    Do you know what the documents

8    show between the dates of -- I guess for

9    the month of October 2004?

10        A.    Not offhand.  If I look back

11   through, I might.  I don't know right

12   offhand.

13        Q.    And what do you recall that

14   these documents show?

15        A.    They used the same coupons,

16   the sixty-five-dollar coupon, I guess

17   specifically.

18        Q.    Now, do you know if those

19   customers had a service call?

20        A.    Well, according to --

21        Q.    Do you know if those customers

22   had a service call is my question,

23   Ms. Smith?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 194

1      A.      Not per -- No.  But in a

2  sense, yes.

3      Q.      So, no, you don't know if they

4  had a service call?

5      A.      No.

6      Q.      Do you know if Terry contacted

7  customer service to find out if those

8  customers that Darby sold appliances to

9  and used that coupon, do you know what

10 customer service told him if they had had

11 a service call or not?

12     A.      No.

13     Q.      Do you know --

14     A.      Can I go back and -- I pretty

15 much know that they didn't have a service

16 call because the coupons that they used

17 for the sixty-five dollars is the same

18 coupons that's in the register.  There was

19 no new coupons added to the register.

20     Q.      Well, do you know if Darby

21 turned her coupons in?

22     A.      Nobody turned them in.

23     Q.      How do you know?  Were you

Page 195

1   there every day that she worked?

2        A.     No, I wasn't.  But that wasn't

3   a practice.  I've been there to close with

4   her.

5        Q.     Were you there every day that

6   Darby worked?

7        A.     I have worked with her and we

8   closed together a lot.

9        Q.     Ms. Smith, that's not my

10  question.

11       A.     Not every night I closed with

12  her.

13       Q.     Okay.  Were you there every

14  day that she worked?

15       A.     No, I wasn't.

16       Q.     So do you know if she turned

17  in her coupons at any time?

18       A.     She did not turn them in.

19  Because --

20       Q.     And you weren't with her every

21  day when you worked, correct?

22       A.     Not every day.

23       Q.     So, therefore, you would not

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 196

1    know if she turned her coupons in if you

2    weren't there, correct?

3        A.    I know the practice of

4    everybody, that they didn't turn them in.

5    We only turned in the money and a slip

6    that showed the money, that's what we

7    turned in.    Then we turned in the sheets

8    when we had to do credit copies; those are

9    the only things we turned in.

10        Q.    But, Ms. Smith, what I'm

11   asking you, you said you didn't work with

12   Darby every day, correct?

13        A.    That's correct.

14        Q.    So, therefore, you don't know

15   what she did every single minute of the

16   day with regards to coupons, do you?

17        A.    That's correct.

18        Q.    And you don't know what

19   service told Terry Gandy about whether or

20   not those customers had a service call, do

21   you?

22        A.    No.

23        Q.    Now, you said -- mentioned

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 197

1    Carolyn Landers also.   Do you know if she

2    was investigated?

3         A.     No.

4         Q.     Do you know if she used the

5    coupon -- the service coupon other than

6    the time she was supposed to?

7         A.     If she -- Because of the

8    sixty-five there, she could not have used

9    them.  She could not have used one that a

10   customer brought in.  She had to use the

11   ones that was in the register, because

12   that's all that was there.

13        Q.     Do you know if she misused the

14   service coupon?

15        A.     I did not work with her every

16   night, so, no.  But if she used them, she

17   used the ones that was in the register.

18        Q.     How do you know if she used

19   the ones in the register?

20        A.     Because no one turned them in.

21   There were no new coupons in the register.

22        Q.     Again, I asked --

23        A.     They were all the same

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 198

1    coupons.

2        Q.    Again I ask you, Ms. Smith,

3    did you work with Carolyn Landers every

4    single day?

5        A.    No.

6        Q.    So then a customer may have

7    brought a coupon in, and she may have

8    turned it in, and you may not have known

9    about it, correct, since you weren't

10   working with her?

11       A.    No, that didn't happen.

12       Q.    That didn't happen?

13       A.    No, it didn't happen.

14       Q.    So you weren't there, but you

15   know that --

16       A.    I know that it did not happen.

17       Q.    Even though you weren't there?

18       A.    Right.

19       Q.    Do you know what customer

20   service told Terry Gandy or -- I'm sorry.

21       Do you know what the service

22   department told Terry Gandy if he called

23   to check and see if the customer that she

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 199

1    gave that coupon to actually had a service

2    call?

3        A.    No.

4        Q.    So you don't know if they told

5    him that that customer did have a service

6    call, do you, and was issued a coupon, do

7    you?

8        A.    No.  But the only thing I was

9    told, that Terry said there was only one

10   service at that time during that month,

11   and they did not provide that receipt

12   because I know that it was one of my

13   customers that came in that did have a

14   service, but it's not there, that month.

15        And so if my customer is the one

16   that did it, all the others was used in

17   the register.

18        Q.    I'm not following you.

19        A.    From what I understand what

20   Terry said, is that there was only one

21   customer that had service that month that

22   received a coupon.  I know I had a

23   customer that came in that had a service

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 200

1    call.

2         Q.    Okay.  Was he referring to

3    your transactions?

4         A.    If it's one month, he said one

5    month out of all the ones that was used,

6    that was everybody included.

7         Q.    Do you know if he had

8    completed his investigation at that point?

9         A.    Yes.  This is the time he was

10   doing his interrogations then.

11        Q.    Do you know if he had reviewed

12   -- do you know if he had reviewed Landers'

13   transactions and the other transactions at

14   this point?

15        A.    He said he had out of all the

16   whole month.  Because he told me how many

17   I supposed to have used, he told

18   Ms. Willis how many she supposed to have

19   used, there were some left over, so

20   apparently he had to have investigated

21   everybody.  But I had that one.

22        Q.    My question:  Did he tell you

23   he had investigated everybody?