**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 201

1      A.      I can't say that word for word

2   what he said about, you know, had he

3   completed his investigation.

4      Q.      Do you know when he

5   investigated each of you?

6      A.      No.

7      But he said for the month of

8   October.

9      Q.      But you don't know what

10  service told Gandy about each of y'all's

11  transactions, do you, as to whether or not

12  the customers had --

13     A.      Said for the month of October

14  only one --

15     Q.      That's not my question,

16  Ms. Smith.  You're not listening to my

17  question.

18     Okay.  I'm asking you, do you know

19  what the service department told Gandy

20  when he called about each of your

21  transactions where all of you used the

22  sixty-five-dollar coupon, do you know what

23  customer service told Gandy about each of

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 202

1    those transactions.

2         A.    He said that there was only

3    one coupon that was issued for the month

4    of October.

5         Q.    And when did he tell you that?

6         A.    He told Beatrice Willis that.

7    And then I stated it during my

8    interrogation, and he did say yes.

9         Q.    Okay.  So this was after

10   Willis's interrogation or investigation he

11   said that?

12        A.    Right.  Then I stated that.

13        Q.    So at that point you don't

14   know if he had investigated your

15   transactions or anybody else's, do you?

16        A.    But he did agree to that when

17   I said that.

18        Q.    He agreed to what?

19        A.    That there was only one that

20   was issued that month.

21        Q.    Only one out of the ones that

22   he investigated, correct?

23        A.    He said for the whole month.

Page 203

1    He didn't say for everybody he

2    investigated.  He said for the whole month

3    there was only one issued.

4         Q.    So you don't know if he

5    actually had investigated everybody else

6    at that point, do you?

7         A.    Well, I would assume that he

8    did because he said out of the whole

9    month --

10        Q.    That's your assumption.  But

11   you don't know if he did it, correct?

12        A.    Not to say yes, I was there

13   when he did it, no, I can't say that.

14        Q.    Do you know if -- Clint Teal,

15   do you know when he worked in appliances?

16        A.    No.

17        Q.    Do you know if he was working

18   in appliances at the time this

19   investigation was going on?

20        A.    Yes.  He worked -- He wasn't a

21   sales person I don't believe.  He was

22   working with the remodel team.

23        Q.    So he wasn't in sales at that

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 204

1    point?

2         A.    Right.

3         Q.    Anybody else that you claim

4    that was not terminated for misusing the

5    service coupon besides Darby, Landers, and

6    Teal?

7         A.    No.

8         Q.    Do you know if Gandy pulled

9    Clint Teal's transactions?

10        A.    I don't know.  I know he

11   pulled the one that was supposedly run

12   under my number.

13        Q.    But you don't know if he

14   pulled the associate summaries and the

15   journal tapes for Clint's transactions?

16        A.    I don't.

17        But the transaction with the

18   sixty-five-dollar transaction was used

19   under Clint Teal's sale.

20        Q.    The sixty-five-dollar

21   transaction was, I'm sorry, what?

22        A.    Under his sale.  The sale that

23   he bought something.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 205

1      Q.    The sale that who bought

2   something?

3      A.    Clint Teal.

4      Q.    I see what you're saying.  So

5   that was the transaction that you did

6   involving Clint?

7      A.    I didn't say I did it.

8      Q.    I'm sorry.  The one associated

9   with your associate number?

10     A.    Right, my associate number.

11     Q.    But it wasn't where he was

12  selling is what I'm asking?

13     A.    No.  He was the customer.

14     Q.    So if Clint Teal's employment

15  records show that he was not selling at

16  that point in time or working as a sales

17  person in appliances at the time this was

18  investigated, do you have any reason to

19  disagree with that?

20     A.    No.

21     Q.    Do you know if others have

22  been terminated for misusing the service

23  coupon?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 206

1      A.     No.   Nobody but Beatrice

2  Willis and myself.

3      Q.     Do you know if Jackie Dodson

4  was investigated for the misuse of the

5  service coupon?

6      A.     She was.

7      Q.     And what race is she?

8      A.     She's black.

9      Q.     And she was not terminated?

10     A.     No.

11     Q.     Do you know if Gandy or

12  anybody else from Sears pulled her

13  associate summary and journal tapes?

14     A.     They did.

15     Q.     How do you know that?

16     A.     Because she stated they did.

17     Q.     So based on what she told you?

18     A.     Yes.

19     Q.     Do you know what that

20  investigation showed?

21     A.     Well, basically she was told

22  the same thing we were told.

23     Q.     Do you know what the

Page 207

1    investigation showed?  Do you know what

2    the journal tapes and the transactions

3    showed for her?

