# EXHIBIT D

## **DECLARATION OF KENNY REESE**

1. My name is Kenny Reese. I am a white male and am over the age of nineteen (19) years. I have personal knowledge of the facts set forth below pertaining to the case pending in the United States District Court for the Middle District of Alabama, Eastern Division, styled Denise L. Smith v. Sears, Roebuck and Co., CV-05-1018-MHT. I give this Declaration voluntarily, without coercion and under the penalty of perjury.

2. From February 2004, until April 2005, I worked for Sears as the Store General Manager ("SGM") at its store in Auburn, Alabama. As the SGM, my duties included overseeing the daily operations of the Auburn store.

3. At all times relevant to Smith's lawsuit against Sears, Terry Gandy was the Loss Prevention Manager, John Lawrie was the Hardlines Manager (which included the appliance, electronics, lawn and garden, fitness, vacuums, and hardware departments), and Byron Mason was the Softlines Manager (which included apparel, home fashions, luggage, and the shoe departments). Gandy and Lawrie are white and Mason is African-American.

4. At all times when I was the SGM, Sears had a policy strictly prohibiting employees from giving unauthorized discounts to its customers. This included applying coupons to sales transactions when customers <u>were</u> <u>not</u> <u>eligible</u> to receive the discount as provided by the terms of the coupon. Sears considered this conduct to be <u>completely unethical</u> and grounds for <u>immediate termination</u>. This policy was clearly stated in Sears' Code of Conduct in Sears' Associate Handbook. The Code of Conduct was distributed to all Sears' sales associates and reviewed with them annually.

5. Not only were the sales associates trained on this policy through the Associate Handbook, but myself and the assistant managers, including Byron Mason and John Lawrie, advised them of Sears' policies during our regular associate meetings. I specifically recall discussing when to use coupons and Sears' unauthorized discount policy in some of these meetings.

6. During my employment at Sears, we trained the sales associates to discard a coupon after they received it from a customer and applied it to a sale or to put it in the detail drawer to be turned into the cash office at the end of the day. Associates were specifically told not to reuse coupons presented to them by customers.

7. When I worked at the Auburn store, Sears had a $65.00 service coupon that its service technicians distributed to Sears' customers who had received a service call at their home but had declined to have their appliance repaired because they wanted to purchase a replacement. Sears offered this $65.00 coupon to these customers as an incentive for them to purchase a replacement item at Sears rather than one of its competitors. These coupons were distributed by Sears' service technicians and <u>not</u> Sears' sales associates. Only those customers who had <u>received</u> a <u>service</u> <u>call</u> and had declined a repair <u>were</u> <u>eligible</u> to receive this $65.00 discount. <u>No other</u> customers were permitted to receive this discount. This condition was clearly stated on the coupon.

8. This service coupon also specifically instructed sales associates to collect and destroy the coupon and not to reuse it.

9. I did tell sales associates to call a manager if they were having trouble closing a sale to see if the manager could work something out with that customer to help close the sale. I never told Denise Smith or any other sales associate that they were

allowed to give a customer an <u>unauthorized</u> <u>discount</u> using Sears' service coupon or any other coupon when the customer was not entitled to it. I never heard anyone in management instruct Smith or any other sales associate to give a customer an unauthorized discount using Sears' service coupon, or any other coupon, when the customer was not entitled to it.

10. On or about November 1, 2004, Terry Gandy, who was the store's Loss Prevention Manager, informed me that Sears' delivery company had notified him that Beatrice Willis, another sales associate in the appliance department, was attempting to give a customer <u>unauthorized</u> free delivery. Gandy told me that while he was investigating this allegation, he discovered that Willis had approximately 15 or 16 transactions involving Sears' service coupon. Gandy further stated that he contacted the service department and confirmed that almost <u>none</u> of these customers had received a service call. The results of this investigation led to Willis' termination in early November 2004. The decision to terminate Willis was based solely on the results of the investigation, which showed that she had violated Sears' unauthorized discount policy.

11. Gandy and I subsequently decided that we needed to investigate the remaining appliance associates to determine if any other associates were also misusing the service coupon.

12. I recall that the other appliance associates who were working in the appliance department at this time included Denise Smith (African-American), Jackie Dodson (African-American), Carolyn Landers (white), and Merle Miller (white).