4         A.    No, I don't.

5         Q.    Do you know if she used

6    coupons for people who had had service

7    calls, the sixty-five-dollar coupon, only

8    for people who had had service calls?

9         A.    She used the coupon.  I can't

10   say if it was for people with service

11   calls.

12        Q.    Do you know if Sears contacted

13   the service department to ask about

14   Jackie's transactions involving this

15   coupon?

16        A.    I don't know.

17        Q.    And you don't know what

18   service told them about these

19   transactions?

20        A.    No, I don't.

21        Q.    Do you know if management

22   investigated other departments for coupon

23   abuse of the service coupon?

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 208

```
 1          A.     I don't know.

 2          Q.     You said other white

 3  associates were not terminated, that's one

 4  reason that you think you were terminated

 5  because of your race.  What was the other

 6  reason?

 7          A.     What now, I'm sorry?

 8          Q.     My initial question was tell

 9  me everything, every fact you have, to

10  support your belief that you were

11  terminated because of your race.  And one

12  thing that you told me that we just went

13  through, you said other white associates

14  were not terminated.

15          A.     Yes.

16          Q.     And we just went through all

17  of those, correct?

18          A.     Right.

19          Q.     Now, any other reason, any

20  other facts that you have to base your

21  belief that you were terminated because of

22  your race?

23          A.     Not terminated, but treated
```

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 209

1    the way we were treated while we were

2    there.

3         Q.    Now, when you say because you

4    were treated differently or because you

5    were treated -- the way you were

6    treated --

7         A.    Uh-huh (positive response).

8         Q.    -- is an indicator of why you

9    think you were terminated because of your

10   race; is that right?

11        A.    Right.

12        Q.    Tell me what those are.

13        A.    We could be standing up, some

14   black associates and white associates

15   standing up talking, Kenny Reese would

16   walk between everybody and only speak to

17   the white associates; the black associates

18   he wouldn't say anything to.

19        Q.    And when did this happen?

20        A.    All the time.

21        Q.    Can you give me specific

22   instances?

23        A.    Not specific dates.  But it

Page 210

1    was from the time he walked in the door

2    until we left or even after we left,

3    because one guy got terminated because

4    Kenny wouldn't speak to him and spoke to a

5    white girl and he asked him about it.

6        And then during football season, the

7    white male associates would be over

8    watching football, and Kenny would make

9    sure that the ones of us -- the black

10   associates was working.  He would walk

11   past the white associates standing up and

12   walk straight to a black associate to ask

13   them to do something, to do this or that.

14       Q.    And what --

15       A.    And also Beatrice Willis and

16   myself, we would be on the sales floor, he

17   would pull us off the sales floor to go

18   make copies of just anything.  We have to

19   come off the sales floor, go all the way

20   to the back to make copies.

21       Q.    Anything else?

22       A.    When he was doing the remodel

23   team, he had the white associates, they

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 211

1   were being paid their benefit rate to work

2   on the remodel team.  When it came down to

3   the black associates, he wanted to pay us

4   six dollars an hour to work on the remodel

5   team.

6        Q.    Anything else?

7        A.    I guess that's probably the

8   gist.

9        Q.    I'm asking you, is there

10  anything else?

11      This is my chance today to ask you

12  questions.  Is there anything else?

13      A.    As far as I can think of right

14  now.

15      Q.    You said that he would talk to

16  white associates but not to black

17  associates; is that right?

18      A.    Uh-huh (positive response).

19  Speak.

20      And then something else he would do,

21  he would walk up to the black associates

22  like myself, Beatrice, and even Jackie

23  Dodson, and walk up and ask about how is

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 212

1    Carolyn Landers' sales; never question

2    about how is our sales, how are we doing.

3         Q.    I'm going to go through each

4    of those if you don't mind.

5         A.    Okay.

6         Q.    You say he would talk to the

7    white associates and not blacks.  You

8    can't remember a specific time?

9         A.    Not a specific day or time,

10   no.  It happen all the time.

11        Q.    Who were the white associates

12   that he would talk to?

13        A.    Any of them.  Any of the white

14   associates.

15        Q.    Did you give me specific

16   names?

17        A.    You know, Carolyn Landers;

18   Stephanie Darby; Jeffrey Rhodes; Ryan, I

19   can't remember his name; another girl in

20   -- several girls in hardware, I don't even

21   know their names -- not in hardware, I'm

22   sorry, on the soft side.

23        Q.    And when was this?

Page 213

1      A.      All the time.  It was a

2  constant behavior.

3      Q.      You can't give a specific

4  time?

5      A.      No.  I mean, I wouldn't -- We

6  didn't walk around talking notes and

7  jotting times down.  Because if I say,

8  well, it happened this day, I would be

9  lying, because I don't know a date or

10  time.