13. Gandy pulled a summary of each of these sales associates' transactions and the journal tapes associated with these sales. The journal tapes showed the details of

each associate's sales transactions, including the customer's name, the associate number of the sales person who completed the sale, and the bar code number pertaining to any coupons that the associate used. Examining the bar code numbers on the journal tapes was the <u>only</u> way to determine exactly what coupons the sales associates used. Because of the memory limitations of Sears' register system, Gandy was only able to obtain the journal tapes for the past 30 days.

14. These journal tapes revealed that Smith had used the service coupon 9 times within the month of October. This was extremely high for one associate. A store the size of the Auburn store usually had only a total of 4 to 8 service coupon markdowns per month for the <u>entire</u> store.

15. Gandy told me that he had contacted the service department and had confirmed that 7 out of 9 of Smith's customers <u>had</u> <u>not</u> received a service call. Based on this, we contacted Sears' corporate Human Resources consultants at Sears' corporate office. The HR consultant advised us to interview and obtain a statement from Smith regarding her misuse of the coupons.

16. On or about November 8, 2004, Gandy and Nina Fitzwater (white), who was the HR Lead at the time, questioned Smith about these unauthorized discounts. I understood that during this meeting, Smith admitted that she was reusing the service coupon and giving it to customers who <u>were</u> <u>not</u> <u>eligible</u> to receive it. This was a blatant violation of company policy. I understood that during this meeting, Smith stated that she did not know that she was not supposed to reuse the service coupons and that she assumed she was allowed to do so because there were service coupons in the register. This was despite the fact that she was aware of Sears' unauthorized discount policy <u>and</u>

1465308

4

had been told to call a manager if she needed assistance closing a sale. Additionally, the coupon itself had printed on it who was entitled to this discount and that associates were to "collect and destroy" the coupon after receiving it from the customer.

17. Based on the investigation and Smith's interview, Gandy and I concluded that Smith should be terminated. The corporate HR consultant approved our recommendation. I did not consider Smith's race in making my recommendation. My decision was based <u>exclusively</u> on the investigation and her failure to reasonably explain her misconduct. Neither the HR consultant nor Gandy ever said or did anything to lead me to believe that they considered Smith's race in making the decision to terminate her.

18. I understood that Gandy contacted Smith on or about November 14, 2004, and informed her that she was being terminated for misusing the service coupon.

19. This same investigation revealed that associate <u>Dodson</u> had completed <u>four</u> sales transactions using the $65.00 service coupon, that associate <u>Landers</u> had completed <u>one</u> transaction using the $65.00 service coupon, and that <u>Miller</u> had completed <u>none</u>.

20. Gandy informed me that Sears' service department verified that <u>Landers'</u> one customer was entitled to the discount and that <u>three</u> <u>out</u> <u>of</u> <u>four</u> of <u>Dodson's</u> customers were entitled to the discount.

21. I understood that Gandy and Fitzwater subsequently asked Dodson about this fourth transaction. I further understood from my review of Dodson's statement from this meeting that Dodson explained that this particular customer had obtained a service coupon from her daughter, who had received the service call, and that this customer had purchased the appliance as a gift for her daughter.

22.     I believed Dodson's explanation and therefore concluded that Dodson did not misuse the service coupon and that she should not be terminated. Dodson is an African-American.

23.     Additionally, Gandy pulled all of the sales associates' transactions in the electronics department. I recall that <u>both</u> black and white associates were working in this department at the time. Gandy informed me that based on his review of these transactions that <u>none</u> of the electronics associates had used the service coupon.

24.     Prior to November 2004, I was not aware that any sales associates in the appliance department were using the service coupon to give customers unauthorized discounts.

25.     I have no reason to believe that prior to the November 2004 investigation, that Gandy, Mason, Lawrie or any member of management was aware that anyone in the appliance department was misusing Sears' service coupon to give customers unauthorized discounts.

26.     Prior to November 2004, I was not aware that there were any service coupons being kept in or by the registers in the appliance department that were not being "collected and destroyed" or turned into the cash office at the end of the day.

27.     When I was the SGM at the Auburn store, Sears also had a policy prohibiting its employees from obtaining and using information about its customers, associates and suppliers for <u>any</u> <u>non-business</u> related reason. Any <u>violation</u> of this policy was likewise grounds for immediate termination. This policy was clearly stated in Sears' Associate Handbook, which was distributed to Sears' associates.