11      Q.      Do you know what he would talk

12  to them about?

13      A.      Sometimes it was just even

14  speaking, that's all; or how they're

15  doing.

16      Q.      So he just he wouldn't ask the

17  black associates how they were doing?

18      A.      No.

19      Q.      Do you know if he ever asked

20  the black associates how they were doing?

21      A.      None that I know of.

22      Q.      Did you always work with the

23  black associates?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 214

1        A.      No.

2        Q.      Do you know if he spoke to

3    black associates in other departments?

4        A.      The ones that I saw, everybody

5    said the same thing.

6        Q.      Who is everybody?

7        A.      All the black associates in

8    the store.

9        Q.      Tell me who they are that you

10   spoke to that said this to you.

11       A.      I mean, it was just general

12   conversations around the store.

13       Q.      Right.  But I want to know who

14   those people are.

15       A.      I can't name them.

16       Q.      Well, you just told me that

17   black associates told you that he wouldn't

18   speak to them, and I want to know who

19   those black associates are.

20       A.      You can talk -- Shannon

21   Bryant, you can talk with her, and you can

22   talk to Beatrice Willis.

23       Q.      Anybody else?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 215

1        A.      James Benson is on the list.

2    Anthony Smiley, Wilborn Sanders, all those

3    will testify, the same thing.

4        Q.      And they say that Reese didn't

5    speak to them; is that right?

6        A.      Right.

7        Q.      Do you know if there are other

8    black associates in the store that Reese

9    did speak to?

10       A.      No.  No more than telling them

11   -- no -- Telling them what to do or

12   something like that, yes.  But other than

13   just walking up, hey, how are you doing;

14   no, that wasn't his thing, he didn't do

15   that.

16       Q.      Did you work with all the

17   black associates that were there every

18   time that they were there?

19       A.      No.

20       Q.      So you don't know whether

21   Kenny would have spoken --

22       A.      I know what I saw.

23       Q.      -- to all those black

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 216

1    associates or not?

2         A.    I know what I saw and what was

3    discussed.

4         Q.    But times outside of your

5    presence, you don't know if Kenny actually

6    spoke to black associates or not, do you?

7         A.    I've never seen him do it.

8         Q.    But you don't know what he

9    does when you're not there, correct?

10        A.    The only thing I can say is

11    what I haven't seen.  I don't know.

12    He also had a practice of --

13        Q.    Well, hang on to that thought

14    for a second.

15    You say that he let the white males

16    watch football.  What about the black

17    males?

18        A.    There was only one, he treated

19    him just like he treated us.

20        Q.    And who was that?

21        A.    That was Danny.  I can't

22    remember Danny's last name.

23        Q.    Were the -- Were y'all

1    watching football also?

2        A.    No.  You could watch it if you

3    was walking by or you're glancing by,

4    because it was on the big screen.  But you

5    still had to be doing something.  You

6    couldn't stand over there and celebrate

7    like they're celebrating and just stand up

8    watching it.

9        We still had to be dusting and

10   moving.  But, you know, if you were

11   standing up waiting, you could see it

12   because it's a big-screen TV; you can see

13   it from a distance.  But we couldn't stand

14   over there with the TV.  And they were

15   standing over there with the television.

16       Q.    So you walked over there, do

17   you remember -- tell me --

18       A.    Just every Auburn home game.

19   Every Auburn home game, not one, it was

20   all of them.

21       Any of them that was on TV that was

22   a home game.

23       Q.    Did you go stand over there to

Page 218

1    watch the game?

2         A.    No.

3         Q.    So you weren't even standing

4    over there to watch the game.  Could you

5    have if you had wanted to?

6         A.    If -- Any time we was standing

7    still, he told us to do something.

8         Q.    But were you ever watching the

9    game and he told you to go back to work

10   and didn't say anything to the males?

11        A.    Yes.

12        Q.    When was that?

13        A.    During football.  During the

14   game.  I can't say what game.

15        Q.    Ms. Smith, you just told me

16   that you weren't over there watching the

17   games.  And now?

18        A.    You said if he walked up and

19   we were watching a game did he tell us to

20   do something and not tell the others, yes.

21   Because most of the time if we were in the

22   aisle and we were watching the game.  I

23   didn't say we were over there; in the

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 219

1  aisles that you could see the television.

2  He would say, have you dusted, can you

3  make sure this sign is this way, something

4  to do.

5      Q.    Did you hear his conversations

6  with these other males and if they did

7  anything?

8      A.    Yes.  Because he was over

9  there celebrating with them.

10     Q.    You hear their conversations?

11     A.    Go Auburn; hey; you know,

12  stop; don't, whatever the conversation is.