28. I understand that during the litigation of this lawsuit Smith produced documents establishing that prior to her termination, she had accessed Sears' company records and took information stored in Sears' computers pertaining to the sales transactions of other associates, information relating to managers' purchases from Sears, and other documents belonging to Sears for purely non-business reasons. I understand that some of these documents contain confidential and proprietary information including credit card information. Had I been aware of this misconduct at the time it occurred, I would have immediately terminated Smith's employment.

29. I did not treat African-American employees less favorably than I treated white employees.

30. When I first started working at the Auburn store, Denise Smith was working part-time selling vacuums and microwaves. In late March or early April 2004, a full-time sales position in the appliance department became available. The appliance department was considered to be the top sales associate position because these associates had the opportunity to make more money as compared to other departments. Sales associates in the appliance department were paid on a straight commission basis. Smith told me that she wanted to be considered for this position and that she wanted to work full-time. I subsequently promoted Smith to this full-time sales position.

31. I also promoted several other African-Americans when I worked at the Auburn store. I specifically recall that in addition to Smith, I promoted Stacy Dumas from Softlines Lead to Automotive Store Manager and Tammy Calhoun from Merchandising Associate to Merchandising Lead.

32. When I worked at the Auburn store, I had lunch with Byron Mason (Softlines Manager) almost every day. Mason was one of the employees that I got along with the best. Mason is African-American.

33. I did not always speak to <u>all</u> employees when I saw them. This included both white associates and African-American associates.

34. When I was the SGM, I instructed <u>both</u> black and white employees to return to work rather than watch television in the electronics department. I never singled out anyone in this respect based their race. Additionally, I told my assistant managers (both black and white) to notify <u>all</u> the sales associates under their supervision to return to work.

35. I also recall that during my employment as SGM, I asked <u>both</u> African-American and white associates to make copies of documents for me. I did not single anyone out in this respect on the basis of their race.

36. When I was the SGM, I frequently asked about how <u>all</u> the sales associates in the store were doing on their sales. I did not only ask about the white associates. In fact, I held monthly meetings with each sales associate who worked on commissions to go over their sales.

37. I never observed Lawrie or Gandy treat African-American employees less favorably that white employees in any respect.

38. When I was the SGM, the Hardlines and Softlines Managers were responsible for making the schedules for the sales associates in their departments. They were required to use Sears' scheduling software. I never observed that Lawrie or Mason

1465308

8

ever treated the African-American associates less favorably than the white associates with respect to scheduling.

39. When the store was being remodeled, I recall that both black and white associates worked on the remodel team. Any associates who wanted to work on the remodel team were allowed to do so. I recall that Smith did not want to work on the remodel team.

40. As an appliance associate, Smith's responsibilities included assisting customers, selling in-home appliances such as, refrigerators, dishwashers, dryers, etc., ringing up sales, being familiar with Sears' promotions and discounts of merchandise, keeping the sales area clean, unpacking appliances and the accessories that went with these appliances for display on the sales floor, and other miscellaneous duties as assigned by management.

41. At first, Sears was paying the <u>all</u> the associates on the remodel team their benefit rate. The benefit rate was the amount of sales divided by number of hours worked. However, Sears changed this rate to the training rate (which is a lesser rate) for <u>all</u> the associates on the remodel team because of the duration of the remodel and because associates were only supposed to be paid the benefit rate for vacation time or other paid time off. This reduction had nothing to do with anyone's race. The change in rate was applied to both white associates and African-American associates on the remodel team.

42. I did not make the decision to terminate either Gerdine Barnes (African American) or Jimmie Tyson (African-American). To my knowledge Byron Mason (African American) made these termination decisions.

43. When I was employed with Sears, it took policy violations concerning integrity issues very seriously. I have never retained a Sears employee whom I have known to have violated Sears' unauthorized discount policy.

44. I am not aware of any Sears manager who has retained an employee who has given a customer an unauthorized discount.

45. While I was the SGM, Terry Gandy and myself were involved in the terminations of several white sales associates for unauthorized discounts and other integrity issues. I recall that we participated in the decision to terminate Michael Cunningham, who is white, for offering delivery for less that the actual cost, and Chris Pritchett and Brent Haney, both of whom are white, for re-ringing customers' tickets to make their sales appear better than they actually were.

46. I have never made any derogatory remarks about African-Americans or ever heard anyone in management ever make any such remarks while I was the SGM.

47. I never told Smith that she was being terminated because of her race or heard anyone in management ever make any such remarks.

48. I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

6-15-06
DATE

_____
KENNY REESE