13     Q.    Do you know if they told

14  him -- if Reese told them to do certain

15  tasks around?

16     A.    No.  Because he stood over

17  there with them to watch the football

18  game.

19     Q.    I understand that you say you

20  saw him stand over there.  But did you

21  hear him tell them to do something?

22     A.    No.

23     And when he would walk off, they

Page 220

1    would still be standing there.

2        Q.    Do you know if he told them to

3    do something?

4        A.    If they did -- If he did, they

5    didn't do it.  And I don't think that he

6    would have allowed -- I don't think he

7    would have allowed them --

8        Q.    Do you know if he told them to

9    do something?  Were you standing, did you

10   hear him say that?

11       A.    I couldn't hear.  But Kenny

12   would not have stood there if he told them

13   to do something and they didn't do it.  He

14   would not have walked off that floor and

15   left them standing up there.

16       Q.    Now, you say he would ask you

17   to make copies and Willis to make copies.

18   Do you know if he asked white associates

19   to make copies?

20       A.    I've never seen him ask them.

21       Q.    Do you know if he did?

22       A.    Not while I was on the floor,

23   no.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 221

1      Q.    Now, you say the remodel team

2   was paid a benefit rate.

3      A.    Right.

4      Q.    And you were not?

5      A.    I didn't do it.  I wouldn't do

6   it.

7      Q.    Okay.  So would you have been

8   paid the benefit rate?

9      A.    No.  That's the reason we

10  didn't do it, because we were going to be

11  paid six dollars an hour.

12     Q.    Do you know -- How do you know

13  that these people were paid the benefit

14  rate?

15     A.    Because they told it.  We saw

16  a check stub of Jeffrey Rhodes that was

17  left in the register with him being paid

18  his benefit rate.

19     Q.    Do you know if that was a

20  mistake?

21     A.    No.

22     Q.    You don't know?

23     A.    It wasn't a mistake.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 222

1      Q.      How do you know?

2      A.      Because they were bragging on

3  the money that they were making.  And

4  then --

5      Q.      Ms. Smith, you're not

6  answering my question.

7      A.      They said that they were not

8  going to pay benefit rates, they were

9  going to pay six dollars an hour for

10 everybody else.

11     Q.      Okay.  Now, so they came back

12 later and said they were only paying six

13 dollars an hour, correct?

14     A.      Yes.  And it was only the

15 blacks that wasn't working.  And from the

16 beginning of it --

17     Q.      You don't know --

18     A.      From the beginning we were

19 never even asked to work on the remodel

20 while they were being paid the benefit

21 rate.

22     Q.      But they went back and didn't

23 pay them benefit rate; is that right?

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 223

1     A.    At the end they didn't because

2  they was running out of money.  And that

3  came out of John Lawrie's mouth, so I do

4  know that.

5     Q.    That's what you heard from

6  Lawrie?

7     A.    Lawrie.  Straight out of his

8  mouth.

9     Q.    Did you ask to do remodeling?

10    A.    No.

11    Q.    Who told you they would pay

12  you the regular rate rather than the

13  benefit rate?

14    A.    That was discussed both by

15  John Lawrie and Kenny Reese.

16    Q.    Do you know if this was after

17  they had already decided to take everybody

18  back to the regular rate that they told

19  you that?

20    A.    No.  They were still getting

21  paid their benefit rate.

22    Q.    Do you know if they had

23  already decided to pay everybody the

Page 224

1    regular rate?

2         A.    I don't know when they

3    decided.  But these guys that were still

4    working were still getting their benefit

5    rate.

6         Q.    How do you know?

7         A.    Because they were saying it.

8    We asked them.

9         Q.    And who are these people that

10   are being paid the benefit rate?

11        A.    Jeffrey Rhodes and Ryan

12   Hitchcock (sic), I think is his last name.

13        Q.    Hathcock?

14        A.    Hathcock, whatever.

15        Q.    And when was this, do you

16   know?

17        A.    It was right before the

18   remodel, right before October.  I don't

19   know the specific dates.

20        Q.    2004?

21        A.    Yes.

22        Q.    Now, you say that they would

23   walk up -- Kenny Reese would walk up and

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 225

1    ask how Landers was doing with sales.

2         A.    Uh-huh (positive response).

3         Q.    And not ask about your sales.

4         A.    Right.

5         Q.    Do you know if he asked other

6    people about your sales?

7         A.    No.

8         Q.    Was Carolyn Landers fairly

9    new?

10        A.    No.

11        Q.    At that point?

12        A.    No.

13        That was --

14        Q.    Do you know if he had hired

15   her?

16        A.    I don't know.

17        Q.    Do you know if he asked about

18   Dodson's sales?

19        A.    No, he didn't.

20        Q.    He didn't ask you or you don't

21   know if he asked anybody?

22        A.    As far as -- It wasn't anybody

23   else to ask.  Me, Beatrice, Dodson.

Page 226

1        Q.    What about Darby?

2        A.    She -- No, he wouldn't ask

3    her.

4        Q.    Do you know if he did?

5        A.    No, I don't.  But --

6        Q.    Any other reason that you

7    think you were terminated because of your

8    race besides what we've talked about?

9        A.    No, not that I can remember.

10    Something else, that Ryan was

11    getting paid on the remodel team.

12        Q.    Who?

13        A.    Ryan.  And John Lawrie walked

14    up to me and asked me -- he supposed to

15    have been putting up some range cords, and

16    wanted me to finish putting up the range

17    cords that had to do with remodel and take

18    the boxes to the back.  And I told him,

19    I'm not getting paid remodel, I'm on the

20    sales floor.  And Ryan was over there

21    standing up doing nothing, he's the one

22    that's getting paid for remodel.

23        Q.    And what boxes were these?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 227

1          A.      Those was the boxes that the

2     range cords and things came in, to set up

3     the wall for the range cords behind the

4     register.

5          Q.      Now, you stated earlier when

6     we were talking about your job duties,

7     it's part of your duties to keep the area

8     clean --

9          A.      No.    That was the remodel.

10     That didn't have anything to do with --

11     that was setting up that plan-a-gram and

12     remodel, that's what they were getting

13     paid for.

14          Q.      So the ranges didn't have

15     anything to do with --

16          A.      Range cords didn't have

17     anything to do with -- We kept it straight

18     once they set it up.

19          Q.      And part of your job duties

20     isn't miscellaneous tasks to do whatever

21     management asks you to do related to

22     keeping the area neat and clean --

23          A.      On the floor.  But not during

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 228

1    the remodel, we didn't do the remodel.

2         Q.    So during a remodel, you just

3    quit keeping the area clean and that

4    was --

5         A.    No.   We kept it dusted.   We

6    was dusting, because it was a lot of dust

7    there, a whole lot of dust.   And we spent

8    most of our time when we wasn't with

9    customers wiping everything down over and

10   over again.

11              MS. HEMSTREET:   Off the Record.

12              (Off the Record.)

13        Q.    Ms. Smith, you told me that

14   one of the reasons that you think that you

15   were terminated because of your race was

16   because of certain things -- certain ways

17   that management acted towards you and

18   other black employees; is that right?

19        A.    Yes.

20        Q.    Now, we talked about how one

21   of those was that he would not speak to

22   you or, from what you observed, other

23   African-Americans; is that right?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 229

1          A.     Yes.

2          Q.     And you named a couple of

3    individuals that you claim he didn't speak

4    to as well, right?

5          A.     Yes.

6          Q.     Now, did you speak to all of

7    Sears's black associates to see if he

8    spoke to them?

9          A.     No.

10         Q.     Have you talked to all of

11   Sears's white associates to see if he

12   spoke to them?

13         A.     No.

14         Q.     Now, you also said that white

15   males would watch football and Reese

16   wouldn't say anything to them about that;

17   is that right?

18         A.     Yes.

19         Q.     And did you ever go stand over

20   there and watch football?

21         A.     Yes.

22         Q.     You did?

23         A.     Yes.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 230

1       Q.     Do you remember when?

2       A.     No.

3       Q.     Do you remember who else was

4    there with you?

5       A.     No.

6       Q.     Now, at that point in time,

7    did Reese say anything to you about

8    standing there watching football?

9       A.     Let me --

10      Q.     I ask that you not consult

11   with him after I've asked you a question.

12   So just answer it to the best of your

13   ability.

14      A.     What was that question again?

15      Q.     My question was that you said

16   you would stand over there occasionally

17   and watch football, correct?

18      A.     I have stood over there.

19      Q.     Okay.  Now did Reese come by

20   and say anything to you while you were

21   standing there or any of these instances

22   when you were standing watching football?

23      A.     He would tell us to do

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 231

1    something, yes.

2         Q.    He would tell who to do

3    something?

4         A.    The black associates.

5         Q.    And who are those?

6         A.    Myself, Beatrice Willis,

7    Jackie Dodson, at that time Lisa Farren

8    and Danny.

9         Q.    Danny who?

10        A.    I don't remember Danny's last

11   name.

12        Q.    And what would he tell you to

13   do?

14        A.    Various duties.

15        Q.    Such as?

16        A.    Dusting.

17        Q.    And what department was Lisa

18   in?

19        A.    Electronics.

20        Q.    And what about Danny?

21        A.    Electronics.

22        Q.    And what about Jackie?

23        A.    Appliances.

Page 232

1      Q.    And Beatrice was in

2   appliances, right?

3      A.    Right.

4      Q.    And who were the white

5   associates standing there, do you know?

6      A.    Jeffrey Rhodes; Ryan; asset

7   protection, Jason was over there; Ben

8   Burdette has been over there; Terry Gandy

9   himself was there.

10      Q.    Now -- Anybody else that you

11   can think of?

12      A.    Different associates from -- I

13   don't know their names, from hardware.

14      Q.    And were all these individuals

15   white?

16      A.    Yes.

17      Q.    Now, Rhodes, he was in

18   remodel, correct?

19      A.    He was electronics.

20      Q.    He wasn't a remodel?

21      A.    At one point.

22      Q.    At that point he was in

23   electronics?

Page 233

1      A.    Yes.  I would think.  I can't

2  say for sure.

3      Q.    You don't know what department

4  he was in at that point?

5      A.    At some of the times he was in

6  appliances -- I mean electronics,

7  sometimes he was on remodel, so it was

8  both.

9      Q.    Do you know about when this

10  occurred?

11      A.    Football season.

12      Q.    September, October?

13      A.    Don't know.

14      Q.    What about Ryan Hathcock, what

15  department was he in?

16      A.    Electronics and the remodel.

17      Q.    Now, are the TVs located in

18  electronics?

19      A.    Yes.

20      Q.    Now, Jason, he is in loss

21  prevention, correct?

22      A.    That's correct.

23      Q.    And Ben is in loss prevention;

Page 234

1    is that correct?

2         A.    That's correct.

3         Q.    And Terry Gandy is in loss

4    prevention; is that correct?

5         A.    That's correct.

6         Q.    Are the TVs located in the

7    electronics area?

8         A.    It is.

9         Q.    So were y'all standing over

10   there away from the appliances watching --

11        A.    Mostly in the aisles.

12        Q.    Mostly in the aisles?

13        A.    Yes.

14        Q.    Did he ever tell you to do

15   anything else besides dusting or was it

16   always dusting?

17        A.    Always dusting or signs or

18   bringing something from the back to put on

19   the floor.

20        Q.    Now, you said earlier you

21   didn't hear conversations that he may have

22   had with some of these other white

23   persons; is that correct?

Page 235

1        A.      That's correct.

2        Q.      Now, as far as you brought --

3    Tell me if this is different or if this is

4    the same, you said he would ask -- and

5    again we're talking about Mr. Reese,

6    right?

7        A.      Uh-huh (positive response).

8        Q.      He would ask you and Willis to

9    make copies?

10       A.      Right.

11       Q.      Is that right?

12       A.      That's correct.

13       Q.      What was he asking you to make

14   copies of?

15       A.      Various things.

16       Q.      Can you be more specific?

17       A.      I didn't really pay attention

18   to look at it.

19       Q.      Do you know if he asked

20   Landers or any of the other white

21   associates to do things like that?

22       A.      No.

23       Q.      You don't know?

Page 236

1      A.    No.

2      Q.    Now, the -- You say the

3  remodel team was paid at benefit rate at

4  first; is that right?

5      A.    That's correct.

6      Q.    And that later changed to be

7  the regular rate, correct?

8      A.    Correct.

9      Q.    Did you ever ask to do remodel

10  work when they were paying them the

11  benefit rate?

12      A.    No.

13      Q.    Did you ever ask to do remodel

14  work period?

15      A.    No.

16      Q.    Now, would you say that you

17  were making more -- would you have made

18  more money doing remodel work than you

19  would have selling on the floor?

20      A.    I don't know.

21      Q.    You don't know?

22      A.    Huh-uh (negative response).

23      Q.    Now, you said that Kenny Reese

Page 237

1    would -- First of all, who told you that

2    they were getting paid the benefit rate?

3          A.     Ryan and Jeffrey.

4          Q.     And do you know who made that

5    decision to pay them the benefit rate?

6          A.     Kenny Reese was -- Kenny

7    Reese.

8          Q.     How do you know that?

9          A.     I don't.

10         Q.     So you don't know who made the

11   decision to pay the benefit rate?

12         A.     I don't.

13         Q.     You don't know who made the

14   decision to change it back?

15         A.     No.

16         Q.     Now, you also said that

17   Landers -- Kenny would ask y'all about --

18   and when I say y'all, you and Ms. Willis,

19   is that what you stated earlier?

20         A.     That's correct.

21         Q.     About Landers's sales; is that

22   right?

23         A.     That's correct.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 238

1      Q.    Do you know if he asked other

2  associates about your sales?

3      A.    I don't know.

4      Q.    Were you and Ms. Willis -- Let

5  me back up for a second.

6      Were you a fairly successful sales

7  person?

8      A.    Yes.

9      Q.    Would Mr. Reese have any

10 reason to wonder if you were making your

11 sales?

12     A.    Yes.

13     Q.    He would?

14     A.    Yes.

15     Q.    What would that reason be if

16 you were performing well?

17     A.    He would have a reason because

18 it was -- it dealt with where the store

19 was standing.  So it was a benefit for him

20 to know where we all were standing --

21 where we are in our sales.

22     Q.    When he asked you about

23 Landers, what exactly did he say, do you

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 239

1   recall?

2       A.    Yes.

3       Q.    What did he say?

4       A.    How was she doing on her sales

5   today.

6       Q.    And how was she doing?

7       A.    I don't know.

8       Q.    Do you know why he asked you

9   that?

10      A.    Yes.

11      Q.    And what's that reason?

12      A.    I'd rather not say.

13      Q.    Did he tell you why he asked

14  you that?

15      A.    No.

16      Q.    So you don't have any personal

17  knowledge as to why he asked you how

18  Carolyn was doing?

19      A.    Yes, I do.

20      Q.    And what's that?

21            THE WITNESS:  Do I have to

22  answer?  Is it important?  It's what we

23  have discussed before.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 240

1          MR. MCINTYRE:  If he didn't

2   state it specifically, then you don't

3   know.

4          A.    No, I don't.

5          Q.    I'm asking if you have

6   personal knowledge.

7          A.    I don't know.

8          Q.    Do you know if he asked about

9   anybody else's sales besides Carolyn's?

10         A.    No.

11         Q.    Now, you also said that you

12  were asked on one occasion to take boxes

13  back to the back; is that right?

14         A.    Yes.

15         Q.    And who asked you to do that?

16         A.    John Lawrie.

17         Q.    When was that?

18         A.    I was working one night.  I

19  don't know what night.

20         Q.    Do you know if he asked other

21  white associates to take boxes and things

22  like that to the back?

23         A.    I was the only one on the

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 241

1    floor in appliances.

2        Q.    Do you know if he had asked

3    other white associates to do things like

4    that in the past?

5        A.    No.

6        Q.    Did he ask any other

7    associates to do that that night?

8        A.    I don't know.

9        Q.    Any other reason that you feel

10   you were discriminated against while you

11   were working at Sears besides what we just

12   listed?

13       A.    No.

14       Q.    And obviously what we've

15   talked about, your termination.  Any other

16   reasons besides those that we've

17   discussed?

18       A.    No.

19       Q.    Any other facts that you have

20   to support your contention that you were

21   discriminated against because of your

22   race?

23       A.    No.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 242

1          Q.      Did Gandy ever tell you that

2   you were being terminated because of your

3   race?

4          A.      No.

5          Q.      Did Reese ever tell you you

6   were being terminated because of your

7   race?

8          A.      No.

9          Q.      What about John Lawrie, did he

10  ever tell you you were being terminated

11  because of your race?

12         A.      No.

13         Q.      Anyone else in management tell

14  you that you were being terminated because

15  of your race?

16         A.      No.

17         Q.      Anyone in management ever say

18  anything derogatory to you about black

19  people?

20         A.      No.

21         Q.      They ever do anything besides

22  the -- obviously what we've gone over with

23  your alleging that they -- the various

Page 243

1    things that we listed, like asking you to

2    take boxes to the back and things like

3    that, did they ever do anything --

4    management ever do anything to make you

5    think that they were discriminating

6    against you because of your race?

7          A.    Yes.

8          Q.    What's that?

9          A.    The schedule.

10          Q.    Do you know who makes out the

11    schedule?

12          A.    John Lawrie and Kenny Reese.

13          Q.    And what was your complaint

14    with the schedule?

15          A.    That we was full-time, and it

16    was only the three black woman that was

17    full-time, we've always had set days of

18    off days as long as I had been there.  And

19    when Carolyn Landers, part-timer, she

20    came, she got a set schedule; we had to

21    work around her schedule.

22          Q.    Now, as full-time, are you

23    required to be available certain times, is

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 244

1    that right, a certain amount of hours per

2    week; is that right?

3        A.    Yes.

4        Q.    And part-timers obviously are

5    required to be available less time,

6    correct?

7        A.    That's correct.

8        Q.    Now, how did they -- You say

9    they -- in scheduling they discriminated

10   against you, how was that?

11       A.    Because we had always had a

12   set day off, that changed.  We were no

13   longer allowed to have a set day off, a

14   set schedule, or anything.  Carolyn had a

15   set -- pretty much set schedule with set

16   days off, part-time.  Part-time and white.

17       That has never been the practice

18   before.

19       Q.    Anybody else besides Carolyn

20   had a set schedule that you think?

21       A.    No.

22       Q.    Who were the other associates

23   in that department at that time?

Page 245

1      A.    Beatrice Willis, Jackie

2  Dodson, and myself.

3      Q.    And y'all were all full-time,

4  correct?

5      A.    The three of us was.  She was

6  part-time.

7      Q.    You fill out sheets saying

8  when you're available, correct?

9      A.    That's correct.

10     Q.    And they will schedule you

11 according to your availability; is that

12 right?

13     A.    At one time they did.

14         MS. HEMSTREET:  What number am

15 I on?

16         COURT REPORTER:  Eleven is

17 next.

18              (Whereupon, Defendant's

19              Exhibit No. 11 was

20              marked for

21              identification.)

22     Q.    Is this your signature?

23     A.    Yes.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

1       Q.      Is that indicating your

2   availability?

3       A.      Yes.

4   But we were made to do that.

5       Q.      And it shows on there that you

6   were available seven days a week, open to

7   close; is that right?

8       A.      And we were told we had to put

9   that.

10      Q.      Who told you that?

11      A.      Kenny Reese.

12      Q.      Do you know if he told other

13  associates that -- full-time associates

14  that?

15      A.      I know he told Beatrice Willis

16  that.

17      Q.      Do you know if he told black

18  and white associates that?

19      A.      No, I don't know.

20      Q.      Now, based on those documents

21  I showed you involving your associate

22  summaries and the journal tapes pertaining

23  -- linked to your associate number, the

Page 247

1    190, I believe it was Defendant's Exhibit

2    6, this one right here (indicating).

3    Based on those documents, do you have any

4    reason to believe, if that's what

5    management reviewed, do you have any

6    reason to believe that based on those

7    documents and their following up with

8    service that they believed that you had

9    not misused the Sears coupons at the time

10   they decided to terminate you?

11        A.    Yes.

12        Q.    What is that?

13        A.    Because they were aware of the

14   common practice.

15        Q.    And when you say common

16   practice, what do you mean by that?

17        A.    Everybody using the coupons

18   the way we used them.

19        Q.    When you say the way you used

20   them, what do you mean by that?  Not

21   throwing them out?

22        A.    Not throwing them out, reusing

23   them, keeping them in the drawer.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 248

1    Q.    Okay.  Now, do you have any

2  reason to think that they thought these

3  customers actually had service calls --

4    A.    I don't know.

5    Q.    -- and therefore were eligible

6  to use the coupons?

7    A.    I don't know.

8    Q.    When you say they were aware

9  of the common practice, who are you

10  referring to?

11    A.    Management.

12    Q.    And who -- Name -- Tell me

13  specifically who you think was --

14    A.    Kenny Reese, John Lawrie,

15  Terry Gandy.

16    And management before that too.

17    Q.    And when you say common

18  practice, you, again, said taking them out

19  of the drawer and not throwing them out?

20    A.    That's correct.

21    Q.    And we talked about why you

22  think Gandy was aware of that.  Why do you

23  think Lawrie was aware of that?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 249

1          A.     I don't know.

2          Q.     Why do you think Reese was

3    aware of that?

4          A.     I don't know.

5          Q.     That's just what you think?

6    I mean, you think they were aware,

7    but you don't have any specific facts to

8    show that they were aware; is that what

9    I'm understanding you to say?

10         A.     Yes.

11         Q.     Do you know if Gandy and/or

12   Kenneth Reese have been involved in the

13   terminations of white associates?

14         A.     I don't know.

15         Q.     Do you know if they've

16   terminated anybody else for integrity-type

17   issues?

18         A.     I don't know.

19         Q.     And you don't know the races

20   of these individuals?

21         A.     I don't know.

22         Q.     Now, before you mentioned that

23   many of the individuals that you listed

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 250

1    were terminated and you say that they were

2    replaced; is that right?

3        A.    That's correct.

4        Q.    By white individuals?

5        A.    That's correct.

6        Q.    And who were those people that

7    were terminated that were replaced by

8    white people?

9        A.    Jimmie Tyson and Geraldine

10   Barnes.

11       Q.    What's her last name?

12       A.    Barnes.

13       Q.    Barnes?

14       A.    Uh-huh (positive response).

15       Q.    And they worked in the shoe

16   department?

17       A.    That's correct.

18       Q.    And their manager was Byron

19   Mason, right?

20       A.    That's correct.

21       Q.    And he's African-American?

22       A.    That's correct.

23       Q.    And do you know why they were